UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


UNITED STATES OF AMERICA       )
                               )
VS                             )   No. 3:22-cr-327
                               )
CHESTER GALLAGHER [1]          )
HEATHER IDONI [2]              )
CALVIN ZASTROW [3]             )
COLEMAN BOYD [4]               )
PAUL VAUGHN [6]                )
DENNIS GREEN [7]               )
_____




BEFORE THE HONORABLE ALETA A. TRAUGER, DISTRICT JUDGE

TRANSCRIPT OF PROCEEDINGS

January 25, 2024

(Volume 3)

_____








_____

**Roxann Harkins, RPR, CRR**
Official Court Reporter
719 Church Street, Ste 2300
Nashville, TN 37203
615.403.8314
roxann_harkins@tnmd.uscourts.gov

**APPEARANCES:**

For the Government:    AMANDA J. KLOPF
US Attorney's Office
719 Church Street, Suite 3300
Nashville, TN 37203

KYLE RANDOLPH BOYNTON
WILFRED T. BEAYE , JR.
U.S. Department of Justice
150 M St. NE
Washington, DC 20530

For the Defendant Gallagher:

JODIE A. BELL
Law Office of Jodie Bell
214 Second Avenue North
Suite 208
Nashville, TN 37201

For the Defendant Idoni:

WILLIAM J. CONWAY
214 Second Avenue North
Suite 208
Nashville, TN 37201

For the Defendant Zastrow:

ROBERT LYNN PARRIS
200 Jefferson Avenue
Suite 1500
Memphis, TN 38103

DAVID I. KOMISAR
800 Broadway
Third Floor
Nashville, TN 37203

```
 1    For the Defendant Boyd:

 2                          G. KERRY HAYMAKER
                            Haymaker & Heroux
 3                          300 James Robertson Parkway
                            Suite 306
 4                          Nashville, TN 37201

 5                          STEVEN C. THORNTON
                            PO Box 16465
 6                          Jackson, MS 39236

 7

 8    For the Defendant Vaughn:

 9                          STEPHEN CRAMPTON
                            Thomas More Society
10                          PO Box 4506
                            Tupelo, MS 38803
11

12    For the Defendant Green:

13                          MANUEL B. RUSS
                            340 21st Avenue North
14                          Nashville, TN 37203

15

16

17

18

19

20

21

22

23

24

25
```

1                            **I N D E X**

2

3    <u>Government Witnesses Cont'd</u>

4    **SARAH FLOWERS**

5    Direct Examination By Mr. Boynton ..................16
     Cross-Examination By Ms. Bell .......................43
6    Cross-Examination By Mr. Parris .....................70
     Cross-Examination By Mr. Haymaker ..................72
7    Cross-Examination By Mr. Russ .......................78
     Redirect Examination By Mr. Boynton ................79
8    Recross-Examination By Ms. Bell .....................89
     Recross-Examination By Mr. Haymaker ................90

9

10   **CAROLINE DAVIS**
     Cross-Examination By Ms. Bell .....................243
11   Cross-Examination By Mr. Parris ...................296
     Cross-Examination By Mr. Thornton .................300

12

13                       **E X H I B I T S**

14   Government No. 1F....Photo Coleman Boyd ..........183
     Government No. 1A....Coleman Boyd's Recording  ...188
15        Clip 1
     Government No. 1C – 1E....Clips of Coleman Boyd's 188
16        recordings
     Government No. 2A – 2P....Clips of Dennis Green ..188
17        recordings
     Government No. 2Q....Still shot from Dennis ......190
18        Green's recording
     Government No. 2R....Still shot from Dennis ......190
19        Green's recording
     Government No. 3A – 3D....Clips of Chet ..........189
20        Gallagher's recordings
     Government No. 3G – 3M....Clips of Chet ..........189
21        Gallagher's recordings
     Government No. 3P....Clip of Chet Gallagher's ....191
22        recordings
     Government No. 3Q....Clip of Chet Gallagher's ....191
23        recordings
     Government No. 3R....Clips of Chet Gallagher's ...192
24        recordings

25

1    Government No. 3N – 3O....Clip of Chet Gallagher's229
                recordings
2    Government No. 4....Clinic employee full recording 33
     Government No. 4A....Still photo from recording ...33
3    Government No. 4B....still photo from recording ...33
                from exhibit 4
4    Government No. 5A and 5B....WZTV recording Clips 1241
                & 2
5    Government No. 17....Clip from Google Drive Video 238
     Government No. 19....Stipulation agreement by the .94
6                parties to the accuracy of certain
                exhibits as to Coleman Boyd's Facebook
7                account
     Government No. 20....Stipulation agreement by the .95
8                parties to the accuracy of certain
                exhibits as to Paul Vaughn's interview
9    Government No. 22....Stipulation agreement by the .96
                parties to the accuracy of certain
10               exhibits as to Chet Gallagher's email
                addresses
11   Government No. 24....Stipulation as to where ......97
                Coleman Boyd was standing conducting
12               livestream on Facebook

13
     Gallagher Defense No. 1....Picture of clinic ......55
14               hallway
     Gallagher Defense No. 1A....Photo hallways ........56
15   Gallagher Defense No. 2....Photo (blurry) of ......66
                hallway
16   Gallagher Defense No. 2A....Photo of hallway ......68
     Gallagher Defense No. 2B....Photo of hallway ......69
17

18   Boyd Defense No. 1....Photo of Boyd holding 2 cell 75
                phone
19

20

21

22

23

24

25

1

2            The above-styled cause came to be heard on

3  January 25, 2024, before the Hon. Aleta A. Trauger,

4  District Judge, when the following proceedings were had

5  at 9:06 a.m., to-wit:

6

7            THE COURT:  Good morning.  I understand

8  there are some preliminary matters.  Government want

9  to -- Mr. Conway?

10           MR. CONWAY:  Yes, Your Honor.  And I've

11  spoken with Ms. Klopf about this.  In reviewing some of

12  the testimony that Ms. Caroline Davis, the second

13  witness, did in the DC circuit, there is one problem that

14  we had I'd wanted to point out to the Court, and she's

15  already spoken to Ms. Davis about this.  There was a

16  question from the prosecutor, how would chains or locks

17  prolong the rescue.

18           THE COURT:  How would what?

19           MR. CONWAY:  How would chains or locks

20  prolong the rescue.  Valid question.  Her answer:  When

21  you have a bike lock or chains, generally the police

22  department has to call the fire department or something

23  like that to try and figure out how to get rid of the

24  chains or bike locks.  I've seen it happen with my own

25  eyes.

1          Here's the problem.  Her next paragraph:

2     Actually, a rescue Heather Idoni participated in in

3     Saginaw, Michigan, she used a bike lock around her neck,

4     connecting it to a gas pump.  And so it was this whole

5     thing and they had to figure it out, like how to

6     disconnect it safely.

7          So she kind of adds in this whole Saginaw,

8     Michigan, bike lock, even though that was not part of the

9     question.  And Your Honor has already ruled on all these

10    404(b) issues.

11         THE COURT:  I'm sure the government's not

12    going to bring this out, are they?

13         MS. KLOPF:  Absolutely not, Your Honor.  I

14    believe 404(b) was allowed in that case, so that may have

15    been how that came up.  But I do want to note for the

16    record that we have prepared Ms. Davis multiple times and

17    instructed her to comply with the Court's orders,

18    including the 404(b) and the order on cult and culty and

19    the use of those terms.  As early as this morning I

20    reminded her of these rulings.

21         THE COURT:  Okay.

22         MR. CONWAY:  We just wanted to put that on

23    the record.

24         THE COURT:  What else?

25         MR. BOYNTON:  Just four matters from the

government, we apologize for the number. I've already
spoken with one of the attorneys about this, but we would
just ask for a little assistance on Rule 613(a) from
defense counsel. If they're going to use the 302 in
examining a witness, it would just be helpful for the
government -- because the witnesses have been interviewed
a number of times, some of those interview reports are
lengthy. If they could just flag for us exactly the 302
that they're referencing and the page number, that would
help the government follow along with what's happening.
We'd just appreciate that.

            THE COURT: All right.

            MR. BOYNTON: Second, Your Honor, there are
three witnesses testifying today, all of whom have
independent counsel representing them. At the moment
counsel is all the way on the back wall --

            THE COURT: They can come and sit on the
front bench.

            MR. BOYNTON: Thank you, Your Honor.

            The third issue, Your Honor, is that --

            THE COURT: And I mean in front of the bar.
They're lawyers, they can sit on the bench in front of
the bar. They can sit there the entire time. You don't
have to just come up when your witness is testifying.

            MR. BOYNTON: Thank you.

1          The third issue we wanted to raise -- and

2   we're not making a motion on it right now.  We are just

3   creating a record.  The 404(b) ruling that Your Honor

4   issued, the government is going to abide by that, but

5   Your Honor did leave open the possibility of the door

6   opening on that.  And we wanted to begin to create a

7   record so that there's no question, if this case goes up

8   on appeal, how it came to be if that door was, in fact,

9   opened.

10          And Ms. Bell in her opening statement

11   yesterday made references to Mr. Gallagher engaging in

12   other rescues and talked about interposition as the idea

13   of getting between an expecting woman and a clinic and

14   engaging that person.  We expect that the testimony will

15   actually be that interposition is the idea of getting

16   between the unborn and the person who is going to or

17   potentially going to perform an abortion.

18          Those references to other rescues in that

19   opening statement, those rescues, the statement that

20   mischaracterizes, we think, what an interposition is,

21   begin to open that door.  We're not saying it's open.  We

22   just wanted to create the record that if there's

23   testimony from defendants or other defense witnesses that

24   start going into what other rescues were and that it was

25   just about counseling, I think that -- you know, we may

1   at that point move to have the door opened on the 404(b)

2   that shows, in fact, that that's not what those rescues

3   were about.

4                   THE COURT:  All right.  Forewarned is

5   forearmed.

6                   MR. BOYNTON:  Thank you, Your Honor.

7                   And then finally, Your Honor, we filed that

8   motion in limine with respect to Ms. Flowers's testimony.

9   Ms. Bell and I spoke after Your Honor took up the motion

10  in limine, but given that there are -- we now anticipate

11  that more defense attorneys may cross-examine

12  Ms. Flowers, given that I think -- I think she was

13  cross-examined by everyone -- or Mr. Schneider, Sergeant

14  Schneider was cross-examined by everyone except for one

15  yesterday, we would ask for a ruling on that motion in

16  limine.

17                  If Your Honor recalls, it was under seal so

18  I don't want to put too much on the record here, but it

19  was the motion dealing with some medical issues and also

20  dealing with employment issues.

21                  THE COURT:  Yeah.  I believe what we

22  discussed was that the medical issues were fair game.

23  And that the employment issues were not relevant.

24                  MR. BOYNTON:  Your Honor, I agree on the --

25  I think there's a wrinkle to the medical issues that

deals with an arrest, and that's what we are particularly concerned about and would want to front if Your Honor's ruling is that that misdemeanor arrest is admissible in cross-examination of the witness.

THE COURT:  Is anyone asserting that that is admissible?  Is anybody asserting that that misdemeanor arrest is admissible?

MS. BELL:  Your Honor, I'm not.  I don't think under the Rules of Evidence a misdemeanor arrest or that particular offense would come in to impeach her.

THE COURT:  Does anybody intend to try to introduce a misdemeanor arrest as impeachment?

MR. RUSS:  No, Your Honor.

THE COURT:  Okay.

MR. BOYNTON:  I think the other wrinkle there is there are questions that try to go into details about that particular medical issue that just aren't relevant.  What the government intends to put on the record is that the witness does suffer from substance abuse disorder, that she was in a period -- talk a little bit about what that disorder looks like for her, long periods, up to a year of sobriety, followed by very short periods of relapse, one or two days of relapse.

We will put on the record that -- or we anticipate that she will testify that she was in a period

1  of sobriety at and around the time of this incident and

2  at or around the time of every time she's spoken with the

3  government about this incident.  And our position would

4  be beyond that -- I think if they wanted to ask those

5  same questions on cross-examination, I have no objection.

6             But I believe that going beyond that will

7  get into details that are not relevant that are precluded

8  under 403 even if they were relevant, that implicate

9  18 USC 3771, the CVRA and other Rules of Evidence

10  governing impeachment.

11             THE COURT:  Okay.  I'm -- my antenna will

12  be up.

13             MR. BOYNTON:  Thank you, Your Honor.

14             MR. THORNTON:  Your Honor, in light of

15  that, I'd ask for clarification because I will be asking

16  Mrs. Davis questions about her intention and her

17  understanding, what she agreed to, and what she

18  understood the agreement would be.

19             There's conversations between Ms. Davis and

20  Ms. Idoni going back to activities they had in Michigan,

21  not a charge, not part of the Michigan case, but other

22  activities in Michigan, but there will also be

23  conversations between her and Ms. Idoni relating to a

24  rescue in Washington, DC.  So I'll try to ask her

25  questions without referring to that, but I think the

question's going to be so confusing that she is going to

draw out of me, are you referring to conversations we had

between Michigan and Washington or the day before the

Washington event.

So I anticipate that she will say or put me

in a position to explain what I'm asking, like your

conversation with Ms. Idoni and Ms. Eva Zastrow, they

were part of the Washington rescue and your understanding

of the agreement was this.  Well, that understanding

flows over into the -- her understanding of what

Ms. Idoni and Ms. Zastrow were agreeing to in Nashville.

So that's all part of a continuing conversation of what

this agreement that she's going to testify to.

So my intention is not to delve into the

Washington, DC event, but only to focus on conversations

and understandings that Ms. Davis had with others,

including the defendants, about their agreement to

rescue.

THE COURT:  Then you ask a very, very

leading question --

MR. THORNTON:  I will indeed, Your Honor.

THE COURT:  -- that focuses her exactly

where you want to focus her.

MS. KLOPF:  And I do just want, so the

Court is not surprised, Ms. Davis will be talking about

her role in something called a red rose rescue and a
misdemeanor charge that stemmed from it and then her role
in Eastern District of Michigan, her role here, her role
in DC --

THE COURT: Only what she was doing.

MS. KLOPF: Exactly. What she was doing,
what those things meant to her, but she will not be
referencing any of the defendants.

THE COURT: Okay.

Now, I have a preliminary matter. The
social media of these defendants is being monitored. It
has been brought to my attention that Mr. Green has
posted on Facebook: By midday we had finished jury
selection and the attorneys began with their opening
statements. One witness has been called already. It was
a police officer who was on the scene. Tomorrow more
witnesses will be called, including Caroline Davis.
Thank you for your prayers.

Now, to me, that is a -- an objective
recitation of what's going on in the courtroom, but I
wanted to just bring it to your attention unless somebody
thinks this amounts to witness intimidation. Doesn't
sound like it to me, but I just wanted to bring it to
your attention because it mentions Caroline Davis. The
government doesn't consider this witness intimidation, I

1   presume.

2               MS. KLOPF:  No, Your Honor.  I think it's

3   concerning and worth noting for the Court, but at this

4   point we don't think it rises to that level.

5               THE COURT:  All right.  Are we ready for

6   the next witness?  Okay.  Yes?

7               MR. BOYNTON:  Yes, Your Honor, I believe we

8   are ready for the jury.

9               THE COURT:  Very good.  Let's get the jury

10  in here.

11              (Whereupon, at 9:17 a.m. the jury returned

12  to open court.)

13              THE COURT:  Good morning.  Has everyone

14  followed my instruction to not talk about this case with

15  anyone or amongst yourselves?  I'm looking for lots of

16  nodding heads.

17              Has everyone followed my instruction to

18  ignore any news coverage on any media?

19              Has everyone followed my instruction to not

20  do any research about anyone or anything connected to

21  this case?

22              Very good.  We are ready for the next

23  witness.  Mr. Boynton?

24              MR. BOYNTON:  Thank you, Your Honor.  The

25  government calls Sarah Flowers to the stand.

1    THE COURT:  Sarah Flowers.

2                    **SARAH FLOWERS**

3  called as a witness, after having been first duly sworn,

4  testified as follows:

5                 **DIRECT EXAMINATION**

6  BY MR. BOYNTON:

7        Q.    Good morning, Ms. Flowers.

8        A.    Good morning.

9        Q.    Will you please state your full name and

10 spell it for the court reporter.

11       A.    Yeah.  Sarah Jessica Flowers.  S-a-r-a-h,

12 J-e-s-s-i-c-a, F-l-o-w-e-r-s.

13       Q.    Ms. Flowers, where did you grow up?

14       A.    In Alabama.

15       Q.    And could you talk a little bit about your

16 general education and your professional field?

17       A.    Yeah.  I have a bachelor of arts in

18 history, and my professional field is reproductive

19 health.

20       Q.    Are you currently working?

21       A.    No.

22       Q.    Ms. Flowers, I'd like to talk to you a

23 little bit about your substance abuse disorder.  Can you

24 tell the jury a little bit about what you experience with

25 that?

1       A.    Yeah.  I'm an alcoholic and have struggled

2   with that for several years now.

3       Q.    Can you talk to the jury a little bit about

4   kind of the intervals of your alcoholism, periods of

5   sobriety versus periods of relapse?

6       A.    Yeah.  So for me periods of relapse tend to

7   last for a day or two and periods of sobriety tend to

8   last for months to years.

9       Q.    Ms. Flowers, we're going to be talking

10  about the events of March 5, 2021.  Were you in a period

11  of sobriety or a period of relapse on and around that

12  date?

13      A.    A period of sobriety.

14      Q.    And you were interviewed several times by

15  the FBI over the years leading up to today; is that

16  correct?

17      A.    Yes.

18      Q.    And when those interviews took place, were

19  you in a period of sobriety or a period of relapse?

20      A.    A period of sobriety.

21      Q.    Okay.  And, Ms. Flowers, today sitting here

22  on the witness stand, are you in a period of sobriety or

23  a period of relapse?

24      A.    A period of sobriety.

25      Q.    Okay.  Ms. Flowers, at some point were you

1    a resident of the state of Tennessee?

2          A.    Yes.

3          Q.    And in approximately March of 2021 where

4    were you working, ma'am?

5          A.    I was working for carafem.

6          Q.    Can you tell the jury where that is?

7          A.    Yeah.  Carafem was a small clinic located

8    in Mt. Juliet, Tennessee.

9          Q.    All right.  And you said it's a small

10   clinic.  Can you be more specific about what kind of

11   clinic services carafem provided?

12         A.    Yeah.  Carafem provided abortion care,

13   contraceptive care, dating ultrasounds, miscarriage

14   management, limited STI testing as well.

15         Q.    I'd like to talk a little bit about those

16   things.  So you mentioned STI testing.  What is that

17   exactly?

18         A.    Screening for sexually transmitted

19   diseases.

20         Q.    And when you talked about a dating

21   ultrasound, what does that mean?

22         A.    Generally in the first trimester an

23   ultrasound to determine how far along the pregnancy is,

24   how old the fetus is.

25         Q.    Were those ultrasounds related to generally

1 checking on the health of the fetus as well?

2       A.    More or less, but mostly for purposes of

3 dating.

4       Q.    Okay.  And you talked about miscarriage

5 care.  Can you tell the jury a little bit more about what

6 that term means?

7       A.    Yeah.  That ties pretty neatly in the

8 dating ultrasound discussion.  So there are certain

9 criteria that an ultrasound might meet that would mean

10 that someone was having a miscarriage, so no fetal

11 cardiac activity, certain things that would indicate to

12 us that it was a miscarriage.

13      Q.    Okay.  What were your specific duties at

14 the carafem clinic?

15      A.    I was a health services coordinator.  So

16 would do things like checking patients in, collecting

17 payments, doing abortion and contraception education,

18 performing some ultrasounds occasionally, assisting in

19 surgical abortion procedures, things like that.

20      Q.    Okay.  And at the time that you were doing

21 all those things, all that was lawful; is that correct?

22      A.    That is correct.

23      Q.    Okay.  Now, I want to orient the jury a

24 little bit to where the carafem clinic was.  You said

25 that it was in Mt. Juliet, Tennessee, but can you tell

1  them a little bit more about what kind of building it was

2  in?

3          A.    Yeah.  So it was in a medical pavilion,

4  three-story building with lots of other offices,

5  orthodontists.  Vanderbilt had a couple of offices there

6  as well.

7          Q.    And you said it was a three-floor office

8  building with multiple other -- it sounded like medical

9  offices; is that right?

10         A.    Uh-huh (affirmative).

11         Q.    Okay.  And what floor was carafem on?

12         A.    The second.

13         Q.    Can you describe to the jury if you were to

14  go to -- entered into the medical pavilion and try to get

15  to carafem, please describe to the jury what that route

16  looks like.  How do you get there?

17         A.    Yeah.  So one could take the stairs or

18  elevator to the second floor.  And then carafem's office

19  was located down at the very end of a hallway with no

20  other offices around us.

21         Q.    Okay.  So there were no offices at the end

22  of the hallway; is that right?

23         A.    That's correct.

24         Q.    Was there another office or any other

25  offices on that hallway itself, though?

1          A.    Uh-huh (affirmative).  There was a

2    Vanderbilt office, as well as an orthodontist that you

3    would have to pass to come down the hall to the clinic.

4          Q.    Okay.  Were either of those offices

5    affiliated with carafem in any way?

6          A.    No.

7          Q.    And orthodontistry is teeth-related; is

8    that right?

9          A.    Yes.

10          Q.    How many entrances were there to the

11    carafem office?

12          A.    Two.

13          Q.    Can you describe what those two entrances

14    were?

15          A.    Sure.  So as you're heading down the

16    hallway on the right side there is a door that was sort

17    of our employee entrance that we all had keys to.  And

18    then straight at the end of the hallway there was a

19    patient entrance that had a large window and an intercom

20    for patients to buzz in.

21          Q.    So you mentioned on the first door, the

22    staff entrance, that was windowless; is that right?

23          A.    That's correct.

24          Q.    You said you had to use a key to get into

25    that door?

1          A.    Correct.

2          Q.    And you called it a staff entrance because

3   it was only used by staff; is that right?

4          A.    That's right.  No patients went in or out

5   of that door.

6          Q.    All right.  And then the patient entrance

7   had a window on it, you said; is that right?

8          A.    Correct.

9          Q.    And they would -- I think you used the term

10  buzz in?

11         A.    Yes.  So we had an intercom system.

12         Q.    Yeah.

13         A.    So patients would buzz to let us know

14  someone was there.  We would ask if they had an

15  appointment, ask for a first or last name, confirm they

16  were a patient, and then buzz them into the office.

17         Q.    Okay.  Otherwise that door was locked; is

18  that right?

19         A.    That's correct.

20         Q.    Okay.  Did you have a key to get in through

21  that door?

22         A.    I personally did not.

23         Q.    Did you have a key to get in through the

24  staff entrance?

25         A.    I did.

1     Q.   All right.  I'd like to turn your attention

2 to March 5 of 2021.  Can you -- do you recall that date

3 sitting here today?

4     A.   I do.

5     Q.   Can you talk to the jury about arriving at

6 work that day?

7     A.   Yeah.  So we generally started around

8 8 o'clock in the morning.  So I arrived around maybe 7:40

9 or 7:45, got into the elevator to go up to the second

10 floor.  We were instructed to use elevators because there

11 are cameras at the entrance and the exit of the elevators

12 as opposed to the stairs.

13        And when I got to the top of the second

14 floor, I stepped out and saw a tall man with a camera and

15 heard kind of some voices down the hall.  Turned the

16 corner to see lots of people in the hallway.

17     Q.   You said lots of people in the hallway.

18 How many people approximately were in the hallway, if you

19 can recall?

20     A.   Couple dozen maybe.

21     Q.   Was that a usual occurrence there with the

22 number of medical offices that were in the building?

23     A.   No.

24     Q.   Was it a usual occurrence to see people in

25 the hallway just generally?

 1          A.     No.

 2          Q.     At that point what was your reaction to

 3  getting off the elevator and seeing that?

 4          A.     I panicked.

 5          Q.     Why were you panicked about it?

 6          A.     Generally having worked in abortion care

 7  for a long time, when there are lots and lots of people

 8  around an abortion clinic, you get -- your spidey senses

 9  kind of tingle a little bit.

10          Q.     Fair to say you were concerned; is that

11  right?

12          A.     Yes.

13                 THE COURT:  Ms. Flowers, can you move that

14  mic just a little closer to you?

15                 THE WITNESS:  Absolutely.

16                 THE COURT:  Thank you.

17                 THE WITNESS:  Is that better?

18                 THE COURT:  That's better.

19                 THE WITNESS:  Okay.

20  BY MR. BOYNTON:

21          Q.     Did anyone try to talk to you in the

22  hallway?

23          A.     Not that I recall.

24          Q.     No one was violent towards you or attacked

25  you or threatened you in any way; is that right?

1          A.      That's correct.

2          Q.      But you were surprised to see what you saw,

3    you said?

4          A.      That's right.

5          Q.      All right.  So what did you do when you saw

6    that and you had that reaction?

7          A.      I took my key and went into the office to

8    try and get away from whatever was happening.

9          Q.      Okay.  Why didn't you go back down the

10   elevator?

11         A.      I don't know.  It's just my instinct.

12         Q.      Did you do anything with your phone at that

13   point?

14         A.      I did, yeah.  So when I saw this

15   gentleman -- when I stepped off the elevator, he had a

16   phone and was recording.  And I saw all of these people

17   and I thought, okay, well, I need to be recording.  So I

18   took out my phone and thought that I had started to

19   record.

20         Q.      So you thought you had started to record.

21   What do you mean by that?

22         A.      Yeah.  So once I had gotten into the

23   office, I looked at my phone and realized that, in fact,

24   I hadn't recorded anything.

25         Q.      Okay.  I just want to ask you, given what

1  you described as your reaction to seeing those folks in
2  the hallway, why was your first instinct to take out your
3  phone and start trying to video record as you were
4  heading into the office?
5        A.    Protection, documentation.  Even if they
6  had been nobody, it still might have been important to be
7  able to identify them.  And for who I thought they were,
8  I felt it important to be able to identify them in the
9  future.
10        Q.    Okay.  You said who you thought they were.
11  Just in the shortest terms, what was your initial thought
12  about why they were there?  What was your impression?
13        A.    Yeah.  That these were people who are
14  antiabortion.
15        Q.    Okay.  Now, you said you got inside -- you
16  went inside your office at that point?
17        A.    Uh-huh (affirmative).
18        Q.    Anyone try and follow you in there?
19        A.    They did not.
20        Q.    Okay.  But you got inside and you said that
21  you looked at your phone at that point and realized you
22  hadn't been recording; is that right?
23        A.    That's correct.
24        Q.    What happened once you're inside your work
25  space?

1      A.    I noticed our clinic manager, doctor and

2 front desk person were there.  I set my things down and

3 decided to go back out and get the recording that I

4 thought I had gotten initially.

5      Q.    You went back out there -- can you just

6 explain again why you went back out into the hallway?

7      A.    To get a recording.

8      Q.    Sitting here today, do you think that was a

9 good idea?

10      A.    No.

11      Q.    Can you tell the jury why that was a

12 mistake, then?

13      A.    I mean, I think entering the office was

14 the -- was my first mistake because I then granted access

15 to whomever it is who's in the hallway to the office.

16 And then heading back out, once again potentially

17 granting access to the office and also putting myself

18 right in the middle of it.

19      Q.    Now, you said before that no one tried to

20 enter the office when you first went in.  Is it fair to

21 say that no one tried to enter the office when you went

22 out?

23      A.    Yes.

24      Q.    Okay.  But sitting here today are you aware

25 of any kind of carafem policies that address a situation

1   like this?

2           A.    Yes.

3           Q.    Okay.  At the time back on March 5, 2021,

4   how familiar were you, if at all, with those policies?

5           A.    Quite.  Yeah.

6           Q.    Were you thinking about those policies when

7   you went back out in the hall?

8           A.    No.

9           Q.    Why not?

10          A.    It's a lot of adrenaline, a lot of panic.

11  Yeah, just a lot of adrenaline.  Wasn't thinking.

12          Q.    And it's fair to say that going back into

13  the hall was inconsistent with those policies; right?

14          A.    That is correct.  Yeah.

15          Q.    What did you understand those policies

16  directed you to actually do in this situation?

17          A.    Once I arrived and saw the people in the

18  hallway, I should have gotten back on the elevator and

19  gone back to my car and left.

20          Q.    And if you had been inside the office, what

21  did the policies direct you to do?

22          A.    Stay.

23          Q.    So you said you went back out into the

24  hallway to record video; is that right?

25          A.    Yes.

1          Q.     And do you know whether you were successful

2     at recording video that second time you tried?

3          A.     I was.

4          Q.     Have you reviewed the footage from that

5     video that you recorded?

6          A.     Many times.

7          Q.     Before we watch the video, I'd like to talk

8     to you about some of the things you say in it.  We'll

9     hear you refer to the people in the hallway as super

10    pro-life and talk about them not wearing masks; is that

11    right?

12         A.     That's correct.

13         Q.     Why did you comment on people not wearing

14    masks and people being super pro-life?

15         A.     You'll all remember, this is 2021, sort of

16    at the height of the coronavirus pandemic.  Yeah.

17         Q.     Sitting here today, how do you feel about

18    the words that you used in the video?

19         A.     I wish I hadn't.

20         Q.     And why is that?

21         A.     They're antagonizing.  They're unkind.

22    Yeah.

23         Q.     So before we talk about the video further,

24    you talked -- you talked about arriving and feeling -- I

25    think the word you used was panic; is that right?

1          A.     Yeah.

2          Q.     Can you help us understand why, if you --

3     if you're in that state you're going back out into the

4     hallway with a cell phone and recording?

5          A.     To be very honest, I wasn't thinking.  Lots

6     of adrenaline.  But, I mean, I'd never seen a clinic

7     blockade -- or I'd never seen something like this happen

8     before, but also do feel -- I mean, part of carafem's

9     security policy is if, you know, protesters or whomever

10    is around, that we document those things, time, date,

11    number of people, things like that.  So I'm thinking I

12    felt a responsibility to do that.

13         Q.     Okay.  Just want to -- want to clarify that

14    a little bit.

15         A.     Yeah.

16         Q.     You talked before about carafem security

17    policy directing you to stay inside the clinic and you

18    just weren't thinking about that when you went out into

19    the hall.

20         A.     Yeah.

21         Q.     Were you thinking in terms of the policy

22    when you were recording, then?

23         A.     No.

24         Q.     Okay.  I'd like to show you what's been

25    marked for identification purposes as Government's

1    Exhibit 4.

2              A.    Okay.  Thank you.

3              Q.    Ms. Flowers, do you recognize what's in

4    front of you?

5              A.    I do.

6              Q.    Can you describe to the jury what it is?

7              A.    It is a disk with my signature and

8    yesterday's date.

9              Q.    Okay.  And what is on that disk, if you

10   know?

11             A.    The video that I took.

12             Q.    Okay.  You know that because you've

13   reviewed that disk?

14             A.    That's correct.

15             Q.    And you just said you signed it and dated

16   it just yesterday; is that correct?

17             A.    That's correct.

18             Q.    You have a white binder there in front of

19   you.  Can you flip to what's been tabbed Exhibits 4A and

20   4B, please?

21             A.    Uh-huh (affirmative).  Maybe.

22                   Yes.

23             Q.    Okay.  Let's start with 4A.  Do you

24   recognize what 4A is?

25             A.    I do.

1          Q.     What is it?

2          A.     It's a picture of the people in the

3   hallway.

4          Q.     And where does that picture come from?

5          A.     It's a still from the video that I took.

6          Q.     Okay.  So that's actually a frame from your

7   video footage in Exhibit 4; is that right?

8          A.     That's correct.

9          Q.     Can you flip to 4B and tell us what that

10  is, if you recognize it?

11         A.     Yeah.  This is the first person that I saw

12  when I stepped off the elevator who was recording with

13  his phone.

14         Q.     Okay.  So you're saying that that's a

15  picture at 4B?

16         A.     Uh-huh (affirmative), yes.

17         Q.     And where does that picture originate from,

18  if you know?

19         A.     This is a still from the video that I took.

20         Q.     Okay.

21                MR. BOYNTON:  Your Honor, I'd move to admit

22  Government's Exhibits 4, 4A and 4B into evidence.

23                THE COURT:  Any objection?

24                MS. BELL:  No objection, Your Honor.

25                THE COURT:  Received.

1                    (Government Exhibits Nos. 4, 4A and 4B were

2   admitted.)

3                    MR. BOYNTON:  Your Honor, may we publish?

4                    THE COURT:  Yes.

5                    MR. BOYNTON:  Thank you, Your Honor.

6    BY MR. BOYNTON:

7           Q.    Ms. Andrews, can we play for the jury

8   Exhibit 4 from the very start until approximately the

9   12-second mark, please.

10                   (Playing video.)  Ms. Andrews, is there a

11  way to rotate that by any chance?

12                   MR. CONWAY:  Your Honor, we have one screen

13  that's not hooked up.

14                   THE COURT:  Oh.  Do we need to get IT in

15  here?

16                   COURTROOM DEPUTY:  That's one of those

17  added on, I'm not sure if they can connect that one.

18                   THE COURT:  Well, let's get IT in here.

19                   MR. BOYNTON:  IT issues on both ends,

20  Your Honor.

21                   THE COURT:  Excuse me?

22                   MR. BOYNTON:  IT issues on both ends.

23                   THE COURT:  Apparently.

24                   It's suggested to me maybe there's a power

25  button to push.  Maybe one of the paralegals who is in

1   here -- I'm not going to suggest the youngest person in
2   the room come forward, but that's what I'm tempted to
3   suggest.
4           COURTROOM DEPUTY:  Someone's coming.
5           THE COURT:  Okay.  IT is on its way.
6           In the meantime can't you just look at the
7   very large screen?  I mean, you-all have shown this video
8   a million times, I'm sure.  So it's not new information
9   for you.  So we'll get this as quickly as we can, but in
10  the meantime if you would use the large one.
11          All right.  Let's go forward.
12  BY MR. BOYNTON:
13      Q.  Ms. Andrews, can we just replay that from
14  the beginning to the 12-second mark.  (Playing video.)
15          Ms. Flowers, can you just explain briefly
16  what has happened here at the very start of the video.
17  What is the jury seeing?
18      A.  Yeah.  I've stepped out into the hallway
19  and begun recording the people who were there.
20      Q.  All right.  And at this moment here at the
21  12-second mark, at least your camera is facing down the
22  hallway; is that fair to say?
23      A.  Yes.
24      Q.  And that's down the hallway the opposite
25  direction from the clinic; is that right?

1          A.     Correct.

2          Q.     And what are you seeing at this moment?

3          A.     I am seeing -- so to sort of backtrack a

4    little bit, before I got on the elevator to come up to

5    the office, I noticed a young woman with who I assume was

6    her partner sort of looking at the list of offices.  And

7    having worked in this field for some time, you start to

8    sort of get a sense of -- I assumed that we would see

9    later, right.

10         So I see this young woman being spoken to

11   by one of the people in the hallway --

12         Q.     Okay.  What was your reaction to seeing

13   that?

14         A.     To protect her.

15         Q.     Why was that your reaction?

16         A.     Because when I took this job, I knew that

17   things like this could happen.  But she didn't sign up

18   for that.  She just needed medical care.

19         Q.     Ms. Andrews, can we play from 12 seconds to

20   one minute and 17 seconds, please.  (Playing video.)

21         Ms. Flowers, when you testified about first

22   arriving at work that day, you talked about a man being

23   right outside the elevator when you got off on the second

24   floor; is that right?

25         A.     Yeah.

1    Q.  And he was recording with a cell phone?

2    A.  Uh-huh (affirmative).

3    Q.  And what are we seeing here in this frame

4 at one minute and 17 seconds in the video?

5    A.  That person that I first saw.  That's also

6 the still in front of me.

7    Q.  Do you know who that person is?

8    A.  No.

9    Q.  Would you have any way of recognizing if he

10 were in the courtroom today?

11    A.  I don't think so.

12    Q.  When you say I don't think so, why is that?

13    A.  Masked.  Hat, glasses.

14    Q.  I want to ask a little bit about your

15 emotions that you're talking about here on the witness

16 stand and what we're hearing you say.  Many of those

17 words were yours, right, in the video?

18    A.  Yes.

19    Q.  Okay.  The loudest voice is yours because

20 you're the one holding the camera; is that fair to say?

21    A.  Yes.

22    Q.  Can you talk a little bit about what was

23 going through your head at that moment and why you were

24 saying the things you were saying and behaving the way

25 you were?

1      A.    I really just think it was adrenaline.

2  Panicked, scared.

3      Q.    Can you describe a little bit more -- I'm

4  sorry, do you need a minute?

5      A.    No, I'm all right.

6      Q.    Can you describe a little bit more what

7  happened here in the clip that we just watched?

8      A.    Yeah.  I put myself between the person who

9  was speaking to who I assumed was a patient.  I put

10  myself between the two of them and told her and her

11  partner who was also clearly very upset by the situation,

12  told them to go back to their car.

13      Q.    Why did you tell them to go back to their

14  car?

15      A.    I feel like when I first stepped into the

16  office I remember someone saying something about our call

17  center contacting everyone on our schedule to let them

18  know what was happening and that we would be -- we would

19  take care of them.

20      Q.    Okay.  Can you explain that a little bit

21  more?  What's the call center and what does that mean to

22  be contacting people on the schedule?

23      A.    Yeah.  So we had a full schedule of

24  patients this day, and carafem contracted with a call

25  center that helped us, like, schedule appointments and

1  things like that.  And those people were contacting
2  everybody on our schedule to let them know what was
3  happening and let them know that we would take care of
4  them later.
5          Q.    When you say take care of them later, what
6  does that mean?
7          A.    We would be open and we would see them for
8  their appointments.
9          Q.    You would be open later?
10         A.    Yes.
11         Q.    So let me ask it this way, why didn't you
12 try -- you said that you told her to go back to her car
13 and you told the man that was with her to go back to
14 their car.  Why didn't you try to take them inside the
15 office?
16         A.    I don't know.  Yeah.  I don't know.
17         Q.    Okay.  What did you decide to do at this
18 point after -- after you told them to go back to their
19 car?
20         A.    I turned back around and tried to get back
21 into the office.
22         Q.    And, again, I want to ask you, you
23 described the situation here in the hallway and we've now
24 seen video footage of that, the number of people who are
25 in the hallway.  Why didn't you leave as well at this

1  point?

2         A.    I don't know.  I felt like being in the

3  office with my colleagues was maybe safer, but I'm not

4  sure.

5         Q.    And, again, that would not have been

6  consistent with carafem policy, right, to go back inside?

7         A.    That's correct.

8         Q.    But that's nonetheless where your head was

9  at?

10        A.    Correct.

11        Q.    The patient that you talked about, you

12 testified a couple minutes ago that you had actually seen

13 them down in the lobby when you came in?

14        A.    Uh-huh (affirmative).

15        Q.    And you -- I think you said you assumed

16 that they would be -- that you'd be seeing them later I

17 think were your words; right?

18        A.    Yeah.

19        Q.    Now, when you make that assumption, are you

20 assuming what kind of reproductive healthcare they might

21 be coming to carafem for?

22        A.    Presumably an abortion, but I didn't know.

23        Q.    Is there any way that you would have known?

24        A.    I could have looked at the schedule, but

25 that wasn't an option that was available to me.

1          Q.    With this particular patient, did you have

2    any specific knowledge?

3          A.    (no verbal response.)

4          Q.    Okay.

5                THE COURT:  You have to say yes or no.

6                THE WITNESS:  No, I did not.

7    BY MR. BOYNTON:

8          Q.    Ms. Andrews, can we play from one minute 17

9    seconds to two minutes, please.  (Playing video.)

10               Earlier in your testimony, Ms. Flowers, you

11   talked about two doors into the clinic.  And you talked

12   about a staff entrance with no window and you talked

13   about a patient entrance with a window; is that right?

14         A.    That's correct.

15         Q.    And I think you said that you had a key to

16   the staff entrance but not a key to the patient entrance;

17   is that right?

18         A.    That's correct.

19         Q.    Okay.  So a moment ago, can you please

20   describe to the jury what you were attempting to do

21   there?

22         A.    I put my key in the lock and tried to pull

23   the door, but could not.

24         Q.    And that was the door to the staff entrance

25   into the clinic; is that right?

1           A.      That's right.

2           Q.      And why couldn't you open the door?

3           A.      Because there were two men sitting in front

4    of it.

5           Q.      The frame that we're seeing here, what is

6    that showing?

7           A.      That is the patient entrance with someone

8    kneeling in front of it and a couple of other folks

9    around it.

10          Q.      And, again, you didn't have a key to this

11   door.  What did you -- did you try to get in through this

12   door, did you try to buzz?

13          A.      I didn't.

14          Q.      And why didn't you do that?

15          A.      That would have required another staff

16   member to come to the front and buzz me in and I -- yeah.

17          Q.      If you'd been buzzed in, how would you have

18   gotten through this door?

19          A.      I wouldn't have been able to.

20          Q.      Does the door open out into the hallway or

21   does it open into the clinic?

22          A.      It opens out into the hallway.

23          Q.      Okay.  And the staff entrance, open into

24   the clinic or out into the hallway?

25          A.      Out into the hallway.

1    Q.    Why did you not try to force your way

2  through?

3    A.    I didn't want to hurt anybody.

4          THE COURT:  I'm sorry.  Can't hear you.

5          THE WITNESS:  I didn't want to hurt

6  anybody.  Yeah.

7   BY MR. BOYNTON:

8    Q.    Ms. Andrews, can we just play to the end.

9  (Playing video.)

10          Where did you go instead?

11    A.    I went down the stairs and had gotten a

12  text from our clinic group chat that another coworker had

13  arrived and was going to pick me up in the back of the

14  building and get away.

15    Q.    Ms. Flowers, when I asked you before about

16  why didn't you try to bring the patient and her companion

17  into the office, I think you answered I don't know; is

18  that right?

19    A.    Uh-huh (affirmative).

20    Q.    Okay.  Do you think you could have gotten

21  the patient into the office?

22    A.    No.

23    Q.    Why not?

24    A.    Because of the people blocking the doors.

25          MR. BOYNTON:  No more questions,

1    Your Honor.  Thank you.

2              THE COURT:  All right.  Cross?

3              MS. BELL:  Thank you.

4                    **CROSS-EXAMINATION**

5     BY MS. BELL:

6         Q.    Good morning, Ms. Flowers.

7         A.    Good morning.

8         Q.    I talk kind of low, so if you can't hear

9    me, just let me know.  Okay?

10        A.    Okay.

11        Q.    My name's Jodie Bell.  I represent one of

12   the defendants in this case, Mr. Gallagher.

13        A.    Okay.

14        Q.    I need to ask you some questions about what

15   happened and sort of leading up to today.  I want to

16   start with, this happened back in March of 2021; correct?

17        A.    Yes, ma'am.

18        Q.    Okay.  And you talked to the FBI shortly

19   thereafter, didn't you?

20        A.    Yes, ma'am.

21        Q.    And was that at the carafem clinic?  Did

22   they come and see you?

23        A.    They did.

24        Q.    In Mt. Juliet?

25        A.    Uh-huh (affirmative).

1          Q.     You spoke to the FBI, you gave a full

2    interview?

3          A.     Uh-huh (affirmative).

4          Q.     They then talked to you again about a year

5    later; is that correct?

6          A.     I couldn't tell you exactly when.

7          Q.     All right.  Well, if I have a report that

8    says -- it's actually longer than that, October 27, 2023,

9    you had another interview?

10         A.     Yeah.

11         Q.     That would have been with the FBI and the

12   US attorney; does that sound correct?

13         A.     Yes.

14         Q.     Did you do that in their office, the

15   US Attorney's Office or did you meet at carafem again?

16         A.     We met at the carafem office in Chicago.

17         Q.     Okay.  And then between October -- that

18   October interview and today, how many more times have you

19   met with the government?

20         A.     I don't know.  I couldn't tell you.

21         Q.     Well, has it been so many you just couldn't

22   keep track or can you say there were five more meetings,

23   three more meetings?

24         A.     Two, three, four.

25         Q.     Okay.  Were those in person or on Zoom?

 1      A.    A combination.

 2      Q.    Okay.  Who was present during those

 3 meetings?

 4      A.    My lawyers, as well as Kyle, and I believe

 5 maybe one or two other agents, attorneys.

 6      Q.    And when you say Kyle, you mean Mr. Boynton

 7 who was just questioning you; correct?

 8      A.    Yes, uh-huh (affirmative).

 9      Q.    So going back to when you met with the

10 government in October up in Chicago at the carafem office

11 there, how long did you meet with the government?  How

12 long was that interview?

13      A.    Maybe an hour, hour and a half.

14      Q.    Okay.  And when you met with the

15 government, did you go through videos, text messages and

16 review sort of your part of this case?

17      A.    Yes, ma'am.

18      Q.    Okay.  Now, you said there were three or

19 four more interviews since then?

20      A.    Yes.

21      Q.    Okay.  How much more time would you

22 estimate that you spent meeting with the government and

23 reviewing for your testimony?

24      A.    Another maybe hour, two hours.

25      Q.    Per interview?

1          A.     In total.

2          Q.     Oh, in total?

3          A.     Uh-huh (affirmative).

4          Q.     When's the last time you met with the

5    government?

6          A.     Yesterday morning.

7          Q.     And how long did you meet with them then?

8          A.     Very briefly.

9          Q.     Okay.  Prior to that meeting yesterday

10   morning, when did you meet with them last?

11         A.     I believe over like a Microsoft Teams

12   meeting a couple weeks prior.

13         Q.     Couple weeks prior to yesterday; correct?

14         A.     Yes, ma'am.

15         Q.     So in January of 2023?

16         A.     Yes.

17         Q.     So there's been at least two meetings in

18   January of 2023?

19         A.     Yes.

20         Q.     Do you think there's been another one?

21                MR. CRAMPTON:  Excuse me, Counsel.  I

22   believe you mean 2024, don't you?

23   BY MS. BELL:

24         Q.     2024, I apologize.  Thank you.

25                You think twice, maybe three times in

1    January of 2024?

2         A.    Yes.

3         Q.    Okay.  You said that you have watched that

4    video many, many times; is that correct?

5         A.    Yeah.

6         Q.    Was that with the government or off your

7    own phone?

8         A.    Maybe twice with the government and

9    otherwise on my own.

10        Q.    Do you still have that video on your phone?

11        A.    I do.

12        Q.    To review whenever you want; correct?

13        A.    I do.

14        Q.    Now, you said that in March -- on March 5,

15   2021, you worked at carafem; correct?

16        A.    Yes, ma'am.

17        Q.    Prior to that you had worked at Planned

18   Parenthood; is that right?

19        A.    That's correct.

20        Q.    For how long had you worked there?

21        A.    At --

22             MR. BOYNTON:  Objection, Your Honor.

23   That's not relevant what she did, prior employment.

24             MS. BELL:  I think it is in this case,

25   Your Honor.  Do we need to approach?

1          THE COURT:  I'll give you a little leeway
2   and then I'll cut you off if I think it's inappropriate.
3          MS. BELL:  Thank you.
4    BY MS. BELL:
5          Q.   How long did you work for Planned
6   Parenthood?
7          A.   I worked for Planned Parenthood for about
8   two years, and then worked for a birthing center for
9   about six months.  And then started with carafem in
10  October of 2020.
11         Q.   At Planned Parenthood, just like at
12  carafem, you get training and advice on how to deal with
13  protestors; correct?
14         A.   Yes, ma'am.
15         Q.   And Planned Parenthood tells you also, do
16  not engage; is that right?
17         A.   As far as I remember, yes.
18         Q.   Okay.  And so by March 5, 2021, I think you
19  had worked at carafem for five or six months; is that
20  correct?
21         A.   Yeah.
22         Q.   And you had been trained again, do not
23  engage?
24         A.   That's correct.
25         Q.   Now, it's fair to say that -- and you

1  testified to this, that reproductive health services for
2  women are really important to you?
3        A.    That's correct.
4        Q.    That's kind of a large part of who you have
5  been in your career; correct?
6        A.    That's correct.
7        Q.    And you have strong feelings, I take it,
8  about a woman's right to choose?
9        A.    I do.
10       MR. BOYNTON:  Objection, Your Honor.
11 Your Honor, this is expressly governed by one of
12 Your Honor's rulings on a motion in limine.
13       MS. BELL:  Goes towards bias, Your Honor.
14       THE COURT:  Overruled.
15       THE WITNESS:  Yeah.  In the same vein that
16 I worked in the birthing center, I believe in people's
17 right to choose their own healthcare.  Yeah.
18  BY MS. BELL:
19       Q.    Completely fair.  Completely fair.
20             As part of your career, though, you --
21 would it be fair to say you don't appreciate those that
22 don't agree -- those that disagree with that position?
23       A.    I would want to know what you mean by don't
24 appreciate.
25       Q.    Well, you don't agree with people who are

1    pro-life.  That's fair to say?

2           A.    I believe abortion is important, and I

3    think that people who are...  I think it's fine to

4    disagree.  I think disagreement is good, but preventing

5    access to services is not.

6           Q.    That's your opinion?

7           A.    Yes.  That's correct.

8           Q.    And so on this particular day -- I want to

9    bring you forward to March 5, okay.  You got a text when

10   you were in your car in the parking lot notifying you

11   that there were protestors in the clinic, didn't you?

12          A.    I know I got a text.  I don't know where I

13   was when I got it.  I got a text from our front office

14   person that there were some people.

15          Q.    And that was before you ever went into the

16   building; correct?

17          A.    As -- I don't know, but maybe.

18          Q.    Well, you got a text, you're saying.  You

19   said you typically arrive at work about 7:40, 7:45,

20   right?

21          A.    Yes, ma'am.

22          Q.    You provided your text history or somebody

23   provided that group text to the government; correct?

24          A.    Sure.

25          Q.    And would it refresh your memory to take a

1  look at the text to see what time you arrived and what

2  time you got the text?

3          A.    Yeah, that would be lovely.

4                MS. BELL:  Your Honor, I won't show this to

5  the jury, let me just get it.  And may I place that on

6  the --

7                THE COURT:  Well, you're refreshing her

8  recollection, you don't put it on the evidence presenter.

9                MS. BELL:  I wasn't sure if you wanted me

10  to approach or put it --

11                THE COURT:  Someone can hand it to her,

12  please.

13                MS. BELL:  May I step forward?

14   BY MS. BELL:

15          Q.    Can you take a look at that document?

16          A.    Yes.

17          Q.    Did you get a text that morning?

18          A.    I did.

19          Q.    What time did you get it?

20          A.    At 7:48 a.m.

21          Q.    And what were you advised?

22          A.    Someone -- so the text message says call

23  the police.

24          Q.    Start at the top.

25          A.    Yeah.  So the first text message says:  The

1  hallway and staircase are filled with antiabortion

2  protestors.

3        Q.    And what time was that again?

4        A.    7:48 a.m.

5        Q.    And would you have been in or outside of

6  the building when you received that?

7        A.    I don't remember.

8        Q.    What was your response to that text?

9        A.    What the fuck.

10        Q.    So you got a text, you responded; right?

11  And you went right up there to the carafem clinic;

12  correct?

13        A.    Yes.

14        Q.    In violation of policy not to engage;

15  right?

16        A.    Yes.

17        Q.    Okay.  And when you got up there, you said

18  that you pulled your cell phone out and started

19  recording; correct?

20        A.    Yes.

21        Q.    You also said that you were recording in

22  order to generate, I guess, a record of who was there; is

23  that right?

24        A.    Yes.

25        Q.    Now that building does have security;

1  correct?

2      A.  Yes.

3      Q.  And you mentioned the front door to the

4  clinic.  When somebody buzzes the door -- and I don't --

5  can the staff see who's at the door from inside?  Is

6  there a camera or anything like that?

7      A.  There is a camera -- or there was a camera.

8  The building would not allow us to place a camera that

9  would show the hallway directly.

10      Q.  Okay.

11      A.  So it's sort of at an angle so we can kind

12  of -- we could kind of see a little bit.

13      Q.  Okay.  Well, let's talk about the hallway

14  just briefly and then we'll come back to that.  I'm going

15  to place an exhibit on this and see if you can recognize

16  it before we try to authenticate and publish it to the

17  jury.

18          MR. BOYNTON:  Your Honor, if it's -- okay,

19  thank you.

20          THE COURT:  Is this admitted?

21          MS. BELL:  This is Exhibit No. 1.

22          THE COURT:  Exhibit 1 is not in evidence

23  yet, so we don't show it to the jury until it's admitted

24  into evidence.

25          MS. BELL:  Right.  And what I said,

1 Your Honor -- I understand that -- is I'm going to put it

2 up here.  It's not going to be shown to the jury.

3               THE COURT:  It's being shown to the jury

4 right now, I believe.

5               COURTROOM DEPUTY:  No, ma'am, it's not.

6 Once that goes off, the jury doesn't see it.

7               THE COURT:  All right.

8               MS. BELL:  Just so the Court knows, I went

9 over this earlier.

10  BY MS. BELL:

11        Q.    So can you see what I just put up on the

12 screen?

13        A.    I can.

14        Q.    And for identification purposes, this is

15 Defense Exhibit 1.

16        A.    Okay.

17        Q.    It has not been admitted yet.  Do you

18 recognize that location?

19        A.    I do.

20        Q.    And can you -- just tell me what that is.

21        A.    Yeah.  That's the hallway down to the

22 clinic.  The side door staff entrance is visible.  The

23 clinic front door is also visible.

24        Q.    And that's basically how it was set up on

25 March 5, 2021?

1          A.     Yes, ma'am.

2                 MS. BELL:  Your Honor, if I could just

3   publish that to the jury, please.

4                 THE COURT:  Do you move it into evidence?

5                 MS. BELL:  Move it into evidence and

6   publish it to the jury.

7                 THE COURT:  Any objection?

8                 MR. BOYNTON:  No objection.

9                 THE COURT:  Received.  You may show it to

10   the jury.

11                (Gallagher Exhibit No. 1 was admitted.)

12   BY MS. BELL:

13         Q.     Again, that's the hallway without people in

14   it?

15         A.     Yes, ma'am.

16         Q.     Just so that the jury knows, the door that

17   we can see is the entrance to the clinic; correct?

18         A.     Yes, the door with the long window is the

19   entrance -- the patient entrance to the clinic.

20         Q.     And then the door on the right side would

21   be the employee entrance; correct?

22         A.     Yes, ma'am.

23         Q.     And then you can sort of see a door on the

24   left and that would go to the stairwell; is that fair to

25   say?

```
 1         A.    Uh-huh (affirmative).

 2         Q.    Thank you.  Again, I'll go ahead and take

 3   that down.

 4               And then I'll have you look at what's been

 5   marked as Exhibit 1A, not showing it to the jury yet.  Do

 6   you recognize that document or that photograph?

 7         A.    Yes.

 8         Q.    Does that accurately -- well, what is it?

 9         A.    This is a longer view of the hallway down

10   to the clinic.

11         Q.    Okay.  And is that essentially how it

12   looked on March 5 of 2021, without people in it?

13         A.    Yes.  Yeah, without people in it, this was

14   the setup on -- yeah, uh-huh (affirmative).

15               MS. BELL:  Your Honor, I'd move to have

16   that introduced as Gallagher Exhibit 1A.

17               MR. BOYNTON:  No objection.

18               THE COURT:  Received.

19               (Gallagher Exhibit No. 1A was admitted.)

20               MS. BELL:  And ask that that be published

21   to the jury.

22               THE COURT:  Yes.

23    BY MS. BELL:

24         Q.    Thank you.  Again, that's the full hallway

25   leading down to the carafem clinic; correct?
```

1           A.      Yes.

2           Q.      And basically how you would get to the

3    clinic, so that the jury knows, you come up the elevator,

4    exit on the second floor?

5           A.      Uh-huh (affirmative).

6           Q.      You'd go left and then you'd go left again;

7    correct?

8           A.      That's correct, yeah.

9           Q.      And the door that is not the entrance to

10   the clinic but on the right side of the photograph,

11   that's another business; correct?

12          A.      Yes, that's correct.

13          Q.      And then on the left side of the photograph

14   you can see a water fountain and then doors to the

15   restroom?

16          A.      Yes.

17          Q.      Okay.  I'll go ahead and take that down.

18                  So that is -- that accurately depicts where

19   all this happened; right?

20          A.      Yes, ma'am.

21          Q.      Okay.  Now, you said that when you came up

22   those -- off the elevator you started filming to

23   document; right?

24          A.      Uh-huh (affirmative).

25          Q.      I think you said that there were

approximately two dozen people in the hallway; is that
correct?

        A.    That's my best estimate.

        Q.    That's fair.  As you were walking down the
hall, was anyone talking to you?

        A.    Not that I recall.

        Q.    Was anyone aggressive towards you?

        A.    No.

        Q.    When you got to the employee entrance, you
said you used your key and you entered; correct?

        A.    Yes.

        Q.    Nobody tried to stop you, did they?

        A.    No.

        Q.    Nobody tried to go inside, did they?

        A.    No.

        Q.    Okay.  Now, when you got inside, other
employees were already there; correct?

        A.    Yes, ma'am.

        Q.    How many other employees were there?

        A.    Three.

        Q.    And I think that you said that you had a
conversation with them briefly.  Do you remember that?

        A.    Yeah, I think we exchanged some words and I
remember, like -- I don't remember much about it, but.

        Q.    Well, you knew that the clinic patient

1  appointments for the morning were being canceled;

2  correct?

3          A.    Yeah, I remember someone saying something

4  about the call center contacting patients.  I don't know

5  about canceling, but yeah.

6          Q.    And I'm not familiar with what it looks

7  like back there.  So were -- when you walk in that door,

8  did you go to someone's office or were you talking to

9  people right at the doorway?

10         A.    Yeah.  So the employee entrance, there's a

11 large space which was our lab, and then there's a large

12 middle space around which patient rooms are centered.  So

13 I stepped into that second large middle space and put my

14 things down.  I don't remember where anyone was except

15 for our manager.  I remember she was in her office on the

16 phone.

17         Q.    And do you know approximately what time

18 that would have been?

19         A.    I imagine sometime around 8:00, 8 -- I

20 don't know.

21         Q.    Well, if you got the initial text at

22 7:48 --

23         A.    Yeah.

24         Q.    -- and then you walked up into the

25 building -- I take it you were in the parking lot; right?

1     A.    Yes.

2     Q.    And then got into the elevator, went

3 upstairs, walked down the hall and entered the building,

4 do you think five minutes maybe?

5     A.    Maybe so.

6     Q.    Okay.  How long would you say that you were

7 inside of the building before you went back out?

8     A.    Incredibly briefly.

9     Q.    Long enough to put your things down?

10    A.    Yes.

11    Q.    Go into the second room, it sounds like, or

12 second work space; correct?

13    A.    Uh-huh (affirmative).

14    Q.    Long enough to interact at least with some

15 of the fellow employees; right?

16    A.    Uh-huh (affirmative).

17    Q.    And, again, one or two or three were there?

18    A.    Three were there.

19    Q.    And who was there?  Who were they?

20          MR. BOYNTON:  Objection, Your Honor.  Some

21 of these people inside the clinic are not witnesses in

22 this case and their names are not relevant.

23          THE COURT:  You can give the positions but

24 not their names.

25          THE WITNESS:  Thank you.  Our MD, our

```
 1   doctor was there, our front office person was also there,
 2   and our manager was there.
 3    BY MS. BELL:
 4          Q.    Okay.  And did you tell them you were going
 5   back out?
 6          A.    I don't think so.
 7          Q.    You just went back out there?
 8          A.    I think so.
 9          Q.    Okay.  And so you come up the stairs, you
10   go in, you go back out.  And before you went back out,
11   did you check your phone?
12          A.    As soon as I put my things down, I looked
13   at my phone to look at the recording that I thought I had
14   taken.  Yeah, but that was it.
15          Q.    So you looked and you realized you hadn't
16   recorded something, though; correct?
17          A.    Yes, ma'am.
18          Q.    And so before you go back out into the
19   hall, do you make sure your phone is working and turn the
20   video on?
21          A.    Yeah.  I mean, we can -- we can see in the
22   video that I've got the recording started while I'm still
23   in the office.
24          Q.    So you decide you're going back out to film
25   in violation of policy; correct?
```

1          A.    Yes.

2          Q.    Okay.  And so when you go back out, it

3   looks like you see some people interacting with someone

4   you thought was a patient; right?

5          A.    Yes.

6          Q.    And you approach them; correct?

7          A.    Yes.

8          Q.    Now, you said that there were approximately

9   two dozen people out there; right?

10          A.    My best estimate.

11          Q.    That's fair.  The woman that you thought

12   was the patient, though, she was interacting with two

13   other women; correct?

14          A.    I noticed one woman speaking to her.

15          Q.    And another woman was nearby; is that fair

16   to say?  You've reviewed the video.

17          A.    I -- yes.

18          Q.    No yelling coming from that location;

19   correct?

20          A.    That's correct.

21          Q.    They're just speaking with her?  Or the

22   woman's simply speaking; correct?

23          A.    Yes, that's correct.

24          Q.    Was the woman that you believed was the

25   clinic patient, was she telling them to go away, was she

1  doing anything like that?

2      A.   I think at one point she says, you don't

3  know me, you don't know my story, but I don't remember

4  hearing her say, like, get away from me or things like

5  that.

6      Q.   Okay.  The other approximately 22 people

7  out there were staying away from that interaction; is

8  that fair to say?

9      A.   Yes.

10      Q.   And I think while you're out there, I can't

11  remember if this was before or after you told the patient

12  to leave, but you do start saying things to the

13  protestors or the -- the protestors in the hallway;

14  correct?

15      A.   Yes.

16      Q.   When you're calling them super pro-life,

17  you hear the tone in your voice?

18      A.   Yeah.

19      Q.   It's not kind?

20      A.   No, it's antagonistic, I would say.

21      Q.   Judgmental; is that fair to say?

22      A.   Yeah.

23      Q.   Disparaging?

24      A.   I don't know about disparaging.

25      Q.   You say no mask.  You're frustrated with

1  them for that; correct?

2          A.      Yeah.

3          Q.      And then you turn and you go back to the

4  clinic; correct?

5          A.      Yes, ma'am.

6          Q.      And when you go back, you encounter a man

7  sitting on the ground; correct?

8          A.      Two men.

9          Q.      Two men?

10         A.      Yes.

11         Q.      How -- can you describe -- because I see

12  one in the video.  I don't know what the other one looked

13  like.

14         A.      The first one was an older gentleman, I

15  believe with gray hair.  The other one I believe was a

16  bit younger.

17         Q.      And they were sitting on the floor;

18  correct?

19         A.      Yes, ma'am.

20         Q.      And you were agitated; is that fair to say?

21         A.      Yes, ma'am.

22         Q.      Telling them to leave; right?

23         A.      Uh-huh (affirmative).

24         Q.      Let you in, something like that.

25         A.      Yeah.

1       Q.   And that the police are coming; correct?

2       A.   Yeah.

3       Q.   And at no point did they stand up and act

4 aggressively towards you, did they?

5       A.   No, they did not.

6       Q.   In fact, the man was very polite; right?

7       A.   No one was aggressive.

8       Q.   Was he rude to you?

9       A.   I don't believe so.

10      Q.   He didn't stand up or get in your face or

11 anything like that; right?

12      A.   No, ma'am.

13      Q.   And you said that you were pretty upset;

14 correct?

15      A.   Yeah.

16      Q.   And had he stood up and, you know, gotten

17 up and over you, he's bigger than you, that might have

18 made it worse; correct?  You might have felt threatened?

19      A.   I don't know.  Yeah.

20      Q.   It's possible, though; right?

21      MR. BOYNTON:  Your Honor, objection.  This

22 calls for speculation.

23      THE COURT:  Sustained.  She's answered.

24 BY MS. BELL:

25      Q.   I just want to ask you a couple more

questions, get a few more things in.  I'm going to show

you some photos again before we show them to the jury.

Okay?

    A.    Okay.

    Q.    Now, do you recognize this photograph?

    A.    Yes.

    Q.    And does that appear to have been taken

from your phone?

    A.    Yes.

    Q.    Is that a true and accurate depiction of

what you saw in the hallway that day --

    A.    Yes.

    Q.    -- on March 5?

    A.    Uh-huh (affirmative).

        MS. BELL:  Your Honor, I'd move to admit I

believe it's Exhibit No. 2.

        THE COURT:  Any objection?

        MR. BOYNTON:  No, Your Honor.

        THE COURT:  Received.

        (Gallagher Exhibit No. 2 was admitted.)

 BY MS. BELL:

    Q.    Just so the jury can see that, can you just

explain what that's a photo of?

    A.    Yeah.  So it's a photo of --

        THE COURT:  It's been admitted so it can be

1  shown to the jury.

2            MS. BELL:  I apologize.  If we can show it

3  to the jury.

4            COURTROOM DEPUTY:  I pushed the button.  It

5  just takes a minute.

6            THE COURT:  Okay, go ahead.

7  BY MS. BELL:

8        Q.   Go ahead.  If you could explain what that's

9  a photograph of.

10        A.   Sure.  This is the person that I thought

11  was a patient, and the person on the right is speaking to

12  her.  I had forgotten about the other person who was

13  standing to the left.  Yeah.

14        Q.   But there's only two people that you

15  remember, again, speaking with her; correct?

16        A.   I don't remember the woman to the left

17  speaking to her.

18        Q.   Okay.  That's fair enough.

19        A.   Yeah.

20            MS. BELL:  Your Honor, like I said, I'd

21  just move this -- and this is Exhibit 2 for the record.

22  And I'm going to go to the next one and have her take a

23  look.

24  BY MS. BELL:

25        Q.   Now, this is another photograph.  Do you

1   recognize what's in that photograph?

2        A.    I do.

3        Q.    Does that appear to be a true and accurate

4   depiction of some of the events from March 5, 2021?

5        A.    It does.

6             MS. BELL:  Your Honor, I'd ask that that

7   photograph be admitted as Exhibit 2A.

8             THE COURT:  Objection?

9             MR. BOYNTON:  No, Your Honor.

10            THE COURT:  Received.

11            (Gallagher Exhibit No. 2A was admitted.)

12            MS. BELL:  And published to the jury,

13  please.

14            THE COURT:  Yes.

15   BY MS. BELL:

16       Q.    Now, Ms. Flowers, if you could please tell

17  the jury what is in that picture.

18       A.    Yeah.  This -- in the center is me walking

19  towards the group of women that we saw in Exhibit 2.

20       Q.    Okay.  And that's right before you asked

21  the patient or potential patient, you thought, to go

22  downstairs and go back to her car; correct?

23       A.    Yeah.  Yes.

24       Q.    Thank you.  I have one more, Your Honor.

25  First have you identify this photo.  Showing you a third

```
1   photograph.  Do you recognize what's in that photograph?
2           A.    I do.
3           Q.    And is that a true and accurate depiction
4   of some of the events that you saw on March 5, 2021?
5           A.    It is.
6                 MS. BELL:  Your Honor, I'd move the next
7   exhibit in as Exhibit 2B, Gallagher Exhibit 2B, and ask
8   that that be published to the jury, please.
9                 THE COURT:  Objection?
10                MR. BOYNTON:  No objection.
11                THE COURT:  Received.
12                (Defense Exhibit No. 2B was admitted.)
13  BY MS. BELL:
14          Q.    With respect to that photograph, can you
15  just tell the jury what that depicts?
16          A.    This is a picture of all of the people in
17  the hallway.
18          Q.    And is the patient standing in between the
19  woman with the white sweater and the dark-haired woman or
20  can you tell?
21          A.    I can't tell.
22          Q.    Okay.  Now, after you left the building,
23  did you continue to engage in a group text with your
24  coworkers?
25          A.    Uh-huh (affirmative).
```

1     Q.   And did you acknowledge to them that that

2  was not smart, what you had done?

3     A.   I did.

4     Q.   And to be clear, the entire time that you

5  were in that hallway, no one threatened you; correct?

6     A.   That's correct.

7     Q.   No one made any aggressive movements

8  towards you; correct?

9     A.   That's correct.

10     Q.   They were polite to you; correct?

11     A.   Yeah.

12     MS. BELL:  Let me just check, Your Honor.

13  I think that may be all my questions.

14     Yes, that's all I have for this witness.

15  Thank you, Ms. Flowers.

16     THE WITNESS:  Thank you.

17     THE COURT:  All right.  Next cross?

18               **CROSS-EXAMINATION**

19  BY MR. PARRIS:

20     Q.   Ms. Flowers, on that day in 2021 when you

21  were in that hallway, did anyone threaten you?

22     A.   No.

23     Q.   Okay.  You remember when you tried -- or

24  you went to go back inside and there was a fairly large

25  gentleman with glasses, gray hair sitting in the floor?

1      A.    Yes.

2      Q.    Almost bowed -- head bowed over.  You

3  remember him?

4      A.    Yeah.

5      Q.    Did he ever threaten you?

6      A.    No.

7      Q.    Did anyone ever curse at you?

8      A.    No.

9      Q.    Did he ever curse at you?

10      A.    No.

11      Q.    Did anyone touch you?

12      A.    No.

13      Q.    Did he touch you?

14      A.    No.

15      Q.    Did anyone yell anything at you?

16      A.    No.

17      Q.    Did he yell at you?

18      A.    No.

19      Q.    Did you see any weapons anywhere with

20  anyone, other than the police?

21      A.    No.

22      Q.    Did he have any weapons?

23      A.    I don't know.

24      Q.    Did you see any weapons?

25      A.    No.

```
 1          Q.    Isn't it fair to say that you were
 2    aggravated that day, that morning?
 3          A.    Yeah, aggravated and panicked, yeah.
 4          Q.    And you were annoyed too, weren't you?
 5    Wouldn't that be -- I mean, we saw the video.  You were
 6    annoyed that nobody had masks on; isn't that true?
 7          A.    I think I was frustrated, yeah.
 8          Q.    In fact, you were probably angry, weren't
 9    you?
10          A.    I was a little angry.  Certainly.
11                MR. PARRIS:  That's all I have.
12                THE COURT:  Anybody else?
```

**CROSS-EXAMINATION**

```
14    BY MR. HAYMAKER:
15          Q.    Good morning, Ms. Flowers.
16          A.    Good morning.
17          Q.    I'm going to publish Gallagher Exhibit 1A
18    that's already been admitted.
19                THE COURT:  Okay.
20    BY MR. HAYMAKER:
21          Q.    Ma'am, you've already identified that
22    photograph.  That is a photo taken towards carafem's
23    door; correct?
24          A.    Yes, sir.
25          Q.    That's a long hallway, isn't it?
```

1          A.     Yes, sir.

2          Q.     It's about 60 feet; does that sound about

3   right?

4          A.     I wouldn't -- I wouldn't know.  It's a

5   decent-sized hallway.

6          Q.     Okay.  And you're familiar with the layout

7   of that -- of that floor; right?

8          A.     Uh-huh (affirmative).

9          Q.     And that photo is taken from the end of the

10  hallway; is that correct?

11         A.     Yes.

12         Q.     And just to the right there is -- you said

13  is an orthodontist office; correct?

14         A.     Yes.

15         Q.     Okay.  Now, you said when you got off the

16  elevator there was a gentleman standing with -- there was

17  a gentleman standing holding his cell phone; is that

18  right?

19         A.     That's correct.

20         Q.     Was he standing at the end of the hallway?

21         A.     Yes.  So not the end of -- like, down at

22  the end of the hallway by the office but, like, at the

23  opposite end.

24         Q.     Exactly.  He was standing at the opposite

25  end of the hallway --

1          A.     Uh-huh (affirmative).

2          Q.     -- from carafem; correct?

3          A.     Yes, that's correct.

4          Q.     And he was standing in such a way that he's

5    looking at carafem; correct?

6          A.     Yes.

7          Q.     And to his right there's a business,

8    correct, the orthodontist's office?

9          A.     Yes.

10         Q.     Completely unrelated to carafem; correct?

11         A.     Correct.

12         Q.     And he's essentially standing at the end of

13   the hall kind of in the corner, isn't he?

14         A.     Yes.

15         Q.     I want to show the witness what's been

16   marked as Boyd Exhibit 1.  I do not want this published

17   to the jury yet.

18                Do you see that photograph?

19         A.     Yes.

20         Q.     Does that appear to be the man you

21   described?

22         A.     Yes.  Also is in the still that I have

23   here.

24         Q.     Exactly.  And I wanted you to see -- so

25   that accurately depicts what you saw that day; is that

1  correct?

2         A.     Yes.

3                MR. HAYMAKER:  Judge, I'd like to move that

4  into evidence as Boyd Exhibit 1.

5                MR. BOYNTON:  No objection.

6                THE COURT:  Received.

7                (Boyd Exhibit No. 1 was admitted.)

8   BY MR. HAYMAKER:

9         Q.     So that is another photograph or still

10  that's similar to one you already had that's already been

11  admitted into evidence; correct?

12         A.     Yes, sir.

13         Q.     But it's taken at more sort of a wider

14  angle; correct?

15         A.     Yes, sir.

16         Q.     Okay.  And as you look at that photograph,

17  there's a plant right next to him; correct?

18         A.     Uh-huh (affirmative).  Yes.

19         Q.     And that plant is in the corner of that

20  hallway; correct?

21         A.     It does look that way, yes.

22         Q.     So just so I understand what happened that

23  day -- and I'm going to focus on the man at the end of

24  the hallway, okay?

25         A.     Okay.

1       Q.    You came -- as I understand it, you came

2  onto the floor off the elevator; correct?

3       A.    Uh-huh (affirmative).

4       Q.    You saw the man in the corner at the end of

5  the hallway; correct?

6       A.    Yes.

7       Q.    You proceeded down the hallway?

8       A.    Yes.

9       Q.    And then you came back and that's when you

10  saw the woman that you believed was a patient; correct?

11       A.    Yes.  So after I re-exited the office, yes.

12       Q.    Okay.

13       A.    Or exited the office.

14       Q.    When you first got off the elevator, you

15  saw the man at the end of the hall.  Did he get in your

16  way in any way?

17       A.    No.

18       Q.    Did he yell at you?

19       A.    No.

20       Q.    Did he scream at you?

21       A.    No.

22       Q.    Did he raise his voice in any way?

23       A.    No.

24       Q.    Did he touch you or try to touch you?

25       A.    No.

1          Q.    So you walked down the hall, you come back,

2    you have the interaction that we saw in the video with

3    who you believe was a patient and the two other women;

4    correct?

5          A.    That's correct.

6          Q.    And then you tell that potential patient,

7    you tell that patient to leave; correct?

8          A.    Yes.

9          Q.    Okay.  And you walk her towards the

10   elevator; right?  You walk along with her?

11         A.    Yes.

12         Q.    And her -- and the person that was

13   accompanying her; correct?

14         A.    Yes.

15         Q.    So you had an opportunity to pass the man

16   at the end of the hall again; correct?

17         A.    Yes.

18         Q.    When you passed him again, he didn't yell

19   at you, scream at you, anything like that, did he?

20         A.    No, sir.

21         Q.    Did he say anything to you?

22         A.    Not that I recall.

23         Q.    Now, that day, later in the day the clinic

24   opened back up; correct?

25         A.    Yes, that's correct.

1       Q.   And the clinic saw patients; correct?

2       A.   Yes, that's correct.

3       Q.   And when you directed this patient to

4 leave, the clinic hadn't even opened yet; correct?  It

5 was prior to 8:00 a.m.?

6       A.   That sounds right, yes.

7       MR. HAYMAKER:  That's all I have.  Thank

8 you.

9       THE WITNESS:  Thank you.

10       THE COURT:  Next?  Mr. Crampton, any cross?

11 Is that a no?

12       MR. CRAMPTON:  Oh, no.  I'm sorry,

13 Your Honor.  I thought co-counsel was asking me.

14       THE COURT:  No cross from you.

15       MR. CRAMPTON:  No cross.

16       THE COURT:  All right.  Mr. Russ.

17       MR. RUSS:  Just briefly, Your Honor.

18             **CROSS-EXAMINATION**

19 BY MR. RUSS:

20       Q.   Ms. Flowers, my name is Ben Russ, I

21 represent Mr. Green.  He's the second from the end there.

22 Can you see him with the glasses and the beard there?

23       A.   I can.

24       Q.   On that day on March 5, 2021, at the

25 clinic, you never saw Ms. Green that day, did you?

1          A.    I don't remember seeing him, no.

2          Q.    So obviously you didn't have any

3    interaction with him if he wasn't there when you were

4    there?

5          A.    I don't know if he was there.  I don't

6    remember seeing him.  And I don't remember having any

7    reaction -- or interaction with him.

8          Q.    And pretty much everything that happened

9    with you that day, we just watched that recording, and

10   then you stated afterwards you left the building?

11         A.    That's correct.

12         Q.    So if he's not on that recording, it's fair

13   to say he wasn't there while you were there?

14         A.    Sure.  Yes.

15               MR. RUSS:  Thank you.

16               THE WITNESS:  Yeah.

17               MR. CONWAY:  On behalf of Ms. Idoni, no

18   cross, Your Honor.

19               THE COURT:  Any redirect?

20               MR. BOYNTON:  Yes, Your Honor.

21                   **REDIRECT EXAMINATION**

22    BY MR. BOYNTON:

23         Q.    Ms. Flowers, on your examination by

24   Ms. Bell, you testified that you worked at a birthing

25   center.  Can you just describe to the jury what a

1  birthing center is?

2          A.    Yeah.   So it was the only birthing center

3  in Nashville at the time, and it's staffed primarily by

4  midwifes for people who desire to give birth without

5  medication.

6          Q.    Does a birthing center perform abortions?

7          A.    That birthing center did not.

8          Q.    Okay.   You were asked some questions about

9  your text messages.   Do you remember that?

10         A.    Yeah.

11         Q.    And you testified on -- when Ms. Bell was

12  asking you questions that those text messages started at

13  7:48 a.m.; is that right?

14         A.    Yes.

15         Q.    Okay.   Do you have them there in front of

16  you still?

17         A.    I do, yes.

18         Q.    And I saw you look down.   Were you just

19  refreshing your recollection about that time?

20         A.    I was.

21         Q.    Okay.   Ms. Bell asked you about that first

22  test message and she read it.   It was the text message

23  that said:   The hallway and staircase are filled with

24  anti-abortion protestors.   Do you recall that question?

25         A.    Yes, I do.

```
 1          Q.    And she asked you about your response to
 2   that, which was what the F?
 3          A.    Uh-huh (affirmative).
 4          Q.    In not so few terms.
 5          A.    Yes.
 6          Q.    And then she asked you questions about when
 7   you first received this message; right?
 8          A.    She did.
 9          Q.    Now, when based on your experience as a --
10   this is an iPhone screenshot; is that right?
11          A.    It looks that way, yes.
12          Q.    Do you still have an iPhone today?
13          A.    I do.
14          Q.    Okay.  Based on your experience as an
15   iPhone user, that 7:48 a.m., is that the time you read
16   that text message or is that the time you received that
17   text message?
18          A.    Received.
19          Q.    Okay.  So sitting here today, do you know
20   whether or not you saw that text message before you came
21   into work?
22          A.    I do not.
23          Q.    Okay.  Now, your -- Ms. Bell asked you the
24   question about your text message back, the what the F
25   message; right?
```

1          A.     Yes.

2          Q.     Do you recall what you texted immediately

3     after that, what your next text was in that chain?

4          A.     I can read them aloud.

5          Q.     Well, will it refresh your recollection to

6     look down at the messages in front of you?

7          A.     Yeah.

8          Q.     Will you look down, and then when you're

9     refreshed, will you look up at me?

10         A.     Yeah.

11         Q.     So immediately after that text message,

12    what the F, what was your text message?

13         A.     I can't get back in, they're blocking the

14    doors.

15         Q.     So sitting here today, do you know whether

16    the what the F was related to the hallway and staircase

17    are filled about antiabortion protestors or whether it

18    refers to not being able to get back in because they're

19    blocking doors?

20         A.     I genuinely don't remember.

21         Q.     You were asked some questions about I

22    believe it was Defense Exhibit 2, which has been admitted

23    and already published.

24              MR. BOYNTON:  So with the Court's

25    permission, may I republish it to the jury, Your Honor?

```
1                    THE COURT:  Yes.
2     BY MR. BOYNTON:
3          Q.    And you were asked whether this was a fair
4     and accurate depiction of what was happening in the
5     hallway that day.  Do you recall that?
6          A.    I do.
7          Q.    Now, the view that we see here, was this
8     the only thing that was happening in the hallway?
9          A.    No.
10         Q.    All right.  Ms. Andrews, can we publish
11    Exhibit 4A, which has already been admitted into
12    evidence.
13                    COURTROOM DEPUTY:  Do you need the Elmo?
14                    MR. BOYNTON:  I can use the Elmo, do a
15    physical exhibit.  Court's indulgence, Your Honor.
16                    THE COURT:  Yes.
17                    COURTROOM DEPUTY:  I can change it back if
18    that's easier.
19    BY MR. BOYNTON:
20         Q.    And, again, you already authenticated this
21    photo here.  And I pulled down Defense Exhibit 2.  And
22    what are we seeing here in Government's Exhibit's 4A?
23         A.    A line of people blocking both entrances,
24    but this is also what was happening behind me as I was
25    speaking with the potential patient.
```

1          Q.     Thank you.

2                 You were asked questions about the clinic

3    opening and whether at the time that this all happened in

4    the hallway, whether the clinic would have even been open

5    yet; is that right?

6          A.     Yes.

7          Q.     And you -- you think it may have been prior

8    to 8:00 a.m. that this all happened?

9          A.     Yes.

10         Q.     Okay.  On a normal day if somebody arrived

11   there just prior to 8:00 a.m., would they still be able

12   to buzz the door?

13         A.     Absolutely.

14         Q.     Okay.  Would they be admitted into the

15   waiting room at least?

16         A.     Absolutely.

17         Q.     Okay.  So did it matter whether it was

18   before 8:00 a.m. if a patient was trying to get to the

19   clinic, they could be buzzed in?

20         A.     It didn't matter at all.  They could

21   absolutely be buzzed in.

22         Q.     As long as there's an employee there?

23         A.     Right.

24         Q.     In fact, there were employees there?

25         A.     Yes.

1          Q.    Okay.  You were asked several questions
2    about the man at the end of the hallway.  Do you recall
3    those questions?
4          A.    I do.
5          Q.    Okay.  Pull up what's been admitted as Boyd
6    Exhibit 1.  You recall this image that was shown in
7    Mr. Haymaker's examination of you?
8          A.    Yes.
9          Q.    And what is -- what is this individual
10   holding here?
11         A.    It looks like a phone and maybe also
12   another phone.
13         Q.    Okay.  And do you recall that from your own
14   recollection that day?
15         A.    Yes.
16         Q.    You were asked several questions about what
17   he was doing.  And do you recall those questions?
18         A.    I do.
19         Q.    You were asked if he was saying anything to
20   you?
21         A.    Yes.
22         Q.    Okay.  You know, your answer to that was
23   no, he wasn't saying anything to you; is that right?
24         A.    Yes.
25         Q.    Was he saying anything to the patient -- or

1  the woman you believed to be a patient?

2          A.    Not that I remember.

3          Q.    Okay.  Ms. Andrews, can we play Exhibit 8

4  from approximately 30 seconds.

5                (Playing video.)

6                Pause right there.  So we're stopping at

7  1:21 on Exhibit 4.

8                Does that refresh your memory about whether

9  that individual at the end of the hallway was saying

10  anything to the woman you believed to be a patient?

11          A.    Yeah.  It sounds like he says that baby is

12  a gift from God to her.

13          Q.    You were asked some questions about what

14  was happening to the patient in the hallway.  Do you

15  recall those questions?

16          A.    Yes.

17          Q.    Okay.  And you were asked about whether

18  anyone was trying to harm her or anything like that.  And

19  the answer to all those questions was no; right?

20          A.    That's correct.

21          Q.    Okay.  But in the video -- we actually just

22  rewatched that clip -- you said this is harassment?

23                MS. BELL:  I'd object to the leading at

24  this point, Your Honor.

25                THE COURT:  He's just reminding the witness

1  of the cross-examination.  Overruled.

2              MR. BOYNTON:  I'll be more mindful as well,

3  Your Honor.  Thank you.

4   BY MR. BOYNTON:

5         Q.    Do you recall saying anything about what

6  you were observing in that moment in the video?

7         A.    Sorry.  Can we double back a little bit?

8         Q.    Sure.  So I was asking you questions about

9  the two women who were engaged with the woman in the

10  hallway whom you believed to be a patient.  Do you recall

11  that?

12        A.    Yes.

13        Q.    Okay.  And you were asked questions about

14  what they were doing, you agreed that there was no kind

15  of violence towards the patient; is that right?

16        A.    That's correct.

17        Q.    Okay.  Do you recall characterizing in the

18  video what you perceived them to be doing?

19        A.    Harassment.  Harassing her.

20        Q.    And why did you think the patient was being

21  harassed?  Why was that your impression?

22        A.    The patient's words, I think, were you

23  don't know me.  And I think generally counseling someone

24  when they have not asked to be counseled or consented to

25  be counseled feels like harassment.

1          Q.    Again, your testimony -- when I first asked

2    you questions, what did you know, if anything, about what

3    this patient was actually coming for?

4          A.    Nothing.

5          Q.    And you actually worked at the clinic;

6    right?

7          A.    Yes.

8          Q.    You were asked several questions about your

9    tone towards the individuals in the hallway.  Do you

10   recall those questions?

11         A.    I do.

12         Q.    And you agreed that you were agitated.  I

13   think you agreed with Mr. Parris that you were a little

14   angry?

15         A.    Yes.

16         Q.    Okay.  Why were you agitated and a little

17   angry that day?

18         A.    Because we would -- we wouldn't be able to

19   do our jobs for a while.  And those services, especially

20   in Tennessee, are really important.  Yeah, I was agitated

21   because they were preventing us from doing our jobs.

22              MR. BOYNTON:  Court's indulgence,

23   Your Honor.

24    BY MR. BOYNTON:

25         Q.    Now, you were asked about those emotions,

1   agitation, a little angry.  Were you feeling anything

2   else at that time?

3          A.    Panic, fear.

4          Q.    Are you able to feel multiple feelings at

5   once?

6          A.    Yes.

7          MR. BOYNTON:  I have no further questions,

8   Your Honor.  Thank you.

9          THE COURT:  Any recross?

10          MS. BELL:  Yes, Your Honor.

11                    **RECROSS-EXAMINATION**

12   BY MS. BELL:

13          Q.    Ms. Flowers, I just want to ask you about

14   one area and that has to do with that text message.

15          A.    Yeah.

16          Q.    Was I correct in hearing that you were

17   suggesting that you didn't know about that text message

18   before you went upstairs?

19          A.    I believe I knew.  I honestly don't

20   remember.

21          Q.    Do you remember that you were interviewed

22   by the FBI in March of 2021 shortly after this happened?

23          A.    Yes.

24          Q.    And do you recall telling the FBI that you

25   arrived at work at approximately 7:45 p.m. (sic), parked

1  in the back lot parking lot and received a text message?

2       A.   Okay.  Yeah, I don't remember that, but

3  thank you for the refresher.

4       Q.   Does that help you, though, kind of parse

5  through whether or not that text message came before or

6  after you went up onto the second floor?

7       A.   Yeah.  Yeah.  Came before.

8       MS. BELL:  Those are all my questions,

9  Your Honor.

10      THE COURT:  Any other recross?

11             **RECROSS-EXAMINATION**

12  BY MR. HAYMAKER:

13      Q.   Ma'am, you testified that the man at the

14  end of the hall, that as you were exiting with the

15  couple, that he spoke to the patient; is that right?

16      A.   I did not see him, but what I heard sounded

17  like him speaking to the patient.

18      Q.   Do you remember him saying, sir, that baby

19  is a gift from God, a blessing from God, and then the

20  man, the person who was with the patient, got on the

21  elevator and said, more power to you.  Do you remember

22  that?

23      A.   I do not remember him saying sir.  I mean,

24  if it's on the video, then that's what happened.

25      Q.   Okay.

1          MR. HAYMAKER:  Thank you.

2          THE COURT:  Anything else?

3          Okay.  You may step down.

4          THE WITNESS:  Thank you.

5          **\*\*\*\*\*WITNESS EXCUSED\*\*\*\*\***

6          THE COURT:  All right.  Members of the

7  jury, we're going to take a 20-minute recess at this

8  time.  We're in recess.

9          (Whereupon, at 10:46 a.m. the jury retired

10  from open court.)

11          (Whereupon, a break was taken from

12   10:46 a.m. to 11:13 a.m.)

13          THE COURT:  We apparently have more people

14  seeking entrance to the courtroom than we have space for

15  them.  Over the lunch hour we will see if we can set up a

16  remote connection in the courtroom next door for those

17  additional spectators, but we're not sure about it

18  because it may interfere with the use of the screens in

19  here.  So we will check on that at the lunch hour.  At

20  this point I don't know.  It may have to be first come

21  first serve.

22          All right, next witness.  I mean, sorry,

23  let's get the jury in first.  That would be helpful.

24  That would be very helpful.

25

1           (Whereupon, at 11:13 a.m. the jury returned

2   to open court.)

3           THE COURT:  You can be seated as soon as

4   you get to your chair.

5           Next witness.

6           MS. KLOPF:  Your Honor, before I call my

7   next witness, I'd like to read a few stipulations into

8   the record.

9           THE COURT:  Okay.  Members of the jury, a

10  stipulation is an agreement between the parties that you

11  are to take these facts as established without hearing

12  anything from the witness stand.  Okay?

13          MS. KLOPF:  The United States of America by

14  and through undersigned counsel, and the defendants

15  Chester Gallagher, Heather Idoni, Calvin Zastrow, Coleman

16  Boyd, Paul Vaughn and Dennis Green by and through their

17  undersigned counsel jointly agree and stipulate to the

18  following:

19          On March 5, 2021, a video recording was

20  posted on Coleman Boyd's Facebook account.  The parties

21  agree that Exhibit 1 is an authentic copy of that video

22  recording and Exhibits 1A, 1C through 1E are authentic

23  copies of portions of the video recording.  The parties

24  further agree that Exhibit 1A-T, 1B-T through 1E-T are

25  accurate transcriptions of those portions of the

1  recording.

2           The parties further agree that Exhibit 1F

3  is an accurate copy of a screenshot from Exhibit 1.  On

4  March 5, 2021, a video recording was posted on Dennis

5  Green's Facebook account.  The parties agree that

6  Exhibit 2 is an authentic copy of the video recording,

7  and Exhibits 2A through 2P are authentic copies of

8  portions of that video recording.  The parties further

9  agree that Exhibits 2A-T through 2P-T are accurate

10 transcriptions of those portions of the recording.

11          The parties further agree that Exhibits 2Q

12 and 2R are accurate copies of screenshots from Exhibit 2.

13          On March 5, 2021, a video recording was

14 posted on Chester Gallagher's Facebook account.  The

15 parties agree that Exhibit 3 is an authentic copy of that

16 video recording and Exhibits 3B through 3D and 3G through

17 3O are authentic portions of the video recording.  The

18 parties further agree that Exhibits 3B-T through 3D-T and

19 3G-T through 3O-T are accurate transcriptions of those

20 portions of the recording.

21          The parties further agree that Exhibits 3P,

22 3Q and 3R are accurate copies of screenshots from

23 Exhibit 3.

24          The parties reserve the right to object to

25 the admissibility of any evidence or portions of exhibits

1   on other grounds, including but not limited to

2   materiality, relevancy and hearsay.

3                THE COURT:  Okay.  Do you have those marked

4   as exhibits?

5                MS. KLOPF:  I do, Your Honor.

6                THE COURT:  What exhibits are they?

7                MS. KLOPF:  This one is Exhibit 19.

8                THE COURT:  Okay.

9                MS. KLOPF:  I move that into evidence.

10               THE COURT:  Any objection?

11               MS. BELL:  No, Your Honor.

12               THE COURT:  Received.

13               (Government Exhibit No. 19 was admitted.)

14               MS. KLOPF:  Next I'm reading Government 20.

15               THE COURT:  Okay.

16               MS. KLOPF:  The United States of America by

17  and through undersigned counsel and defendants Chester

18  Gallagher, Heather Idoni, Calvin Zastrow, Coleman Boyd,

19  Paul Vaughn and Dennis Green by and through undersigned

20  counsel jointly agree and stipulate to the following:

21               On March 5, 2021, Paul Vaughn participated

22  in an interview with a local news crew.  The parties

23  agree that Exhibit 5 is an authentic copy of a video

24  recording of that interview and Exhibits 5A and 5B are

25  authentic copies of portions of that video recording.

1          The parties further agree that Exhibits

2    5A-T and 5B-T are accurate transcriptions of those

3    portions of the recording.  The parties reserve the right

4    to object to the admission of any exhibits or portion of

5    exhibits on other grounds, including but not limited to

6    materiality, relevancy and hearsay.

7               THE COURT:  Are you moving that in as an

8    exhibit?

9               MS. KLOPF:  Yes, Your Honor.

10              THE COURT:  What exhibit is it?

11              MS. KLOPF:  That was Exhibit 20.

12              THE COURT:  Any objection?

13              MS. BELL:  No, Your Honor.

14              THE COURT:  Received.

15              (Government Exhibit No. 20 was admitted.)

16              MS. KLOPF:  I'm now reading from the

17   Government's Exhibit 22.

18              THE COURT:  Did you skip 21?

19              MS. KLOPF:  I did, Your Honor.

20              THE COURT:  Okay.

21              MS. KLOPF:  The United States of America by

22   and through undersigned counsel and defendants Chester

23   Gallagher, Heather Idoni, Calvin Zastrow, Coleman Boyd,

24   Paul Vaughn and Dennis Green by and through undersigned

25   counsel jointly agree and stipulate to the following:

1          The parties agree that the email address

2    wearerescuers@gmail.com was created on February 26, 2021.

3    The account was registered in the name, quote, Chet

4    Gallagher, end quote, and the recovery email was

5    chetgallagher@gmail.com.

6               I move that into evidence, Your Honor.

7               THE COURT:  Objection to Exhibit 22?

8               MS. BELL:  No, Your Honor.

9               THE COURT:  Received.

10              (Government Exhibit No. 22 was admitted.)

11              MS. KLOPF:  Now Exhibit 24.  I'm skipping

12   Exhibit 23.

13              The United States of America by and through

14   undersigned counsel and defendants Chester Gallagher,

15   Heather Idoni, Calvin Zastrow, Coleman Boyd, Paul Vaughn

16   and Dennis Green by and through undersigned counsel

17   jointly agree and stipulate to the following:

18              Coleman Boyd arrived on the floor at

19   approximately 7:47 a.m. and left the floor at

20   approximately 8:12 a.m.  Coleman Boyd remained in the

21   same position the entire time he was on the floor.

22   Coleman Boyd conducted a livestream on Facebook the

23   entire time he was on the floor.

24              THE COURT:  Are you moving 24 into

25   evidence?

1          MS. KLOPF:  Yes, Your Honor.

2          THE COURT:  Objections?

3          MS. BELL:  No, Your Honor.

4          THE COURT:  Received.

5          (Government Exhibit No. 24 was admitted.)

6          MS. KLOPF:  United States calls Caroline

7   Davis.

8          THE COURT:  Caroline Davis.

9                    **CAROLINE DAVIS**

10   called as a witness, after having been first duly sworn,

11   testified as follows:

12   BY MS. KLOPF:

13          Q.    Pull the mic as close as you can if you

14   need to.

15          A.    Okay.

16          Q.    Can you please introduce yourself to the

17   jury?

18          A.    Yes.  My name is Caroline Davis.  I'm 25

19   years old, and I currently live in Atlanta, Georgia.

20          Q.    Okay.  And have you recently changed your

21   name?

22          A.    Yes.

23          Q.    Okay.  What is your name now?

24          A.    It is Caroline Hodges.

25          Q.    Do the defendants know you as Caroline

1  Davis?

2         A.    Yes, they do.

3         Q.    Is it all right if I call you Ms. Davis for

4  today?

5         A.    Yes.

6         Q.    What state do you live in?

7         A.    Currently the state of Georgia.

8         Q.    Do you currently work?

9         A.    Yes.

10         Q.    What do you do?

11         A.    I am a paralegal at a criminal defense law

12  firm.

13         Q.    Where were you born?

14         A.    I was born in Atlanta, Georgia.

15         Q.    What was the highest level of education

16  that you've achieved?

17         A.    I have some college under my belt.

18         Q.    Why did you stop college?

19         A.    I was having some medical issues and

20  financial issues.

21         Q.    Have you ever lived in Tennessee?

22         A.    I've never lived in Tennessee.

23         Q.    Did you ever live outside of Georgia?

24         A.    Yes.

25         Q.    Where?

1          A.    I've lived in the state of Texas.  I've

2    lived in the state of Michigan.  I lived in the state of

3    Florida.

4          Q.    What years did you live in Michigan?

5          A.    Michigan, I moved there in -- it would have

6    been May of 2017, and I left in May of 2021, I believe.

7    Yes.

8          Q.    Which part of Michigan were you living in?

9          A.    I lived in Lapeer, Michigan, mostly.  I

10   spent a little bit of time in Davison, Michigan, but

11   mostly it was Lapeer.

12         Q.    I'd like to talk a little bit about your

13   childhood.  During your childhood, did you have any

14   involvement in the pro-life movement?

15         A.    Yes, I did.

16         Q.    What ages generally were you involved?

17         A.    Around -- about seven years old, my mom

18   started taking me and my siblings out to abortion clinics

19   to protest.

20         Q.    And what would you do at those protestors?

21         A.    My mom would have all of us hold signs and

22   call out to the mothers walking into the clinic and tell

23   us to ask them to have mercy on their babies and things

24   like that.

25         Q.    As an adult did you become involved in

1  protests at reproductive health clinics?

2          A.      Yes, I did.

3          Q.      When did that first start?

4          A.      First started, like, when I was I want to

5  say 19 years old.  I became a Christian and I felt

6  convicted about abortion and I looked up the nearest

7  abortion clinic to me, the nearest one was in Flint,

8  Michigan.  And I started going out to a Planned

9  Parenthood there by myself and just wanting to offer help

10 to moms that were going into the clinic.

11         Q.      So this is after you'd moved to Michigan?

12         A.      Yes.

13         Q.      Initially what did your involvement entail?

14         A.      Initially it was just standing in the

15 right-of-way where protestors are legally allowed to

16 stand.  And I would just call out to the moms or any of

17 the patients going into the clinics that I stood out at.

18         Q.      Initially how often were you going to the

19 clinics?

20         A.      It was whenever I had time.  I worked as an

21 insurance agent at that time.  And if I had an open hour

22 or two, I would just go and stand out there during that

23 time and ask if I could help people going in.

24         Q.      Did the frequency of your involvement

25 change?

1          A.     Yes.

2          Q.     Tell us about that.

3          A.     So when COVID first hit, my job slowed way

4    down and I had the availability to go out to another

5    clinic I'd heard about from somebody I met out at the

6    Planned Parenthood in Flint that I was standing at.  And

7    I was told about some individuals that I should get to

8    know that do this all the time.  And when I went out to

9    another abortion clinic in Flint, Michigan, not the

10   Planned Parenthood, I met this group of people, and I

11   started going out more frequently to stand with them.

12   And eventually I quit my job and was doing it full-time.

13         Q.     So when you say full-time, what do you mean

14   by that?

15         A.     Like 40 hours a week kind of a vibe.  I was

16   going out there as much as possible.  Like a full-time

17   job.

18         Q.     And when you say you'd go out there, where

19   would you be when you were protesting?

20         A.     I would stand where it was legally allowed.

21   So I would stand -- if it was a clinic with a sidewalk, I

22   would stand on the sidewalk.  If it was a clinic with,

23   like, a stretch of grass behind the parking lot, that's

24   where I would stand.  Anywhere we were legally allowed to

25   stand to protest is where I would stand.

1     Q.    How did you know where these lines were?

2     A.    When I was a child, my mom kind of made

3 that clear to us where we were allowed to stand, so I

4 knew there was rules about it from being a kid.  But then

5 from the people that I met standing out at the different

6 clinics I would go to, they always knew where the

7 parameters were that we were legally allowed to stand.

8     Q.    At that point were you making an effort to

9 comply with those rules?

10     A.    Absolutely.

11     Q.    So during this time that you were legally

12 protesting, did you meet Cal Zastrow?

13     A.    Yes.

14     Q.    How did you meet him?

15     A.    He was one of the individuals that was at

16 the clinic in Flint, Michigan on Flushing Road, and I was

17 told that I should go get to know him.  The day that I

18 went out there right after COVID started, I met Calvin

19 Zastrow and his daughter.

20     Q.    What is his daughter's name?

21     A.    Eva Zastrow.

22     Q.    Did you get to know him well?

23     A.    I would say over time, yeah, I got to know

24 him really well.

25          THE COURT:  Excuse me, what's -- go ahead.

BY MS. KLOPF:

      Q.    Do you see him in the courtroom today?

      A.    Yes.

      Q.    Can you please identify him?

      A.    Calvin Zastrow is -- has got glasses on. He has gray hair.  He has a light blue shirt and it looks like a red tie with stripes on it and a suit jacket.

      MS. KLOPF:  Can the record reflect that she has identified Mr. Zastrow?

      THE COURT:  Mr. Zastrow, could you stand so we can see what you have on?  You have on a blue shirt and a red-striped tie.  Very good.  Record will reflect the identification.

BY MS. KLOPF:

      Q.    After you first met Mr. Zastrow, did you seek him out again?

      A.    Yes.

      Q.    Why?

      A.    I wanted to learn more from him.  He was a very energetic and charismatic individual who made me feel important and significant, and I felt like I was doing something good when I was around him.  He seemed to be a very pure and holy individual, in my mind.  I just wanted to be more like him.

      Q.    Initially how often were you seeing him?

1      A.    At first not as often.  It's hard to

2   pinpoint.  It was frequently, but not every single day.

3   But it got to a point where I was trying to see him at

4   least once a week, twice a week.  As much as possible.

5      Q.    How did your relationship with his

6   daughter, Eva Zastrow, progress?

7      A.    Well, Eva Zastrow and I, she came with me

8   to a -- an event called a red rose rescue, and that's

9   kind of where we really clicked.  I did meet her out at

10  the Flushing Road abortion clinic, and then I was invited

11  to go to this other event with another one of the

12  defendants.  And Eva Zastrow agreed to go with me, and we

13  really connected on that trip out there.  And

14  afterwards -- and then our friendship just grew.  She

15  ended up being one of the individuals that would stand

16  frequently with me out at abortion clinics, just the two

17  of us.

18     Q.    Okay.  So just to -- your friendship kind

19  of developed into -- would you call it a close

20  friendship.

21     A.    Oh, yes.

22     Q.    During the time that you were doing these

23  daily protests in Michigan, did you meet a woman named

24  Heather Idoni?

25     A.    Yes, I did.

1          Q.     When do you think you met her?

2          A.     Around the same time that I met the

3     Zastrows.

4          Q.     So sometime in the spring of 2020?

5          A.     Yes.

6          Q.     So what kind of a -- excuse me.  What kind

7     of a relationship did you have with her?

8          A.     Like mother/daughter.  She took me under

9     her wing, and she also spent countless hours with me out

10    in front of abortion clinics.

11         Q.     Do you see her sitting in the courtroom

12    today?

13         A.     Yes, I do.

14         Q.     Can you please identify her.

15         A.     Heather Idoni is sitting on the far end

16    here.  She's wearing a blue top.  She has glasses on.

17              MS. KLOPF:  Can the record please reflect

18    that the witness has identified the defendant, Heather

19    Idoni.

20              THE COURT:  It will.

21     BY MS. KLOPF:

22         Q.     How often were you communicating with

23    Ms. Idoni?

24         A.     Constantly.  On a weekly basis, if not a

25    daily basis.

1        Q.    Do you know a person named Coleman Boyd?

2        A.    Yes, I do.

3        Q.    When did you first meet him?

4        A.    When did I first meet Coleman.

5        Coleman I would have met shortly after the

6 Zastrows. I believe that was my initial connection to

7 the Boyd family, so...

8        Q.    So sometime in the spring of 2020?

9        A.    I think. Or the summer of 2020, I believe.

10       Q.    Who -- do you remember who introduced you

11 to Coleman Boyd?

12       A.    I believe it would have been the Zastrows,

13 but I can't give you a firm answer on that.

14       Q.    Okay. Do you see Coleman Boyd in the

15 courtroom today?

16       A.    Yes.

17       Q.    Can you please identify him?

18       A.    He has glasses on and he's wearing -- looks

19 like a white shirt and a tie and a suit jacket.

20       MS. KLOPF: Can the record please

21 reflect --

22       THE COURT: Can we have Mr. Boyd stand so

23 we can... White shirt and a blue tie. Is that who

24 you've identified?

25       THE WITNESS: Yes.

1          THE COURT:  Okay.  The record will reflect
2    your identification.
3    BY MS. KLOPF:
4          Q.    Do you know a person name Chester
5    Gallagher?
6          A.    Yes, I do.
7          Q.    Do you know him as Chet?
8          A.    Yes.
9          Q.    When did you first meet him, approximately?
10         A.    I first met him, I believe it was August of
11   2020.
12         Q.    Do you remember who introduced you to him?
13         A.    It would have been the connection through
14   the Zastrow family as well.
15         Q.    Do you see him in the courtroom today?
16         A.    Yes, I do.
17         Q.    Can you please identify him?
18         A.    He has a mustache and he's wearing a white
19   shirt, looks like a yellow tie with a pattern on it and a
20   suit jacket and glasses.
21         MS. KLOPF:  Can the record please reflect
22   that the witness has identified Chester Gallagher.
23         THE COURT:  Yes.
24   BY MS. KLOPF:
25         Q.    Okay.  So we talked a little about your

1  experiencing -- experience protesting at reproductive
2  health clinics.
3          A.    Yes.
4          Q.    When I use the term reproductive health
5  clinics, what do you understand me to mean?
6          A.    An abortion clinic would be what I've
7  usually called it or an abortion mill.  So a place where
8  women go to get either birth control, abortions, things
9  all in that realm.
10         Q.    Okay.  Now I'd like to talk about the idea
11 of a blockade.  When I say blockade, what does that mean
12 to you?
13         A.    Makes me think of rescue.
14         Q.    And what does rescue mean?
15         A.    Rescue is -- I formerly would have given
16 that answer as the historical Christian doctrine of
17 peaceful interposition.  And it's basically when people
18 go and block the doors of an abortion clinic to try and
19 keep mothers from being able to go inside and have their
20 appointments.
21         Q.    Okay.  If I use the term blockade, is that
22 all right with you?
23         A.    Yes.
24         Q.    Okay.  Very generally, how does a blockade
25 work?

1          A.     Well, generally the goal is to try and keep
2     anyone from being able to enter the abortion clinic.  The
3     priority would be any of the patients over the workers.
4     It has to take some level of strategy.  I've seen rescues
5     done or blockades done with one or two people and I've
6     also seen it done with a big group of people.  And the
7     more people that you have, the larger chance you have
8     that no one will get inside, at least for a longer
9     stretch of time.

10          So usually they're planned out with
11     multiple people willing to sit in front of the doors,
12     people that know that most likely they will go to jail.
13     And they plan to go to jail because they know that
14     they're breaking the law.  And then you also have people
15     involved to drive people to and from, like, jail back to
16     their cars afterwards.

17          You'll have people who will pretend that
18     they're going to block the doors, but when the police
19     officers give a warning, they'll get up and move because
20     they don't really want to go to jail and they'll just try
21     to make it look like more people are doing it.

22          There's people who will try to talk with
23     the police officers to try and buy as much time as
24     possible.  And they can be done with, you know, chains
25     and locks to make it harder to remove people from the

doors and they can be done just sitting there peacefully.
And the goal is generally to be peaceful and just keep
abortions from happening.

Q.   Can the term rescue be used to describe
something other than a blockade?

A.   Sorry, could you ask that one more time?

Q.   Sure.  The term rescue, can it be used to
describe something other than a blockade?

A.   Yes.

Q.   Can you tell about that?

A.   Well, before I had a really deep
understanding of the blockading form of rescue, I
participated in a red rose rescue, which did not include
any blocking of the doors.  So rescue can also mean just
standing outside and using your voice.  You know, it says
in the Bible, open your mouth for the weak and the
destitute and rescue those being led to the slaughter,
right.  So Christians have taken that the way they want
to take it and executed it to the --

Q.   I'm going to slow you down because I do
want to break this down.  And I'm sorry for interrupting
you.  I want to talk about -- you said you have actually
participated in the red rose rescue?

A.   Yes.

Q.   Very simply, can you describe what a red

rose rescue is as opposed to a blockade rescue?

A.   Yes.  A red rose rescue is a rescue where you don't want to get charged with FACE, basically.  A group of individuals who will either go into the waiting room of an abortion clinic or they will go into the parking lot, which is what the one I participated in, that's what happened.

And so you're trespassing, but you're not breaking FACE, the FACE Act to the best of your ability. You're not keeping people from actually going and doing what they want.  You're just putting yourself in a position where it's harder for them to ignore you.

Q.   When you participated in the one you just described, were you arrested as a result?

A.   Yes, I was.

Q.   What ultimately happened to those charges?

A.   I ended up taking a deal and I was charged with something called I think the Holmes Act or something like that.  I was young.  And so it was kind of like a slap on the wrist.  I was given a probation sentence, but then my probation officer just dismissed it, basically.

Q.   Okay.  And you say you were young. Approximately how old were you then?

A.   Let's see.  So that would have been around the spring of 2020.  And so I would have been around 21,

1    I think.

2            Q.    And how old are you today?

3            A.    I'm 25 years old.

4            Q.    And just jumping ahead on March 5, 2021,

5    how old were you?

6            A.    Oh, gosh.  March 5, 2021.  I'm really bad

7    at math.  I was also severely uneducated as a kid.

8    March 5, 2021, I would have been 22.  Right?  I think?

9    Yeah.

10           Q.    Approximately three years ago?

11           A.    Yeah.

12           Q.    Okay.  So let's talk about -- let's go back

13   to talking about the blockade rescue.  Is that kind of

14   considered a more traditional rescue?

15           A.    Yes.

16           Q.    Do you have any experience participating in

17   a blockade of a reproductive health clinic?

18           A.    Yes.

19           Q.    Did you participate in any reproductive

20   healthcare clinic blockades during the time you lived in

21   Michigan?

22           A.    Yes.

23           Q.    Was one in Sterling Heights?

24           A.    Yes.

25           Q.    That's a suburb of Detroit; right?

1        A.    Yes.

2        Q.    When was that?

3        A.    That would have been August 27 of 2020.

4        Q.    Were you indicted by the Department of

5 Justice for your involvement in that blockade?

6        A.    Yes, I was.

7        Q.    Were you also involved in the blockade of a

8 clinic in Washington, DC?

9        A.    Yes.

10       Q.    Were you charged in that case?

11       A.    No.

12       Q.    Did you participate in a blockade of a

13 clinic here in the Middle District of Tennessee?

14       A.    Yes.

15       Q.    Was that on March 5, 2021?

16       A.    Yes.

17       Q.    Was that -- where was that?

18       A.    In Mt. Juliet at a clinic called carafem.

19       Q.    Were you indicted by the Department of

20 Justice for your involvement in that blockade?

21       A.    Yes.

22       Q.    Based on this conduct, have you pleaded

23 guilty in the Eastern District of Michigan to a

24 superseding information?

25       A.    Yes.

1        Q.    To misdemeanor charges?

2        A.    Yes.

3        Q.    And you pleaded that down from a felony;

4 correct?

5        A.    Yes.

6        Q.    And that was in exchange for your agreement

7 to cooperate?

8        A.    Yes.

9        Q.    Did you admit in your plea agreement that

10 you conspired to blockade the clinic in Sterling Heights?

11       A.    Yes.

12       Q.    And that you blockaded -- in fact,

13 blockaded the clinic in Sterling Heights?

14       A.    Yes.

15       Q.    Have you also pleaded guilty here in the

16 Middle District of Tennessee to a superseding

17 information?

18       A.    Yes.

19       Q.    To misdemeanor charges?

20       A.    Yes.

21       Q.    Did you admit in your plea agreement here

22 that you conspired to blockade the clinic in Mt. Juliet?

23       A.    Yes.

24       Q.    And that you blockaded -- that you, in

25 fact, blockaded the clinic in Mt. Juliet?

1        A.      Yes.

2        Q.      Are you, in fact, guilty of those charges?

3        A.      I am guilty of those charges.

4        Q.      Do you have attorneys for you in both of

5   these different cases?

6        A.      Yes, I do.

7        Q.      Did your attorneys negotiate the terms of

8   your plea agreement for you?

9        A.      Yes, they did.

10       Q.      As part of those plea agreements, did the

11  parties agree that you would cooperate with the

12  United States?

13       A.      Yes.

14       Q.      Did that include that you would testify at

15  any trials?

16       A.      Yes.

17       Q.      Are you testifying today pursuant to those

18  agreements?

19       A.      Yes.

20       Q.      Have you testified before?

21       A.      Yes.

22       Q.      How many times?

23       A.      Three times.

24       Q.      Have you been sentenced yet?

25       A.      No.

1        Q.    Who will ultimately decide your sentence?

2        A.    My judges.

3        Q.    Are you hoping that by cooperating you'll

4 get a lower sentence in the Eastern District of Michigan?

5        A.    Yes.

6        Q.    What do your plea agreements require you to

7 do in terms of cooperating?

8        A.    To tell the whole truth, nothing but the

9 truth.  And to show up when I'm called upon.

10       Q.    Do you understand that under the terms of

11 your plea agreement your cooperation does not depend on

12 whether a jury finds any defendant guilty or not guilty?

13       A.    Yes, I understand.

14       Q.    What is the key thing that you have to do

15 in order to uphold your end of the bargain?

16       A.    To tell the truth.

17       Q.    Other than what's in your plea agreements,

18 has the government made any other promises to you?

19       A.    No, they have not.

20       Q.    Prior to today have you met with the

21 government to prepare for this trial or the other trials?

22       A.    Yes.

23       Q.    How many times would you guess?

24       A.    I don't know, ten times.

25       Q.    Has anyone from the prosecution team ever

1  told you what to say?

2          A.    No.

3          Q.    Has anyone ever told you what to tell to

4  the jury?

5          A.    No.

6          Q.    So you've participated in multiple

7  blockades and you've protested?

8          A.    Yes.

9          Q.    Why did you agree to plead guilty and

10  cooperate?

11         A.    Well, I got -- when I initially got

12  arrested by the FBI, I had to have separation from the

13  group of people that I was really tight with.  Some of

14  them are the defendants and some of them are not.

15               And I started talking with other Christians

16  and individuals in my life that really made me think

17  about the lack of wisdom that I had to break the law in

18  hopes of changing the law.  And I finally realized that

19  my beliefs do not supersede the law and that I was

20  throwing my life away by participating in such

21  foolishness.

22         Q.    Have your beliefs changed?

23         A.    I would say greatly they have changed.

24         Q.    I'm sorry, in terms of abortion have your

25  beliefs changed?

1      A.    Oh, no.  I'm very against abortion.

2      Q.    All right.  So I'd like to go back to

3 talking about blockades again.  When was the first

4 time -- you used the word rescue earlier.  When was the

5 first time you heard the word rescue used to describe a

6 blockade?

7      A.    The day I met Cal Zastrow.

8      Q.    What did he tell you about rescue?

9      A.    I believe he randomly shouted it, and then

10 he started talking about it, talking about past rescues

11 and why rescue was important and holy and that he would

12 invite me to a rescue sometime, something like that.

13      Q.    And what did you understand at that point a

14 rescue to be?

15            MR. PARRIS:  Objection, hearsay,

16 Your Honor.

17            MS. KLOPF:  It's a statement of a party

18 opponent.

19            THE COURT:  You just asked her what her

20 understanding of rescue was.

21            MS. KLOPF:  I'm sorry.  For my question, it

22 goes to --

23            THE COURT:  That's your question.

24 Overruled.

25

1  BY MS. KLOPF:

2       Q.   What was your understanding of rescue at

3  that point?

4       A.   My understanding was that -- I knew very

5  little that day, but I understood that he was talking

6  about how in the Bible, you know, it says to rescue those

7  who are innocent and things like that and that you could

8  really do that if you just went and sat in front of the

9  doors and that people had come before us and done it

10 before us and that we needed to bring it back and have a

11 revival of rescue.

12      Q.   Based on your understanding of what he

13 communicated to you about rescue, ultimately what was the

14 objective of a rescue?

15      A.   To keep people from getting abortions at

16 that clinic on that day.

17      Q.   And when you say keep people from getting

18 abortions, what do you mean by that?

19      A.   To block them from being able to enter the

20 clinic to have their appointment.

21      Q.   What's the point of that?

22      A.   Because if the patients can't get inside,

23 then no abortions can happen.  They can't do them in the

24 parking lot.  So the goal was if we just forced them, if

25 we force them by blocking the doors, then that's

1  hopefully less babies that will die through abortion.

2      Q.   By blocking the doors, would it also

3  prevent clinics from providing reproductive healthcare?

4      A.   Yes.

5      Q.   How?

6      A.   Because they can't do it in the parking

7  lot.  They have to use their building and their facility.

8  So it would -- it was keeping the business from being

9  able to operate as normal.

10      Q.   And I think earlier you talked a little bit

11  about the goal was kind of to have it last as long as

12  possible; is that correct?

13      A.   Yes.

14      Q.   Why do you want it to last as long as

15  possible?

16      A.   Well, if the rescue or blockade lasted five

17  minutes, then they -- the clinic would have no issue, you

18  know, just continuing on for the day.  But if you ruin

19  their day of business by keeping their doors closed for

20  three hours, for example, they're going to have to be

21  completely screwed over for the whole day.  They can't

22  just start all of the appointments three hours late

23  because of the time that the abortion doctor shows up.

24  It throws their whole schedule off.

25           So the longer you can keep the abortion

1  clinic shut down, the longer that you can sit in front of

2  those doors, the bigger chance you have that for the day

3  they won't be able to do any abortions.

4       Q.   Now, I want to -- I want to circle back

5  to -- you know, you said you would keep abortions from

6  happening; right?  How would you do that?

7       A.   Well, now I think it's really silly because

8  if anybody that wanted to get the abortion that day,

9  they'll come back the next day or they'll go somewhere

10  else if they're planning to get an abortion.  You can't

11  really change someone's mind by forcing their hand.  But

12  at the time I believed that, you know, it would give us

13  more time to try and talk and convince the patients

14  trying to get inside to not do it.

15       Q.   And you say you would get -- get you more

16  time; correct?

17       A.   Yes.

18       Q.   Okay.  So I want to ask you about, you

19  know, what physically you're doing to get that time with

20  the patient.

21       A.   Oh, yes.  There's multiple methods that

22  were used to buy time, from my understanding.  One of

23  them was having blowfish.  You'd have --

24       Q.   I'm so sorry.  I was talking about what

25  you're physically doing with your body.

```
 1        A.    Blocking, sitting in front of the doors,
 2  not moving, not letting anyone through.
 3        Q.    Not letting anyone through, okay.
 4        A.    Yes.
 5        Q.    Would you ask patients why they were there?
 6        A.    Yes.
 7        Q.    Okay.  Did you care why they were there?
 8        A.    Honestly, at the time, no.
 9        Q.    Okay.  If someone told you they were there
10  for birth control, would you have let them in?
11        A.    No, because I wouldn't have believed them.
12        Q.    When you say you wouldn't have believed
13  them, why not?
14        A.    Generally abortion clinics have abortion,
15  like, days, like days that they'll just do all abortion
16  appointments.  And then they'll have information days.
17              MS. BELL:  Your Honor, I'm going to object,
18  lack of foundation for this information.
19              THE COURT:  You want to establish some
20  foundation?
21              MS. KLOPF:  Sure.
22              THE COURT:  Sustained.
23   BY MS. KLOPF:
24        Q.    Did anyone educate you on how abortion
25  clinics functioned?
```

1          A.    Yes.

2          Q.    Who educated you on how abortion clinics

3    functioned?

4          A.    Well, abortion clinics, I made a lot of

5    phone calls to abortion clinic to set fake appointments

6    in the past, and I discovered kind their system and their

7    schedule.  And I've also been inside an abortion clinic.

8    I was there a lot as a child, so -- and then, of course,

9    things that you learn from other people doing the same

10   thing.  You know, you learn from each other to get as

11   much information as you can to be as effective as

12   possible.

13         Q.    Okay.  So regardless of why the patient was

14   telling you they were there, you were not going to let

15   them in?

16         A.    That's correct.

17         Q.    Okay.  What if a woman didn't want to be

18   talked to?

19         A.    Uhm...

20         Q.    Did you care?

21         A.    Usually we would still try to talk

22   anyway -- I would still try to talk to them anyway.

23         Q.    If they didn't want to talk to you, would

24   you let them inside?

25         A.    No.

                          Q.     All right.  I'm going to move on to another

topic.  Do you know what the FACE Act is?

                          A.     Yes.

                          Q.     Okay.  Very generally, what is your

understanding of what the law prohibits?

                          A.     The law prohibits basically blocking people

from being able to enter reproductive healthcare clinics.

                          Q.     When did you first learn about this law?

                          A.     Either -- I believe it was the day I first

met Cal Zastrow is the first time I heard about FACE.

                          Q.     Who told you about FACE?

                          A.     Cal Zastrow.

                          Q.     What did he tell you about when the law was

enacted?

                          MR. PARRIS:  Objection, hearsay.

                          THE COURT:  Admission of party opponent.

Overruled.

 BY MS. KLOPF:

                          Q.     When did he tell you about when the law was

enacted?

                          A.     He told me that the Clinton administration

enacted the FACE Act to try and stop Operation Rescue,

which was a massive movement of people back in the late

'80s, early '90s that were blocking tons of abortion

clinic doors across the nation.  And so the FACE Act,

1   from my understanding, was brought forth to try and stop

2   that because people were just getting trespassed, which

3   is like a slap on the wrist legally.  But when you commit

4   a FACE act, it's a much bigger deal.  When you break the

5   FACE Act, it's a much bigger consequence.

6         Q.    Who told you that it was a much bigger

7   consequence?

8         A.    Calvin Zastrow.

9         Q.    What did he tell you about how it impacted

10  protests?

11        A.    Well, he told me that when it came to

12  blockades, it diminished them to a complete stop.  So

13  people quit doing rescues because of the FACE Act is what

14  Cal Zastrow told me.

15        Q.    So you understood that blocking access to a

16  reproductive healthcare clinic was against federal law?

17        A.    Yes.

18        Q.    And you understood that prior to all the

19  blockades that you participated in?

20        A.    Yes.

21        Q.    So you said that Zastrow told you about it,

22  you believed, the first time you met him.  Were there

23  other occasions where Zastrow talked to you about the

24  FACE Act?

25        A.    Yes, it was very frequently.

1          Q.     When you say very frequently, are you

2     talking two to three, four to five, what are you talking

3     about?

4          A.     From my memory, it seems like every time I

5     was around him, something about the FACE Act or rescue

6     was discussed.

7          Q.     Let's talk about the summer of 2020.  Did

8     you have the opportunity to camp with some of your

9     codefendants?

10         A.     Yes.

11         Q.     Okay.  Where was that?

12         A.     In Michigan.

13         Q.     Generally -- or can you be a little bit

14    more specific about where in Michigan?

15         A.     Dearborn, Michigan, and then there was

16    different campsites, like -- from southern Michigan up to

17    northern Michigan that everybody went to.  I stayed at

18    one campsite in particular more towards southern Michigan

19    because I lived in Michigan.  People were coming in from

20    out of state, so I didn't feel the desire to sleep

21    outside the whole time.

22         Q.     Who was there of your codefendants?

23         A.     I recall Chet Gallagher, Heather Idoni, Eva

24    Edl, Eva Zastrow, Cal Zastrow, Coleman Boyd.  That's all

25    I remember from the top of my head.

1    Q.    Okay.  At this camping trip was the FACE

2 Act discussed?

3    A.    Yes, the FACE Act was discussed on this

4 camping trip.

5    Q.    By whom?

6    A.    It was discussed by Cal and by Chet, if I

7 remember exactly.

8    Q.    When you say Cal, who are you talking

9 about?

10    A.    Cal Zastrow, I'm sorry.

11    Q.    No problem.  I want to make sure our record

12 is very clear.  When you say Chet, who are you talking

13 you about?

14    A.    Chester Gallagher.

15    Q.    What were they discussing about the FACE

16 Act?

17    A.    They were telling us what the cost was of

18 rescue.  So if you were going to blockade, you had to

19 know and count the cost.  You had to know what you were

20 risking.  That's why they were talking through FACE.

21    Q.    How many people were present when they were

22 having this discussion?

23    A.    I'd say around 50 including children.

24    Q.    Did Coleman Boyd speak at that camp?

25    A.    I believe so.

1      Q.    Okay.  What, if anything, did he say about
2 rescue?
3      A.    It would have been all scripture related
4 most likely.  Usually when it was discussed in general
5 and in an encouraging fashion at these gatherings, it was
6 a lot of Bible verses that had to do with either child
7 sacrifice or rescuing the weak and the needy, things like
8 that.
9      Q.    Based on your recollection of conversations
10 or hearing Boyd speak about rescue, was he supportive of
11 rescue?
12      A.    Very much so.
13      Q.    Would he encourage others to engage in
14 rescue?
15      A.    He believed that if you felt called on by
16 the Lord, you should rescue.
17      Q.    I understand that he believed that people
18 should do that, but was he encouraging others to do so?
19      A.    I would say yes.
20      Q.    Why would you say that?
21      A.    Because I saw him encourage his kids to
22 rescue.
23      Q.    How would he encourage his kids to rescue?
24      A.    He would pray with them about following the
25 Holy Spirit's direction in their lives and that -- and

1  talk to them about how good rescue was and how -- it was

2  very many painted as like a holy martyrdom complex kind

3  of a thing.

4        Q.   Were you present for some of those

5  conversations?

6        A.   Yes.

7        Q.   This camping trip in Michigan, do you

8  recall if his children were there?

9        A.   Yes.

10        MS. KLOPF:  Your Honor, I'm just keeping an

11  eye on the time.  I'm about to go to another section.

12  Would you like me to keep going?

13        THE COURT:  Yes.

14        MS. KLOPF:  Okay.

15   BY MS. KLOPF:

16        Q.   Okay.  So now I want to talk about the nuts

17  and bolts of rescue, how it's implemented.  Do people in

18  a blockade have different roles?

19        A.   Yes.

20        Q.   Okay.  Can you please name -- earlier you

21  kind of addressed some of them.  Can you list those off?

22        A.   Yes.  There's the blowfish role, which is

23  pretending like you're going to sit there until the cops

24  take you away but then getting up at the final warning

25  from the police officers.  There's the actual blockaders,

1  the people who are willing to go to jail, and they will

2  sit there regardless of how many times the police warn

3  them to move.

4          Then there's individuals who do the

5  driving.  They will drive you to the rescue, drive you

6  home from jail, et cetera.  And usually keep tabs on car

7  keys and licenses and phones and things like that.

8          Then there's individuals who generally will

9  be designated to speak with the police.  One of the

10  reasons is they've discovered over time, from what I've

11  witnessed, that if multiple people try to talk to the

12  police at the same time, you have a much smaller chance

13  of them considering what anyone's saying.  So it would be

14  a designated person usually to try and engage the police

15  at once.

16          And then there's other things I've seen in

17  rescue -- in a rescue where, like, I didn't blockade.

18  But in the ones that I participated in, those were the

19  general rules that I noticed.

20      Q.    So you used the term blowfish, and I want

21  to dive into that a little bit more.  When did you first

22  hear the term blowfish used?

23      A.    The first time I recall hearing the word

24  blowfish would have been a gathering with people who were

25  pro-rescue, and some of the defendants would have been

1   there.  The discussion was about to -- trying to buy time

2   to get the police from arresting us quickly.  So a

3   blowfish puffs up to scare its predator away, right, to

4   try and appear like it's bigger than it really is.

5          Q.    Are you talking about the actual fish?

6          A.    Yes.  So the concept is if we had more

7   people sitting in front of the doors, even if that many

8   people weren't willing to go to jail and weren't willing

9   to face -- face the FACE Act, then it would deter the

10  police from arresting us as quickly because they don't

11  want to do all that paperwork and they'll literally beg

12  you -- they will sit and beg, please get up, we don't

13  want to arrest you, please get up, we don't want to

14  arrest you.

15          And the goal is to make them feel like,

16  well, we can just let them sit here for the rest of the

17  day.  Because that's happened before historically with

18  rescue where they see so many people, they're just like

19  whatever, let them sit there the whole day.  We're not

20  going to do all the paperwork, we're not going to take

21  them to jail.

22         Q.    So it sounds like the primary purpose of a

23  blowfish is to slow the police response down; is that

24  correct?

25         A.    That is correct.

1        Q.    What is another purpose of a blowfish?

2        A.    Another purpose of the blowfish is it's

3   more bodies.  So when mothers are coming to the door,

4   it's even more intimidating for them.  When they're

5   walking towards the clinic, they see all those people,

6   it's like, whew, I don't even know what's going on here,

7   I gotta go, you know.

8        Q.    How does someone get assigned the role of a

9   blowfish?

10       A.    Usually it's people that volunteer.  People

11  will be, like, I'm not actually willing to risk arrest,

12  but if it accidentally happens, I'm okay with it.  Like,

13  it's people that are on the fence.  They're not fully

14  committed to being willing to go to jail.  But they're

15  willing to get as close as possible to doing that.

16       Q.    Are they involved in the planning of the

17  blockade?

18       A.    Absolutely.

19       Q.    How so?

20       A.    They participate in the meetings leading up

21  to the rescue.  They are fully willing to be as helpful

22  as they can.  And they want to talk to the moms, they

23  want an opportunity to try and keep abortions from

24  happening at that clinic.

25       Q.    Have you ever been a blowfish?

1          A.      Not exactly.  I participated in a DC -- in

2    the DC rescue to some extent.  I didn't block the doors,

3    but I played a different part.  It wasn't really a

4    blowfish.  I was on the elevator and I just did, like,

5    five-second sermons to people on the elevator.

6          Q.      And what did you view your role in those

7    five-second sermons?

8          A.      I would be more like a sidewalk counselor

9    that's trespassing is how I would probably define it.

10         Q.      Okay.  And in terms of the blowfish that

11   you've worked with in the past -- have you worked with

12   blowfish in the past?

13         A.      Yes.

14         Q.      Or been around blowfish in the past?

15         A.      Yes.

16         Q.      To the best of your understanding, are the

17   blowfish aware of what everyone else is doing?

18         A.      A hundred percent yes.

19         Q.      Why do you say that with such confidence?

20         A.      Because they are fully -- they got all the

21   same information that everyone else got going into it by

22   the leader.  And being told, like, what's going to

23   happen, what they can expect, if they don't want X, Y and

24   Z happening to them, don't do X, Y and Z.  If you are

25   willing to do X, Y and Z -- like, they've got all the

education beforehand.

Q.   Okay.  And you say beforehand.  In --
generally in your experience in a rescue, when is this
beforehand?

A.   The beforehand would be the meeting, like,
either the day before or two days before, when everybody
who's going to participate gathers and talks about what's
going to happen.

Q.   When you were involved in DC, when you kind
of said you were doing the five-second sermons, were you
aware that other people were blocking doors?

A.   I was fully aware.

Q.   Were you encouraging others to commit the
crime?

A.   Yes, I was.

Q.   Did you intend to help them commit the
crime?

A.   Yes.

Q.   Did you get arrested that day?

A.   No.

Q.   But you'd helped commit the crime of a
blockade?

A.   Yes.

Q.   And in terms of the planning of that day,
had you reached an agreement with those people to engage

1   and to help them with that blockade?

2           A.     Yes, I did.

3           Q.     But, again, you weren't arrested that day?

4           A.     Yes.

5           Q.     Do you agree that you still committed a

6   crime?

7           A.     Yes.

8           Q.     All right.  You talked a little bit about

9   drivers.  Why is it important to have a driver?

10          A.     Well, if you don't have a driver, you could

11  get stranded in a jail cell.  I mean, a lot of times the

12  drivers also helped get people out of jail afterwards.

13  They help with the phone calls that you're allowed to

14  make from the jail cell.  They help keep tabs on personal

15  stuff.  And then they will help you get back to your

16  vehicle or back to your home afterwards.

17          Q.     And I guess -- taking a step back, in your

18  experience when you've gone to a blockade, do you know

19  beforehand that you are going to block a door?

20          A.     So what I always said was I was going to

21  let the Holy Spirit lead me.  So I would be in my head,

22  like, ready to do it, and then I would wait and see if I

23  had a feeling that I should do it.

24          Q.     Okay.  So if you're waiting and seeing, did

25  you still take steps to anticipate being arrested?

1          A.    Yes.

2          Q.    Was part of that making sure that there was

3    someone to drive you so that your car didn't get left?

4          A.    Yes.

5          Q.    Now, in terms of the actual blockade as

6    it's underway, is it important to have someone keeping an

7    eye out for patients?

8          A.    A hundred percent.

9          Q.    Why?

10         A.    Well, because it gives more of an

11   opportunity to send someone their direction to try and

12   talk to them about what they're about to do or what they

13   want to do; to see if you can offer them help and to see

14   if you can convince them otherwise and to tell them about

15   Jesus.  So the goal was, like, if you can have somebody

16   looking out and if you can have somebody, you know,

17   directing people, that's very helpful.

18         Q.    Okay.  Have you acted in that role before?

19         A.    Sort of.  I definitely sort of participated

20   in that with the DC rescue in a sense.  I mean, I was on

21   the elevator.  And at this rescue in Tennessee, I started

22   out the whole thing -- not exactly because everyone moved

23   into position quicker than I signaled, but I was supposed

24   to signal everyone that moms were going to come up from

25   the elevator.

1       Q.    Okay.  And why is it important generally to

2  kind of communicate amongst the blockaders?

3       A.    So everyone's on the same page and knows

4  what to do, I guess.

5       Q.    When you say knows what to do, what do you

6  mean by that?

7       A.    Well, you never really know what's going to

8  happen.  I guess I've heard a lot of stories about

9  rescues gone bad in terms of, like, police officers

10  thumping on the rescuers or patients getting violent and

11  then you have to know what to do and how to respond.

12           And then you don't know if the police are

13  going to be, okay, you guys can just sit there for the

14  whole day.  So if you have open communication, everybody

15  knows better, like, what to do.  Should they sit still,

16  should they get up, what should they do.

17       Q.    Is it important to know if a patient is

18  coming?

19       A.    I would say yes.

20       Q.    Why?

21       A.    Because then you can be prepared on what to

22  say to them when they get close to you.

23       Q.    Might you need to get in place?

24       A.    If you're not in place, yes.

25       Q.    Now, earlier you talked about that there

1    was a person who was designated to speak with police.

2    And I think you explained it a little bit, but you said

3    in your experience there's usually one person tasked with

4    speaking with the police; is that correct?

5         A.    Usually, yes.

6         Q.    Okay.  And in your experience having one

7    person designated to speak with the police, what's the

8    end result of that?

9         A.    Well, usually my experience is watching

10   negotiations, it seems like, unfold for hours and it has

11   bought more time.  Like, it made the rescue -- or the

12   blockade last longer.

13        Q.    Is that ultimately a goal of the

14   blockaders?

15        A.    Absolutely.

16        Q.    How far in advance might a blockade start

17   to be planned?

18        A.    Well, I didn't get any of the finer details

19   usually till, like, a month out at most, but usually

20   there's always -- I mean, I feel like I've heard it said

21   a million times.  There's always a rescue being planned.

22   But when it comes down to actual location, actual group

23   of people participating, the furthest out that I can

24   remember was one month.  So for this rescue, I learned

25   about it specifically in February.

1      Q.    Have you ever planned a rescue yourself and

2 brought other people into it?

3      A.    No.

4      Q.    Okay.  In the rescues that you participated

5 in, someone else had planned it and you joined it?

6      A.    Yes.

7      Q.    Okay.  When are the roles in a blockade

8 finally determined?

9      A.    Usually, like, the day of to the -- or the

10 day right before.  So morning of or day before roles are

11 solidified.

12      Q.    When you say day of, is it once people are

13 inside or still outside?

14      A.    Usually before you move into position of,

15 like, trespassing.  Before you start trespassing,

16 everybody kind of knows what they're about to do.

17      Q.    Okay.  When you use the term trespassing,

18 do you mean entering the building?

19      A.    Yeah, entering the building or -- in other

20 rescues I've been a part of, just getting on their

21 property, going in front of the door.

22      Q.    Okay.  Now, going back to -- have you ever

23 seen a smaller rescue?

24      A.    Yes.

25      Q.    And would you agree with me that the -- the

1    Tennessee blockade was well attended?

2         A.    Oh, yes.

3         Q.    Okay.  In terms of how you viewed the

4    groups, you know, of the smaller rescue versus this

5    larger rescue, what do you think the effect of having

6    that many people was on police officers?

7         A.    It was massive.  I mean, so I've really

8    truly participated in two blockades.  And I've been a

9    part of one that wasn't a blockade and I've helped but

10   didn't blockade in one in DC.  But in the two that I

11   participated in, both times there was a bigger number of

12   people and the police officers really didn't want to

13   arrest us both times.  Like, they truly did not.  It was

14   clear they wanted us to just please get up and move back

15   to where we were supposed to be standing.

16         So it was very clear.  And then I witnessed

17   a rescue with just two people.  And they -- moms got

18   inside, patients -- patients got inside, workers got

19   inside.  It was completely ineffective.

20         Q.    Okay.  Would you agree with me that a

21   hallway full of people could be intimidating?

22         A.    Yes.

23         Q.    Why?

24         A.    Well, I imagine if I was going to an

25   abortion clinic to have an abortion, I would want peace

1   and quiet and I would want nobody to know I was going and
2   I would want it to be personal.  I'm just putting myself
3   in their mindset.  And if I walked up and there was a
4   massive group of people telling me to turn to Jesus and
5   let them help me, I would be, like, I'm outta here, this
6   is crazy, bye.  I'd be scared.  So, yeah, I would be
7   intimidated, I'm sure.
8          Q.    When you were participating in the
9   blockade, did you understand that that was going to be a
10  result of your actions?
11         A.    At the time I think I was so convinced that
12  it was just the right thing to do that I didn't really
13  care, but I --
14         Q.    I understand maybe not care, but did you
15  understand that would be a result of your behavior?
16         A.    I think so, yeah.
17         Q.    So let's talk specifically about the
18  blockade on March 5, 2021.
19              THE COURT:  Maybe this would be a good time
20  to take a break.
21              MS. KLOPF:  Certainly, Your Honor.
22              THE COURT:  All right.  Members of the
23  jury, we're going to take our lunch hour at this point.
24  We'll be in recess for one hour.
25

1                    (Whereupon, at 12:08 p.m. the jury retired
2      from open court.)

3                    (Whereupon, a break was taken from
4      12:08 p.m. to 1:11 p.m.)

5                    THE COURT:  Do you have any estimate of how
6      much longer the direct is?

7                    MS. KLOPF:  Yes, Your Honor.  I would
8      guess -- we're starting to play videos, so it's going to
9      take quite a bit of time.  I would guess three hours, but
10     that is a rough estimate.

11                   THE COURT:  Yeah.  I'm a little surprised
12     at your estimate yesterday that you were going to get
13     through all your proof today.

14                   MS. KLOPF:  I was so ambitious.

15                   THE COURT:  You were very, very optimistic
16     and ambitious.  Okay.

17                   MS. KLOPF:  What is it Dolly Parton says,
18     like, just sip a cup of ambition, I don't know.  But --
19     yeah, I was sipping something.

20                   THE COURT:  Okay.  We're ready for the
21     jury.

22                   (Whereupon, at 1:11 p.m. the jury returned
23     to open court.)

24                   THE COURT:  All right.  Be seated.

25                   Counsel, you may continue your direction of

1   Ms. Davis.

2                  MS. KLOPF:  Thank you, Your Honor.

3    BY MS. KLOPF:

4         Q.    Ms. Davis, right before the break, we had

5    just finished talking about blockades generally.  So I

6    want to talk specifically about May 5, 2021.  All right?

7         A.    Okay.

8                  THE COURT:  May?

9                  MS. KLOPF:  I'm sorry, March.

10   BY MS. KLOPF:

11        Q.    March 5, 2021.  Where were you on March 5,

12   2021?

13        A.    I was in Tennessee in Mt. Juliet.

14        Q.    And what was the clinic you were blockading

15   called?

16        A.    Carafem.

17        Q.    When did you learn about this potential

18   blockade?

19        A.    In February of the same year.

20        Q.    What did you hear?

21        A.    I heard that there was a rescue.  Or I

22   think I heard there was going to be a big hoorah

23   happening.  It was that kind of terminology used.  But I

24   was told there was going to be a rescue.  I understood.

25   And I got all excited and started immediately trying to

1  figure out if I would be able to attend.

2          Q.    Let's break it down a little.  First off,

3  who told you that there was going to be a big hoorah?

4          A.    Calvin Zastrow.

5          Q.    When he used the term hoorah, what did you

6  understand that to mean?

7          A.    I knew he meant rescue.

8          Q.    How did you know that?

9          A.    Because he had spoken about that before

10  like that.  At some point the word rescue did come up

11  while talking about it, but it was always very hush-hush.

12          Q.    Why was it hush-hush?

13          A.    Well, because we didn't want law

14  enforcement to know beforehand that it was going to be

15  happening or for the clinic to have any heads-up that it

16  would be happening because then it would be much harder

17  to accomplish.

18          Q.    So tell us about the first time that you

19  heard that there was a possibility of a blockade

20  happening.

21          A.    It would have been outside in front of the

22  Saginaw abortion clinic in Flint -- sorry, Saginaw,

23  Michigan.  It would have in front of an abortion clinic

24  in Saginaw, Michigan.  And I would have heard it from

25  Calvin Zastrow.  That is how I heard about it.

1      Q.    How did you hear him talk about it?

2      A.    He talked about very quietly how he was

3  planning and putting one together, how he had heard that

4  there was Christians in Tennessee that were having a hard

5  time contacting the mothers -- like, having any contact

6  with the mothers going inside the clinic and they needed

7  help.

8            And so I guess it's mostly just because the

9  way this clinic was set up.  If you were standing where

10 you were legally allowed to as a protester, good luck

11 identifying who was going to the carafem clinic because

12 there was other -- other businesses inside that big

13 building that carafem was located in.

14     Q.    Did there come a time that you heard any

15 conversations over the phone?

16     A.    Yes.  I heard Cal talking to Chet Gallagher

17 over the phone --

18           MS. BELL:  I'm going to object.  I don't

19 know how she could know who he was talking to.

20           THE COURT:  You want to lay a foundation?

21           MS. KLOPF:  Yes, Your Honor.

22  BY MS. KLOPF:

23     Q.    When you were standing outside of the

24 abortion clinic, were you close enough to Cal Zastrow to

25 hear phone calls?

1          A.    Yes.

2          Q.    Where are you present when he made phone

3    calls?

4          A.    Yes.

5          Q.    Were you close enough that you could hear

6    the other speaker on the phone?

7          A.    Sometimes, yes.

8          Q.    Did there come a point when you overheard a

9    phone call that related to the March 5, 2021, blockade?

10         A.    Yes.  Cal Zastrow took a phone call and he

11   said Brother Chet.  It was clear he was talking to Chet

12   Gallagher, and they started discussing things.  And I

13   became aware shortly after that conversation of what was

14   being planned by Cal Zastrow.

15         Q.    Tell us what you recall about what you

16   heard from that phone call.

17         A.    I recall hearing that -- just Cal mostly

18   taking in information, asking some questions, but I

19   didn't have an idea 100 percent what was being talked

20   about until it was made more clear in our conversation.

21         Q.    When you say it was made more clear, who

22   was telling you --

23         A.    Sorry, Calvin Zastrow.

24         Q.    And what was he telling you?

25         A.    About how there was some brothers and

sisters in Tennessee that were having trouble reaching

the patients that were going to -- into the abortion

clinic and how we could fix that by doing a rescue.

Q.    In the coming weeks after you heard that

phone call, did the plans start solidifying?

A.    Yes.

Q.    Can you describe that?

A.    Well, I received a group text message on a

group chat, I believe it was the Michigan Holiness

Revival group chat on Facebook Messenger.  And Cal let us

know in group text that he was going to be planning and

figuring out the logistics of this hoorah, I think he

even called it in that text.

And so he was just letting us know that we

could be preparing -- it was basically like an

invitation.  If any of you are thinking about

participating -- he let us know two weeks beforehand that

he was going to be going in and scoping it out and seeing

what the possibilities would be in that text.

Q.    What did you understand was the goal of the

plan?

A.    I understood the goal was to shut down

carafem for a day.

Q.    And in terms of number of participants,

what was Zastrow's goal?

          A.    Actually, I have no idea.  I just know the
more the better.  I know he wanted a lot of people.  And
my understanding was by the date that he picked had to do
with however many people he could get to participate.  So
whatever it was most convenient for people to show up.

          Q.    How do you know that?

          A.    Because when we talked about it, like,
he -- and he talked about this many times with a rescue
how important it is that the more -- the more people, the
better.  If you don't have very many people, it will end
faster.

          Q.    And why did he say it would end faster if
you didn't have more people?

          A.    Well, because then you'd not -- you're not
really threatening anybody at that point.  It's easier to
have a security guard simply remove you or have the
police remove you quickly, things like that.  So he
talked about how back in during Operation Rescue there
would be hundreds and hundreds of Christians that would
show up.  Ever since the FACE Act, then that wasn't
happening anymore.  People were too scared.  People were
too afraid to count the cost, so to speak.  So now the
goal was to bring back the rescue movement.

          Q.    And what's -- what is -- you talked a
little bit, but what is the purpose of having a lot of

1 people? You said slowing down the police officers. In

2 terms of the patient, why do you want a lot of people?

3       A. It's much harder to get through a large

4 group of people blocking a door than just one or two. So

5 pretty much guaranteed they weren't going to get through,

6 the more people that you have.

7       Q. Okay. When you started hearing about this

8 rescue, what were you thinking about?

9       A. I was thinking about trying to be there.

10 Like, I really wanted to attend at the time. I wanted to

11 go. I knew about the certain individuals who were going

12 to be attending, and I didn't want to be left behind.

13 Because at the time I wasn't really supposed to be

14 standing out by myself at abortion clinics as a single --

15 like an alone female. I was married at the time, but I

16 wasn't supposed to be alone as a female at the clinic. I

17 was supposed to have somebody with me.

18       I knew the people that normally stood with

19 me were going to be at the rescue. I didn't want to get

20 left behind and I wanted to go be a part of it, so I was

21 trying to figure out how I could do that.

22       Q. Did Zastrow invite you to go?

23       A. Yes.

24       Q. What, if anything, did you discuss with

25 Zastrow about doing a smaller rescue?

1            MR. PARRIS:  Objection, relevance.  A

2  different -- something different?

3            THE COURT:  Yeah.

4            MS. KLOPF:  I can rephrase it.

5  BY MS. KLOPF:

6      Q.    What, if anything, did Zastrow discuss with

7  you about his views on smaller rescues?

8      A.    My understanding --

9            THE COURT:  Wait.

10            MR. PARRIS:  Objection, relevance.

11            THE COURT:  His views on smaller rescues.

12  Overruled.

13            THE WITNESS:  My understanding from all the

14  conversations about rescue with Cal was that he didn't

15  necessarily think they were wrong, but he didn't think

16  they were the best way to go.  And he had told me stories

17  about when people had used cars to block the doors of the

18  abortion clinic and all kinds of stuff.  My understanding

19  was, from what he told me, is that it's just better to

20  have more people.  So that's kind of all that I recall.

21  BY MS. KLOPF:

22      Q.    In February of 2021 what was going on with

23  your personal health?

24      A.    I was sick.  I might have had COVID again,

25  I'm not really sure, but I definitely was not feeling

1  well and I was trying to, like, get better quickly so
2  that I could go.
3        Q.    Was there a chance that your health was
4  going to impact your ability to go?
5        A.    Yes.
6        Q.    So talk about your decision-making process
7  about, you know, whether or not to go to Tennessee.
8        A.    Well, at the time I wanted to make sure
9  that my ex-husband was okay with me going.  And I wanted
10 to not be alone back at the clinics that I stood out on a
11 regular basis.  So, yeah, that was my big thing was
12 trying to figure out, can I manage it.
13             And I found out that I would have
14 everything covered financially.  I found out that I'd
15 have a place to stay through Heather Idoni.  I found out
16 that I would have a car ride through Michelle Eddy.
17 Found out that my friend, Kendra Petty, was going to go
18 too.  So I was, like, oh, everything's covered.  And then
19 my pastor said that he was okay with me going.  And my
20 ex-husband didn't care, so.
21       Q.    Okay.  So because you were sick in February
22 of 2021, were you still out at the abortion clinics every
23 day protesting?
24       A.    Not every single day.  I know there was
25 days that I did not go out when I was super sick, but

1  there were still days that I did go out that I wasn't

2  feeling 100 percent.

3       Q.    During that period of time was Cal Zastrow

4  still relaying information to you about the planning of

5  the blockade?

6       A.    By that point I wasn't standing outside

7  with Cal every single day.  Usually I would see him,

8  like, once a week on the days that we would all try to go

9  to the same clinic.  So it kind of changed over time.

10  But by that point usually the whole group would get

11  together at a clinic on Saturday, but otherwise during

12  the week we would try to cover as many abortion clinics

13  as we could and spread out.

14        So a lot of the times I was standing with

15  Eva Zastrow every day or Heather Idoni or Kendra Petty,

16  or Megan Petty, those were the individuals that would

17  rotate standing with me.  So I heard about it when I was

18  next to him, which -- but then also heard about it in the

19  Facebook group chat.

20       Q.    Okay.  What, if anything, did Heather Idoni

21  tell you about this?

22       A.    Heather told me that she was going to have

23  like a hotel, sort of room share situation set up, and

24  she was going to be able to bless people by giving them a

25  place to stay for the rescue.

1          Q.    Did you speak to her about this or did you

2   communicate in other forms?

3          A.    I don't specifically remember if it was

4   texting, calls or in person.  It could have been any of

5   those.

6          Q.    And when she told you or she communicated

7   to you that you would have housing available, what did

8   you understand you would have housing available for?

9          A.    I knew I was going to have housing

10  available for the night before the rescue, before the

11  blockade.

12         Q.    Did you understand Idoni to understand that

13  this was for a rescue?

14         A.    A hundred percent, yes.

15         Q.    How do you know that?

16         A.    Because we talked about it.  Like, she

17  knew -- she was excited if the Holy Spirit was going to

18  lead her to do the rescue.  That's pretty much how

19  everyone talks about it who's going to participate is

20  they talk about it like if the Holy Spirit leads me to,

21  then I will.  And, like, they'll be doing it knowing --

22  like, they're going to do it, but it could be a last

23  minute, maybe not, and it's all, like, led by the Holy

24  Spirit.  That's how that's communicated, anyway.

25         Q.    Were you communicating similar things to

1  others?

2          A.     Yes, a hundred percent.

3          Q.     What was actually in your mind?

4          A.     That I was going to do it.

5          Q.     When -- pardon me.

6                 So you were aware of this phone call with

7  Gallagher.  What, if anything, did you know about his

8  involvement in the planning of this?

9          A.     Well, I knew that --

10                MS. BELL:  I'm going to object unless

11  there's a foundation.

12                THE COURT:  Yes.  Sustained.

13   BY MS. KLOPF:

14         Q.     Did you come to learn that Gallagher was

15  involved in the planning of this blockade?

16         A.     Yes.

17                MS. BELL:  Same objection.

18                THE COURT:  Sustained.  We need a

19  foundation.

20   BY MS. KLOPF:

21         Q.     During the course of the planning, did

22  Zastrow communicate to you that others were involved in

23  the planning?

24         A.     Yes.

25         Q.     Who else did he say was involved in the

1    planning?

2                    MS. BELL:  Objection, *Bruton* issues,

3    Your Honor.

4                    THE COURT:  Excuse me?

5                    MS. KLOPF:  *Bruton* implicates testimonial

6    statements.

7                    THE COURT:  Yeah, this -- bench conference.

8                    (Whereupon, the following proceedings were

9    had at the bench outside the hearing of the jury:)

10                   THE COURT:  What is the objection,

11   Ms. Bell?

12                   MS. BELL:  Your Honor, we're hearing all

13   about these statements that I think the government is now

14   going to allege some alleged co-conspirator statements

15   for the first time today.  These have not been provided

16   in any of the 302s.  They were impossible to prepare for.

17   We're just hearing all of this new information today.

18   Now I'm hearing that Mr. Zastrow was implicating my

19   client in some way I never have heard previously, and

20   I've not had an opportunity to properly brief or address

21   that issue.  So I'm making my challenge that it shouldn't

22   come in because I can't cross-examine Mr. Zastrow's

23   statements that are hearsay upon hearsay to Ms. Davis.

24                   THE COURT:  Ms. Klopf?

25                   MS. KLOPF:  Your Honor, the basis is a

1  *Crawford* issue has been heard.  It's a co-conspirator

2  statement, they are admissions of a party opponent.

3  *Crawford* and *Bruton* are testimonial.  It's post police

4  communication statements made to law enforcement with the

5  expectation that they be used in the course of

6  litigation.  *Bruton* is not implicated by the planning of

7  the blockade.

8              THE COURT:  These are co-conspirator

9  statements.  I'm a little surprised that they are not in

10  her 302s.  Are they?

11             MS. KLOPF:  Your Honor, I believe they are,

12  that she knew that Mr. Gallagher was involved in the

13  planning.

14             MS. BELL:  That allegation is there, but

15  the specific statements are not.  And also I haven't

16  heard any specifics as to when these alleged statements

17  occurred.

18             THE COURT:  All right.  Put them into time.

19  They're co-conspirator statements.  And the objection is

20  overruled.

21             MS. BELL:  Thank you.

22             (End of bench conference.  Whereupon, the

23  following proceedings were had in the hearing and

24  presence of the jury:)

25

1    BY MS. KLOPF:

2         Q.    Ms. Davis, we were talking about

3    communications that you had with Mr. Zastrow.  Was this

4    in -- what period of time was this in?

5         A.    It would have been around February of that

6    year leading up to March.

7         Q.    Okay.  So based on these conversations,

8    what did you understand Gallagher's role was?

9         A.    I just understood that he was helping plan

10   it, but I didn't know all the details of how much he was

11   doing or all the pieces of the puzzle.  But I knew that

12   he was helping pick the clinic and stuff like that.

13        Q.    Did you come to learn that Coleman Boyd was

14   going to be involved?

15        A.    I did.

16        Q.    How did you learn that?

17        A.    Facebook Messenger, if I remember

18   correctly.  We had a group chat called the Calvinist

19   Mental Health group chat.  And Coleman Boyd was part of

20   it, along with myself and another -- two other

21   individuals.  And Coleman and I were communicating on

22   that chat about whether or not we were going to be in

23   Nashville for the rescue and also if I was going to go to

24   Mississippi to where he lives.

25        Q.    Okay.  Based on your understanding, what

1  was Boyd's role in the planning?

2       A.    Well, I knew he wasn't going to blockade,

3  but I knew he was going to try to be useful in other

4  ways.  Usually he would do a lot of the sidewalk

5  counseling and communicating to different people, like he

6  would get real close -- as close as he could get to feel

7  like he wasn't going to get arrested, but he would still

8  be right there.

9       Q.    I want to talk all about the blockade in a

10 little bit, but right now I want to --

11      A.    I'm sorry.

12      Q.    No, I'm sorry for interrupting you, but I

13 want to focus on the planning right now.

14      A.    Okay.

15      Q.    So what, if anything, did you know about

16 Boyd's role in the planning?

17      A.    In the planning I wasn't real familiar with

18 what he was doing.

19      Q.    Okay.  And you said that he -- you said

20 that he wasn't going to participate in the blockade.

21 What did you mean by that?

22      A.    Well, he is an individual with a lot of

23 responsibility, a lot of kids and he's a doctor.  So I

24 knew from talking with him about it that he wasn't going

25 to put himself in that position because he felt like it

1   was more responsible and wise for him to be there for his

2   family and for his kids.

3           Q.   But I want to stop you.  You're saying he

4   wasn't going to physically put himself in front of the

5   door; is that correct?

6           A.   Yes.

7           Q.   Was he involved in the blockade, though?

8           A.   Yes.

9           Q.   How so?

10          A.   Well, he played other roles.  Pretty much

11  anything and everything that wouldn't get him arrested,

12  at least that he thought wouldn't get him arrested is

13  what he would do.

14          Q.   Is he a lawyer?

15          A.   No.

16          Q.   Okay.  So did Boyd now you were going to

17  come to Tennessee or at least were considering coming to

18  Tennessee?

19          A.   Yes, he knew.

20          Q.   What did he want you to do after you were

21  done in Tennessee?

22          A.   He wanted me to come visit in Mississippi

23  where he lives.

24          Q.   So jumping ahead to the blockade, were any

25  of Boyd's family members, without naming names, involved

1    in the blockade?

2          A.    Yes.

3          Q.    Without naming names, who was involved in

4    the blockade?

5          A.    Two of his children.

6          Q.    Are they minors?

7          A.    Yes.

8          Q.    What, if anything, were their roles in the

9    blockade?

10         A.    To blockade the doors.

11         Q.    How did they get to the blockade?

12         A.    They would have been brought probably by

13   Coleman, but I don't specifically know if they rode in

14   the same car as him.  But he transported them around.

15         Q.    At any point did it appear that he was

16   discouraging his children to participate?

17         A.    No.  It seemed like he was encouraging them

18   to participate.

19         Q.    How -- what do you mean by that?

20         A.    Well, because -- how do I say this.  He

21   always was talking in a positive light about laying your

22   life down for others and, you know, basically

23   inappropriately encouraging, in my opinion, his children

24   to --

25

1      Q.    I'm going to stop you because I don't want
2  to get into opinion.  I want to get to what you saw.
3  What did you see about him encouraging his children to
4  participate in this blockade?
5      A.    I saw him paint it in a very, very good
6  light and that it would be a holy, good thing for them to
7  do.
8            MR. HAYMAKER:  Judge, I'm going to object
9  to the foundation.
10           THE COURT:  Foundation.  Sustained.
11  BY MS. KLOPF:
12      Q.    In the days leading up to this blockade,
13  did you see Mr. Boyd communicating with his children?
14      A.    Yes.
15      Q.    Okay.  What -- describe -- please describe
16  what, if anything, was discussed about rescue.
17      A.    I saw him praying with some of his children
18  about whether or not they would do the rescue.
19      Q.    And when you say whether or not they would
20  do the rescue, what do you mean by that?
21      A.    Whether or not his children would
22  participate in blocking the doors.
23      Q.    All right.  So let's talk about Tennessee,
24  about how you got here.  You were living in Michigan at
25  the time; correct?

1          A.     Yes.

2          Q.     Do you remember when you left Michigan for

3     Tennessee?

4          A.     It would have been -- actually would have

5     been days before because there was multiple things that

6     happened before the day of the rescue.  So we went around

7     and protested at, like, a Planned Parenthood and we

8     gathered together in three different locations and had,

9     like, meetings.  So there was a lot of, like, protesting

10    out on the streets and stuff like that leading up to the

11    carafem blockade.

12         Q.     How did you get to Tennessee?

13         A.     I got there in Michelle Eddy's car.  She's

14    a woman I knew from the group.

15         Q.     Who else was in the car?

16         A.     Kendra Petty, Heather Idoni and myself.

17         Q.     What conversation, if any, did you have in

18    the car about what was going to happen in Tennessee?

19         A.     It would have just all been about what was

20    going to happen.  There was praying, there was probably

21    some singing.  There was some debate.  It was mostly

22    laid-back conversation.  But if we talked about it, I

23    don't specifically remember what we said.

24         Q.     At that time were you aware of what Idoni's

25    plan was for the actual blockade?

1          A.    Well, I knew that her contribution for the

2    group was going to be housing.  And I knew that she was

3    going to be blockading.  I knew those were her

4    intentions.

5          Q.    How did you know that?

6          A.    Because she said that she was going to, if

7    the Holy Spirit led her, the way that I described

8    earlier.

9          Q.    When you got to Tennessee, where did you

10   go?

11         A.    When we first got there, we went to the

12   lodging that Heather had set up.  And then I know we --

13   like I said --

14         Q.    I'm going to stop you right there.  Can you

15   describe the lodging, please?

16         A.    The lodging was set up almost like a motel,

17   but really nice.  Like, you didn't go inside the building

18   and found a room.  You could access your room from the

19   outside and there was multiple levels and it seemed like

20   multiple buildings.  So the Head family had a room, I

21   stayed in a room with Eva Zastrow, Heather Idoni and Eva

22   Edl, if I remember correctly.  So everyone was kind of

23   spread out and staying in a different spot.

24         Q.    Okay.  And, again, were you paying for that

25   room?

1    A.    No.

2    Q.    Who was paying for that?

3    A.    Heather Idoni.

4    Q.    So after you get to this -- is it all right

5    if I call that a motel?

6    A.    Sure.

7    Q.    After you get to this motel, who did you

8    meet up with?

9    A.    There was people that showed up from

10   different states.  So eventually we connected with the

11   Boyd family.  I don't actually know where they stayed.  I

12   think they camped, but I'm not a hundred percent certain.

13   The Head family showed up, the Belangers showed up, Eva

14   Edl was there.  A bunch of people just started showing

15   up.

16   Q.    Okay.  Did there come a point where there

17   was a larger meeting of all of these people?

18   A.    Yes.

19   Q.    Where was that?

20   A.    Well, we had three different ones that I

21   recall.  There was one in this room share facility, motel

22   place.  They had a big, giant room, and it was like not a

23   conference center, not that big, but it was a big room.

24   A bunch of us gathered in there at one point.

25            And another point we gathered outside under

a canopy and had pizza and talked about the rescue.  And
another time we gathered at a church, and that was the
night before the rescue.

     Q.    Okay.  So I'm going to break down those
three meetings and I'd like to talk about each one.
This -- the meeting in the large room at the room share
facility, who led that meeting?

     A.    Okay.  From my memory, I believe it was --
yeah, I can't -- right now, I just can't remember who it
was, I'm sorry.  My memory's failing me.

     Q.    Do you remember who spoke?

     A.    Well, that's what I'm having trouble, like,
remembering at the moment.

     Q.    Generally what was the meeting about?

     A.    It was about the rescue.  And it was about,
like, scripture encouraging rescue.

     Q.    So more of a general meeting about rescue;
is that correct?

     A.    Yes.

     Q.    Were details of the rescue discussed?

     A.    I'm having a hard time remembering if they
were discussed in detail there.  I feel like more than
anything that was a worship gathering where -- it was
like Bible verses and praying and singing.

     Q.    At that point based on your observations,

1  did the participants in that meeting understand that a

2  rescue was going to take place?

3       A.   Yes.

4       Q.   How do you know that?

5       A.   Because the whole topic was about rescue.

6  Like, all the worship and the prayer and the singing and

7  all of it was focused on verses that encouraged

8  blockading.

9       Q.   Now, you said there was a second meeting.

10 This one outdoors?

11      A.   Yes.

12      Q.   Outdoors where?

13      A.   In the middle of some of the room share

14 buildings.  So it was a covered area with picnic tables.

15      Q.   Covered area with picnic tables.  Do you

16 remember who was at that meeting?

17      A.   All of the defendants -- all the defendants

18 were there.  And then there was some individuals I'd

19 never met before.

20      Q.   I'm going to stop you because there are six

21 defendants here, so I want to go through each defendant.

22      A.   Okay.

23      Q.   First, was Heather Idoni there?

24      A.   Yes.

25      Q.   Okay.  Was Dennis Green there?

1   A. Yes.

2   Q. Okay.  Had you met Dennis Green before that

3 day?

4   A. No.

5   Q. Were you introduced to him?

6   A. I don't recall if we got directly

7 introduced.

8   Q. Did there come a point when you understood

9 who he was?

10   A. Yes.

11   Q. Do you see him here in the courtroom today?

12   A. Yes.

13   Q. Can you please identify him?

14   A. Yes.  He is sitting next to Heather Idoni.

15 He's -- it's hard to tell the color.  Looks like a very

16 light green shirt possibly.  He has -- wears glasses and

17 has quite a beard.

18    MS. KLOPF:  Can the record reflect the

19 witness has identified Dennis Green?

20    THE COURT:  It will.

21 BY MS. KLOPF:

22   Q. Was Paul Vaughn at this meeting?  Do you

23 remember Paul Vaughn being at this meeting?

24   A. Okay.  Then I retract.  I don't remember

25 Paul Vaughn until the day of the rescue, so I'll take

1   that back.  I don't remember Paul until the day of the

2   rescue.

3          Q.    Thank you for that clarification.

4                Was Chester Gallagher there?

5          A.    Yes.

6          Q.    Was Coleman Boyd there?

7          A.    Yes.

8          Q.    Was Cal Zastrow there?

9          A.    Yes.

10         Q.    Okay.  So those five individuals were

11  there.  You were there?

12         A.    Yes.

13         Q.    Who else was there?

14         A.    Eva Zastrow, Eva Edl, all of -- like

15  Coleman's family was there.  The Head family was there.

16  There was kids who were helping, I know for sure they

17  were helping organize the event.

18         Q.    Do you know those individuals' names?

19         A.    There's Ruth Washburn and Amanda Place and

20  Paul Place.  And I don't remember anyone else -- those

21  are the people that I specifically remember hearing them

22  discuss plans about the clinic with Chet and Cal Zastrow.

23         Q.    Had you ever met Paul Place or Amanda Place

24  before that day?

25         A.    No.

1      Q.    Do you remember who introduced you to those

2   people?

3      A.    I think Amanda introduced herself to me.  I

4   don't remember having any conversations with Paul until,

5   like, right before the rescue and I got his phone number

6   to use it to signal to everyone if I saw a mom coming.

7      Q.    Okay.  So there's -- you've named off a

8   number of individuals.  Are there other individuals at

9   this meeting?

10      A.    There was other individuals.  The Belanger

11   family was there.  And then -- I don't specifically

12   recall any of the other individuals.  That could have

13   been it.  I'm not a hundred percent sure.

14      Q.    So what was discussed at this meeting?

15      A.    The rescue in more specific detail.

16      Q.    Okay.  What, if anything, was discussed

17   about roles?

18      A.    The roles were discussed.  Blowfish were

19   discussed.  It was talked about, like, our hope about --

20   there was a discussion about whether or not the pastor --

21   the chief of police apparently in Mt. Juliet was

22   apparently a pastor, and I remember that being discussed

23   because they were hoping that since he was a pastor he

24   would not have us arrested and that he could be talked

25   with and basically felt, like, more compelled that we

were doing the right thing.  So I remember that being
talked about.

Q.    Do you remember who communicated that
information about the police chief being a pastor?

A.    I remember Chet Gallagher talking about it
and I remember Cal Zastrow talking about it, but I don't
remember at what moment specifically.  I just remember it
coming from both of them at some point.

Q.    So this is an outdoor meeting and you said
there's pizza there?

A.    There was.

Q.    Is everyone having individual conversations
or was it one big conversation?

A.    Well, there was a lot of individual
conversation at the beginning and at the end, but it was,
like, a held meeting and there was, like, everyone pay
attention to who was speaking at this moment.  And I
remember at some point -- I think Coleman did the prayer,
if I remember correctly.  Cal Zastrow did a lot of
talking and Chet Gallagher did talking.

Q.    Okay.  What roles were discussed?

A.    I know that the blockaders were identified
as the people who were prayerfully considering and
feeling led by the Holy Spirit.  And then I know that it
was discussed that children were also prayerfully

considering rescuing or blockading.  And I specifically
remember Coleman Boyd talking about that at that
gathering.

Q.    Were drivers discussed?

A.    At the time I don't remember hearing about
the drivers.  But I talked with my group that came in the
car together.  And Michelle Eddy talked about how she was
going to be driving us the next morning when it was right
before the rescue.

Q.    So when juveniles were being discussed
about whether or not they were going to be involved,
describe a little bit about that.

A.    Well, I remember, like -- it was, like,
Coleman seemed very proud and was just saying, like, oh,
my children are prayerfully considering it.  So please be
in prayer for them as they prayerfully consider whether
or not they're going to lay down their lives for their
neighbors.

Q.    Okay.  Did any other people talk about
their children being involved?

A.    I don't recall.  I know other children did
participate, but I don't remember hearing it from the
father of the children who did.

Q.    When you discussed blowfish, what, if
anything, was discussed?

1    A.    Well, they knew that there was going to be
2    people that for sure were not willing to risk arrest the
3    way the blockaders were going to be, so that is why they
4    discussed, like -- and this actually -- blowfish were
5    discussed before -- like, this was in much earlier
6    discussion because people like Kendra Petty who came in
7    the vehicle that I went to Tennessee in, she was going to
8    be a blowfish and I knew she was going to blowfish before
9    we got there.  And I also knew Justin Phillips and Emily
10   Phillips, those people went to my church.  I knew they
11   were considering doing the blowfish position as well.
12       Q.    Was there any discussion at this meeting
13   about the potential for arrest?
14       A.    Yes.
15       Q.    Who, if anyone, said anything about arrest?
16       A.    Well, I know Chet and Cal both talked about
17   being arrested and counting the cost.  So that was a
18   constant discussion.  But it was described in detail what
19   you were going to be risking; if you did get arrested,
20   what the worst potential would be.
21       Q.    Was the FACE Act discussed in that
22   conversation?
23       A.    It was.
24       Q.    In your head, just specifically to you,
25   what did you understand you were risking arrest for?

1      A.   I understood -- could you ask that a
2  slightly different way?
3      Q.   Sure.  So you said -- were you risking
4  arrest that day?
5      A.   Yes.
6      Q.   What were you thinking about what you were
7  being -- what you were risking arrest for?
8      A.   Oh.  For blocking the doors of the abortion
9  clinic.
10      Q.   And that could be a number of different
11  crimes; correct?
12      A.   Sorry?
13      Q.   Blocking the doors to an abortion clinic
14  can result in different crimes; correct?
15      A.   Yes.
16      Q.   Okay.  Trespassing one of them?
17      A.   Yes.
18      Q.   FACE Act being another?
19      A.   Yes.
20      Q.   Who was talking about the FACE Act that
21  day?
22      A.   Well, I -- I always remember Cal talking
23  about the FACE Act.  And I'm pretty sure -- but I don't
24  want to say 100 percent sure, I just know it was talked
25  about, Cal led a lot of conversation, Chet led a lot of

1  conversation.  Coleman I remember praying, and the FACE

2  Act was definitely discussed.

3         Q.    Was there any discussion about the clinic

4  layout?

5         A.    Yes.

6         Q.    Who led that part of the discussion?

7         A.    I can't remember if it was Cal or Chet.

8         Q.    Okay.  And do you remember how -- what they

9  said about the clinic?

10         A.    I remember it was discussed that we'd have

11  to take the elevator or the stairs.  I remember it being

12  discussed that everyone would gather on the stairs and

13  that someone would give a signal if they thought they saw

14  a mom and her boyfriend or just a mom get on the

15  elevator.

16              And that person was going to signal to the

17  people in the staircase waiting.  And then if they got

18  the signal, they were going to move out into the hallway

19  and block -- and immediately move into position and block

20  the doors.  And I was the one who ended up getting that

21  role.

22         Q.    So I want to break that down a little bit.

23  When you say saw a mom, did you have any reason to think

24  a person was actually a mom or pregnant?

25         A.    Yes.

1          Q.     How so?

2          A.     Well, when you stand outside abortion

3    clinics every single day for a while, you start

4    recognizing, like, what these patients look like.  So it

5    was a younger woman and she had a boyfriend with her and

6    they were very solemn and I just -- I just had a feeling

7    and I just -- I just texted -- I think I said I think

8    there's a mom coming.  I don't remember my exact words to

9    Paul Place, but I texted Paul Place's number that I was

10   pretty sure that a mom was coming.

11         Q.     But you understand that carafem provided a

12   number of different services; correct?

13         A.     Yes.

14         Q.     So mom was kind of a catch-all term for a

15   patient; is that fair?

16         A.     Yup.  Hundred percent.  We always just say

17   mom because so many of them -- usually -- especially on a

18   rescue day, it's predetermined, like, either -- someone

19   makes a phone call -- that's another rule that I didn't

20   talk about.  A lot of times with these rescues, someone

21   will make a phone call to find out if it's a kill day or

22   not.  That's what we called it.  A kill day would be a

23   day that abortions are being performed.  And generally on

24   days that abortions are being performed, other services

25   are not offered that day.

1       Q.    Okay.  Were you -- did you make the phone

2  call for carafem that day?

3       A.    I did not.

4       Q.    Okay.  So you just believed --

5       A.    Trusted.

6       Q.    -- that that was -- okay.

7       So going back to this meeting, did anyone

8  discuss steps that could be taken to slow the police

9  response?

10      A.    Yes.  Specifically I remember it being

11  discussed that Chet was going to be teaching during this.

12  I remember this being discussed.  Chet was going to be

13  kind of explaining the best way to go about a rescue

14  because, like, to pass on the torch.  You know, he was

15  well-known for rescue back in the day.  So I knew he was

16  going to be doing that.

17         I knew that there was going to be somebody,

18  but I didn't know who, to be engaging the police.  I

19  thought it would be Chet.  And I don't know how much Chet

20  did, but I know Paul Vaughn engaged most -- the police

21  most of the time.  But, yeah, all of the roles were

22  established pre- -- preday -- pregame day or however you

23  want to call it.

24      Q.    What, if anything, do you know about

25  Mr. Gallagher's history of law enforcement?

1          A.    I knew his testimony, he told -- he shared

2    with us that he was a police officer at one point and he

3    was --

4          Q.    Did you -- did you think that he was using

5    that prior experience and applying it to the blockade?

6          A.    Yes.

7          Q.    And why do you think that?

8          A.    Well, if I remember his testimony

9    correctly, my understanding was that he was a police

10   officer and then he was called to the scene of a rescue

11   and that it convicted him and that he decided to sit down

12   and participate in a rescue back in the day, if I

13   remember correctly.  That is what I remember hearing

14   about it.

15              And I just know that he had participated in

16   so many of them --

17              MS. BELL:  Your Honor, at this point I'm

18   going to object.  I think we're getting into things that

19   are inappropriate.

20              THE COURT:  Yeah, let's move on.

21              MS. KLOPF:  Of course.

22              THE COURT:  Sustained.

23    BY MS. KLOPF:

24         Q.    Let's talk about what, if anything,

25   Mr. Boyd said about things that could be done to slow

1  down a police response.

2       A.    I don't specifically recall Coleman saying

3  something specific about -- about slowing the police

4  down.

5       Q.    What, if anything, did Mr. Boyd say

6  about -- okay, let me step back.

7             Was Eva Edl at that point at this meeting,

8  this outdoor meeting?  Had she made it clear she wanted

9  to participate as a blockader?

10      A.    Yes.  Eva Edl said any rescue that she can

11 show up to, she will participate in across the board.

12 She's made that statement.

13      Q.    What, if anything, was discussed at this

14 meeting about steps that could be taken specific to her

15 to slow down the police response?

16      A.    Well, I mean, I know she was going to sit

17 in the wheelchair as a distraction when we were trying to

18 blend in.  It wasn't discussed directly as, like, slow

19 down the police, but I know it was done as, like, blend

20 in.  And it was very convenient that that chair blocked a

21 lot of the door.  I recall that being discussed.

22      Q.    Thank you for that clarification.  So I

23 guess let's -- let's circle back.  So it was discussed

24 that she should sit in a wheelchair?

25      A.    Yes.

1      Q.    Who discussed that?

2      A.    Well, I remember Coleman Boyd talking about

3  bringing medical devices.  Like, he gave his son

4  crutches.  And I think it was him that recommended the

5  wheelchair.  I don't specifically remember about the

6  wheelchair, but I know he was telling us, like, wear

7  masks, bring the crutches.  We'll do stuff like that to

8  blend in so that at first, before any patients arrive, we

9  won't be found out until it's go time, you know.

10      Q.    By the end of this outdoor meeting, what

11  was the plan for the next morning once this meeting was

12  over?

13      A.    I'm sorry, could you ask that one more

14  time?

15      Q.    Sure.  Once this meeting was over, what did

16  you understand the plan to be for the next morning?

17      A.    Well, I know that when it was going to be

18  the day of the rescue, I knew that we were all going to

19  get there at a specific time early in the morning.  It

20  was supposed to be right before the clinic opened so that

21  we could get into position to be ready for the first

22  patient to come in.  So I knew we were all going to show

23  up.  I knew what I was going to do.  I was going to sit

24  on the bench and watch the elevators and text Paul Place

25  if I saw anyone that looked like it was going to be a

1    patient.

2         Q.    Let's break that down a little bit.  Who

3    helped you come up with that plan?

4         A.    I believe it was Cal Zastrow, but I have to

5    say I believe it was because I don't specifically

6    remember if it was Chet or Cal.

7         Q.    So your job -- can you describe what your

8    job was supposed to be when you first arrived at the

9    clinic?

10        A.    It was to blend in.  Like, everyone was

11   supposed to go in slowly.  I needed to go in, sit down on

12   the bench and just blend in and watch the elevators and

13   see if anybody looked like a patient that was going to go

14   on the elevators and possibly go to the specific floor

15   and go to carafem.

16        Q.    You said you were supposed to text someone.

17   Who were you supposed to text?

18        A.    Paul Place.

19        Q.    How did you get his phone number?

20        A.    It was given to me right before the rescue.

21        Q.    Meaning the morning of?

22        A.    I believe it was the morning of.  If I

23   recall, it was the morning of.  And I put his name in all

24   caps, Paul Place text mom if.

25        Q.    Ex mom if?

1          A.    It didn't make any sense.  I put text --
2    something like text if there's a mom or something like
3    that in his name on my phone because I didn't even know
4    Paul Place.  Like, I had just met him.  Or I don't
5    even -- I met his wife, and his wife wasn't even his wife
6    at the time.
7          Q.    And you said there was a third event
8    leading up to the blockade; correct?
9          A.    There was.  At a church.
10         Q.    And what was discussed at that event?
11         A.    That event was also worship focused.  Eva
12   Zastrow played a song that she wrote.  Coleman preached a
13   sermon about child sacrifice.  And everybody was just
14   very prayerful about the coming-up rescue.
15         Q.    So let's talk about the rescue.  March 5,
16   2021.  How did you get there?
17         A.    I got there in Michelle Eddy's car.
18         Q.    Okay.  And what papers, if any, did
19   Michelle Eddy have in her car?
20         A.    Well, she had a flyer -- she had flyers
21   that she was going to give out around the parking lot and
22   put in people's windshields.  And the flyer said just a
23   bunch of stuff about how people -- faithful Christians
24   were arrested in Mt. Juliet this morning, like
25   preemptively.

1       Q.    Had anyone been arrested at that point?

2       A.    No.  No.

3       Q.    Okay.  Do you recall if there was an email

4 on the flyer?

5       A.    Yes.  It was -- I think it was

6 wearerescuers@gmail.com, something like that.

7       Q.    So you said you got there early.  What time

8 did you get there approximately?

9       A.    I think maybe it was 7:40, 7:45 that we

10 pulled up.

11      Q.    What time did you think the clinic was

12 open?

13      A.    I thought it was 8:00 from my memory.

14      Q.    How did you come to learn that?

15      A.    Somebody must have called the clinic.  Also

16 there was Christians -- or sidewalk counselors that stood

17 out there constantly, and that's where we got a lot of

18 our information from about how the clinic worked and

19 stuff like that.

20      Q.    Okay.  So when Michelle Eddy drove you to

21 the clinic, what was the first thing you did?

22      A.    Well, I remember waiting until it was close

23 enough to the time that was agreed upon, and then I got

24 out of the car and started walking towards the building.

25 And I went inside and sat down on the bench.

1          Q.    Okay.  So there's a binder in front of you.
2    Could you please flip to tab 1F --
3          A.    Yes.
4          Q.    -- as in Frank.
5          A.    Yup.  I'm there.
6          Q.    Do you recognize that?
7          A.    Yup.
8          Q.    What is it?
9          A.    That is the building, the facility that
10    carafem was inside of.
11          Q.    Is it a photo of the building of the
12    facility that carafem was inside of?
13          A.    Yes.
14          Q.    Is it a fair and accurate depiction of
15    that?
16          A.    Yes.
17                MS. KLOPF:  Move to admit and publish,
18    Your Honor.
19                THE COURT:  1F?
20                MS. KLOPF:  1F as in Frank.
21                THE COURT:  Any objection?  Received.
22                (Government Exhibit No. 1F was admitted.)
23                COURTROOM DEPUTY:  They've been having an
24    issue with publishing.
25                THE COURT:  So you can't publish it?

1          COURTROOM DEPUTY:  I've pushed the button.
2    It doesn't show.
3          THE COURT:  We've had to connect to the
4    courtroom next door --
5          COURTROOM DEPUTY:  I'll ask IT to come up
6    right now.
7          THE COURT:  Okay.
8          MS. KLOPF:  I can use the Elmo for a little
9    bit.  I do hit videos pretty quick.
10         COURTROOM DEPUTY:  I don't know if that
11   will make a difference or not.
12         Do you want to try it again?
13         MS. KLOPF:  Sure.  Oh, yes.  Please.
14         COURTROOM DEPUTY:  There we go.
15   BY MS. KLOPF:
16         Q.    Please describe what we're seeing here.
17         A.    That is the front entrance of the facility
18   in which carafem was located.
19         Q.    Okay.  And you said you went into the
20   building.  Where did you go?  And you can mark on the
21   screen if you want?
22         A.    I can circle?
23         Q.    Uh-huh (affirmative).
24         A.    Right there.
25         Q.    Okay.  And what did you do once you went

1  inside?

2        A.    I went in just right straight inside to the

3  main lobby area and sat on a bench that was located

4  directly in front of the elevators.

5        Q.    How long do you think you sat on that

6  bench?

7        A.    Oh, mere minutes.  Eight minutes, maybe,

8  seven.

9        Q.    I think you described this a little bit

10  before, but did you end up seeing a couple?

11        A.    I did.

12        Q.    After you saw the couple, what did they do?

13        A.    They got on the elevator, and then I sent a

14  text message to Paul Place.

15        Q.    After you sent that text message, what did

16  you do?

17        A.    Well, I sat there for a moment and then I

18  noticed Dennis Green approached with -- I believe if I

19  remember correctly, with a child.  And then Eva Zastrow

20  was pushing Eva Edl in a wheelchair and we all got onto

21  the elevator together to go to the floor because we

22  assumed that the rescuers or the blockaders that were in

23  the stairs and the blowfish were already moving into

24  position.  We didn't realize they had already moved into

25  position.

```
 1          Q.    When you got to the floor that carafem was
 2   on, who was the first person that you saw?
 3          A.    One of the first people I saw was Coleman
 4   Boyd.
 5          Q.    And what was he doing?
 6          A.    He was talking on the phone and taking a
 7   video.
 8          Q.    Were other people taking videos on their
 9   phone?
10          A.    Yes.
11          Q.    Who were you aware of filming?
12          A.    I knew Chet Gallagher was filming.  I knew
13   that Coleman Boyd was filming, and I knew that Dennis
14   Green was filming.
15          Q.    In preparation for trial, have you reviewed
16   footage taken by Dennis Green?
17          A.    Yes.
18          Q.    By Chet Gallagher?
19          A.    Yes.
20          Q.    By Coleman Boyd?
21          A.    Yes.
22          Q.    Is it correct to say that the blockade was
23   filmed by multiple vantage points by your codefendants in
24   this case?
25          A.    Yes.
```

1      Q.    Has the United States prepared clips from
2  each of those perspectives?

3      A.    Yes.

4      Q.    Have you reviewed clips of those videos?

5      A.    Yes.

6      Q.    Okay.  Were clips from -- and there's a big
7  stack of DVDs there in case you need to reference them to
8  your left.  Were the clips from Coleman Boyd's recording
9  marked Exhibits 1A and 1C through 1E?

10      A.    I believe so.

11      Q.    Okay.  Were clips from Dennis Green's
12  recording marked 2A through 2P?

13      A.    Yes.

14      Q.    And were clips from Chet Gallagher's
15  recording marked 3A through 3D and 3G through 3M?

16      A.    Yes.

17      Q.    Are those -- have you reviewed all of them?

18      A.    I did review all of the video footage that
19  was put before me, yes.

20      Q.    Were they true and accurate clips of what
21  you saw that day?

22      A.    Yes.

23      Q.    Okay.

24      MS. KLOPF:  I move to admit Exhibits 1A --

25      THE COURT:  Let's do it one at a time.

1          MS. KLOPF:  Sure.

2          THE COURT:  Any objections?

3          MS. BELL:  No, Your Honor.

4          THE COURT:  Received.

5          (Government Exhibit No. 1A was admitted.)

6          MS. KLOPF:  1C through 1E.

7          THE COURT:  Objections?

8          MS. BELL:  No, Your Honor.

9          THE COURT:  Received.

10          (Government Exhibits Nos. 1C – 1E were

11 admitted.)

12          MS. KLOPF:  2A through 2P.

13          THE COURT:  Just a minute.  No objections

14 to 2A through P?

15          MS. BELL:  That's correct, no objection.

16          THE COURT:  Okay.

17          (Government Exhibits Nos. 2A – 2P were

18 admitted.)

19          MS. KLOPF:  3A through 3D.

20          THE COURT:  Any objection?

21          MS. BELL:  No objection.

22          MS. KLOPF:  3G through 3M.

23          MS. BELL:  No objection.

24          THE COURT:  Okay.

25

1                    (Government Exhibits Nos. 3A – 3D and

2    3G – 3M were admitted.)

3    BY MS. KLOPF:

4         Q.    Prior to testifying today were you provided

5    final transcripts of those clips?

6         A.    Yes, I was.

7         Q.    Were the speakers that you recognized

8    properly identified on those transcripts?

9         A.    Yes, they were.

10        Q.    Were some still shots prepared from Dennis

11   Green's recording?

12        A.    Yes.

13        Q.    Okay.  Can you look at in your binder 2Q

14   and 2R?

15        A.    Yes.  I have 2Q pulled up.

16        Q.    What is that?

17        A.    That is a picture in the hallway facing

18   away from the clinic door of Paul Vaughn.

19        Q.    Is it a true and accurate depiction of what

20   you saw that day?

21        A.    Yes.

22             MS. KLOPF:  Move to admit, Your Honor.

23             THE COURT:  Objection?

24             MS. BELL:  No objection.

25             THE COURT:  Received.

1                  (Government Exhibit No. 2Q was admitted.)

2    BY MS. KLOPF:

3          Q.    And then can you look at 2R?

4          A.    Yup.  I see 2R in front of me.

5          Q.    What is that?

6          A.    That's another picture from the same

7    perspective of Paul Vaughn in the hallway.

8          Q.    Is that a true and accurate depiction of

9    what you saw that day?

10         A.    Yes.

11               MS. KLOPF:  Move to admit, Your Honor.

12               MR. CRAMPTON:  No objection.

13               THE COURT:  Received.

14               (Government Exhibit No. 2R was admitted.)

15   BY MS. KLOPF:

16         Q.    Can you please look at 3P.

17         A.    All right.

18         Q.    Okay.  Very generally, what is that?

19         A.    That is a picture facing the clinic door of

20   carafem with multiple individuals in the photo, myself

21   included.  Heather Idoni, Eva Zastrow, Eva Edl.  I think

22   his name is Jim Zastrow.  Paul Place and then Davis --

23   Dennis Green's daughter.

24         Q.    Is that a true and accurate depiction of

25   what you experienced that day?

```
 1          A.     Yes.
 2                 MS. KLOPF:  Move to admit, Your Honor.
 3                 THE COURT:  What was that?
 4                 MS. KLOPF:  3P as in Peter.
 5                 THE COURT:  3P.  Objections.
 6                 MR. CRAMPTON:  No objection.
 7                 THE COURT:  Received.
 8                 (Government Exhibit No. 3P was admitted.)
 9    BY MS. KLOPF:
10          Q.     And can you flip to 3Q.  Is that another
11   image from the day?
12          A.     Yes.
13          Q.     Is this a true and accurate depiction of
14   what you saw that day?
15          A.     Yes.
16                 MS. KLOPF:  Move to admit.
17                 THE COURT:  Objections?
18                 MS. BELL:  No objection.
19                 THE COURT:  Received.
20                 (Government Exhibit No. 3Q was admitted.)
21    BY MS. KLOPF:
22          Q.     And then 3R.  Is that another still image
23   of what you saw that day?
24          A.     Yes.
25          Q.     Is it a true and accurate depiction of what
```

1  you saw that day?

2         A.     Yes.

3                MS. KLOPF:  Move to admit.

4                MS. BELL:  No objection.

5                THE COURT:  Received.

6                (Government Exhibit No. 3R was admitted.)

7   BY MS. KLOPF:

8         Q.     Okay.  Let's look at some of these clips.

9  If you want to close the binder, you're welcome to.

10               Ms. Green, would you please play

11 Exhibit 1A.

12               MS. KLOPF:  Oh, I'm so sorry, Your Honor,

13 these have transcripts.

14               THE COURT:  All right.  You want to direct

15 the jury to what it is you're playing?

16               MS. KLOPF:  Yes.  And I apologize.  I will

17 be jumping around a little bit.  But the first

18 exhibit will be 1A.

19  BY MS. KLOPF:

20         Q.     (Playing video.)

21               Okay.  So what were we seeing in that?  I

22 know it was a brief clip.

23         A.     That was facing the carafem clinic door and

24 it was coming from Coleman Boyd's phone recording.

25         Q.     Whose voice were we hearing?

1          A.     Coleman Boyd.

2          Q.     Can you please play Exhibit 1C.

3                 (Playing video.)

4                 Did you hear Boyd say moms are starting to

5     be here at 8:00?

6          A.     Yes.

7          Q.     Was that your understanding?

8          A.     Yes.

9          Q.     Did you hear Boyd discussing observing a

10    potential mom?

11         A.     Yes.

12         Q.     Okay.  Based on your experience this day,

13    was it normal to call possibly a patient -- I'm sorry, an

14    employee a mom?

15         A.     Yes, that happened every once in a while.

16         Q.     And why?

17         A.     Because a lot of times the employees also

18    looked like they could be patients.  You can't really

19    tell usually until they start exhibiting specific

20    behavior or talking.  Or which door they go through.

21    There's little things that give it away, but it

22    frequently happens where a patient is misidentified.  Or

23    an employee is misidentified.

24         Q.     Okay.  Can we please play Exhibit 1D.

25                (Playing video.)

Case 3:22-cr-00327    Document 547    Filed 03/12/24    Page 193 of 334 PageID #: 3058

1                    Can you pause right there.

2                    Without naming names, is this a juvenile

3  child of one of the defendants?

4           A.    Yes, it is.

5           Q.    Whose child is it?

6           A.    Coleman Boyd's.

7           Q.    And while we're still paused, what are we

8  seeing here?

9           A.    We're seeing the hallway that leads to --

10 at the end of the hallway there's the clinic door.  You

11 see people blocking it, standing near it.  And what's

12 happening right here is I had just texted Paul Place that

13 I thought I saw that couple that is coming up the

14 elevator in that moment.  And that couple starts being --

15 well, Coleman realized that they were probably there for

16 the clinic, and he was going to try and get his child to

17 communicate with them.

18          Q.    So did you observe the woman you'd seen

19 downstairs in this clip that we played so far?

20          A.    I did see her downstairs.  But I was still

21 downstairs when this happened.

22          Q.    Can you please press play.

23                (Playing video.)

24                So you said you weren't at the floor at

25 this particular point; correct?

1          A.     Yes.

2          Q.     What was the joint goal of the people in

3    the hallway?

4          A.     The people standing and sprinkled about

5    through the hallway, those people were basically, like,

6    sidewalk counselors, but trespassing sidewalk counselors.

7          Q.     And the people in front of the door farther

8    back, what was their goal?

9          A.     Blockaders.  Those people were blocking

10   people from being able to get in and out of the clinic.

11         Q.     And ultimately what was the group goal

12   about patients accessing that clinic?

13         A.     To make it impossible for them to access

14   the clinic.

15         Q.     Okay.  Can we please play Exhibit 4, which

16   I think on your computer is 4C, without sound.

17                (Playing video.)

18                Can you please pause right there.  Who is

19   that?

20         A.     That is Chester Gallagher.

21         Q.     And who is that?

22         A.     That is Heather Idoni.

23         Q.     All right.  And can you please press play

24   again, Ms. Green.  And pause right there.  Who is that?

25         A.     That is Paul Vaughn.

1    Q.    And then who is that person?

2    A.    That looks like Cal Zastrow's son.  I think

3 his name is Jim or James.

4    Q.    All right.  Can you play again.

5          (Playing video.)

6          Pause right there.  Play just a tiny bit

7 more.  Thank you.

8          Who is that person?

9    A.    That's Cal Zastrow.

10   Q.    Again, who is that individual?

11   A.    It's blurry, but it looks like that's Paul

12 Vaughn.

13   Q.    I know I chose a bad place to pause, I'm

14 sorry.

15   A.    That's okay.

16   Q.    Okay.  So can you describe the shape that

17 we're seeing there of how these people are standing?

18   A.    Yeah, it's like a half circle.

19   Q.    What's the purpose of that?

20   A.    The purpose is to ensure that nobody's

21 going to go through that patient door and nobody's going

22 to go through the employee door of the carafem clinic.

23   Q.    Now can I please show you Exhibit 4A.

24          Okay.  This is a little cleaner.  Is it

25 fair to say that this is a better paused moment of that

1  video?

2          A.     Yes.

3          Q.     Okay.  You can't quite see it, but what's

4  that?

5          A.     That's a camera.

6          Q.     Okay.  Tell us a little bit about that.

7          A.     Well, I had no idea who that dude was.

8  Didn't know he was going to be there.  And I wasn't sure

9  if he was, like, pro-rescue or anti-rescue, but by the

10 end I felt like he might be pro-rescue and he was there

11 to document it.  But he videoed the whole thing, and I

12 never knew who it was.

13         Q.     In this image do you see some juveniles?

14         A.     I do.

15         Q.     Without naming names, are you familiar with

16 some of these juveniles?

17         A.     I am specifically familiar with one of

18 them, the one on the left side that has the pink in her

19 hair.

20         Q.     Okay.  Whose child is she?

21         A.     Dennis Green.

22         Q.     Okay.  And now I'd like to show you

23 Exhibit 4B, please.  Who is this?

24         A.     That's Coleman Boyd.

25         Q.     And what is he doing?

1        A.    He's recording.

2        Q.    Okay.  And what -- what is in his hands?

3        A.    It looked like he has two phones in his

4   hand.

5        Q.    Based on your understanding of what

6   happened that day, was he communicating with others?

7        A.    Yes, he was.

8              MR. HAYMAKER:  Judge, I'm going to object

9   to the speculation.

10             THE COURT:  Let's have some foundation.

11  Sustained.

12   BY MS. KLOPF:

13       Q.    Have you reviewed footage that involves

14  Mr. Boyd?

15       A.    Yes.

16       Q.    During any of that footage does it appear

17  that he's communicating with others?

18       A.    Yes.

19       Q.    Based on your assessment of your experience

20  that day, what is his viewpoint from where he's standing?

21       A.    He can see all the way down the hallway

22  from the far end of the hallway.  So he can see the

23  elevators, which the people blocking the doors couldn't

24  see.  And then he could also see carafem clinic, the

25  employee door, the patient door and everybody that's in

1  the hallway.

2          Q.    Why is that important?

3          A.    Well, he was able to pay attention to

4  whoever was coming out of the elevators like potential

5  patients, police officers and the like.

6                  MR. HAYMAKER:  Judge, I'm going to object.

7  There needs to be a foundation.  Is she just surmising

8  this or does she know this?

9                  THE COURT:  She's testified she was up on

10 the second floor.  And so -- and she saw him where he was

11 standing.

12                 MR. HAYMAKER:  She's describing what he's

13 doing, and I don't know whether she's surmising this or

14 whether she actually knows this.

15                 THE COURT:  Ask the question again.

16 BY MS. KLOPF:

17         Q.    I'm so sorry, I think it's gone out of my

18 mind.  I think I was asking what did his viewpoint -- I

19 think we've already asked that.  And then what's the

20 purpose of having that viewpoint.  What's the value in

21 that viewpoint?

22         A.    Well, because the -- the reason I know that

23 is because I also walked through there and I heard him.

24 And then I reviewed footage as well of what happened, and

25 he's on the phone explaining what he's seeing and telling

1  people in the hallway, like, his child, hey, you can go

2  talk to this person who's coming.  And then you can see

3  when the police officers were coming and he was telling

4  people in the hallway during the rescue -- like, that's

5  what I saw.  That's what I witnessed.

6          Q.    So now I'd like to look at a clip from

7  Dennis Green.  So I'd like to play Exhibit 2A.

8               (Playing video.)

9               Can you pause there?  What's that?

10         A.    That's the bench I was sitting on.

11         Q.    Okay.  And where are you at this point?

12         A.    I just walked into the elevator and I'm on

13  the elevator with Dennis Green.

14         Q.    Can you please press play.

15              (Playing video.)

16              Can you pause there.  I'm sorry, we just

17  saw a person walk by with an orange skirt.  Who is that?

18         A.    That was me.

19         Q.    Did you hear Dennis Green talking about the

20  live feed?

21         A.    Yes.

22         Q.    What does that mean?

23         A.    It was being streamed live on Facebook

24  from -- I know Coleman Boyd had a live feed going on

25  Facebook.  Dennis Green was doing, I believe, a live

feed.  I just know he was recording.  And Chet Gallagher
was recording as well.

      Q.    What's the purpose of a live feed in
realtime?

      A.    Well, I really believe that --

      Q.    I don't want to get to I believe.

      A.    Sorry.

      Q.    So to the best of your understanding, what
was the purpose of having a live feed?

      A.    To let everybody know it was happening.

      Q.    Okay.  Can you please press play.

      (Playing video.)

So what are you doing there?

      A.    I was just moving into a spot trying to sit
down and block the door.

      Q.    And did you observe on this video clip
Coleman Boyd?

      A.    Yes.  We walked by him.

      Q.    What was he doing?

      A.    Talking on the phone and taking a video.

      Q.    And then just want to be clear, do you
know -- I'm so sorry.  Did you see where I was about to
circle?

      A.    Huh-uh (negative).

      Q.    Ms. Green, do you mind going back to the

1   very end of that clip.

2            Do you know who that person is?

3         A.      That's Paul Place.

4         Q.      Can we please play Exhibit 1E.

5            (Playing video.)

6            So starting at the end, did you hear him

7   say the workers in the other clinics are starting to get

8   a bit stirred up?

9         A.      Yup.

10        Q.      Did you understand that there were other

11   businesses on that floor?

12        A.      I did.

13        Q.      Okay. So who did we see walk past the

14   camera?

15        A.      Well, we saw myself and Dennis Green, one

16   of his children, Eva Zastrow pushing Eva Edl in a

17   wheelchair.

18        Q.      And where were you going?

19        A.      I was -- we were all headed towards the

20   door of the abortion clinic.

21        Q.      Okay. To the best of your understanding,

22   how long did Boyd stay at the blockade?

23        A.      At some point he just disappeared and I

24   didn't see him anymore, but he was there for a good chunk

25   of it at the beginning. And then at some point I didn't

1   see him anymore.

2          Q.    Why do you think he left?

3          A.    Probably because of threat -- the police

4   threatening to arrest people.  Because they started doing

5   that pretty early on, but it was a long time before they

6   finally did.

7          Q.    Okay.  Did you see Boyd again later that

8   day?

9          A.    Yes.

10         Q.    What was he -- was it outside of the

11  building?

12         A.    Yes.

13         Q.    And what was he doing?

14         A.    He was shouting things like worthy is the

15  lamb -- like, Bible verse stuff while we were getting

16  arrested.

17         Q.    What did you take that to mean?

18         A.    Well, worthy is the lamb is, like,

19  basically that you had just now sacrificed yourself for

20  others the way Jesus sacrificed himself for you.  So then

21  it's like this he is worthy of my sacrifice kind of a

22  thing.  So that's -- that's how I understood it.

23         Q.    Was that a positive or a negative thing for

24  you?

25         A.    It was a positive thing for me.

```
 1          Q.    Why?
 2          A.    Because it made me feel like I was walk --
 3   following after Jesus and walking the walk.
 4          Q.    Did you view it as encouragement?
 5          A.    Oh, yes.
 6          Q.    All right.  Can we please look at 2B.
 7                (Playing video.)
 8                Can we pause right there.  Who is that?
 9          A.    Cal Zastrow.
10          Q.    What's he doing?
11          A.    He's blocking the worker's door, the
12   employee door to carafem.
13          Q.    How do you know it was the employee door?
14          A.    Because before I got up there, apparently a
15   worker had gone in there and there was a big thing.  I
16   didn't see it.  Of course, I saw it later on the videos
17   and it was briefly discussed when I was sitting up there.
18          Q.    And then let's see.  Do you know who this
19   woman is?
20          A.    No.
21          Q.    And without naming names, do you know that
22   child?
23          A.    I believe I know who that child is, but I'm
24   not a hundred percent sure.
25          Q.    Whose child do you think this is?
```

1        A.    I believe that child belongs to Dennis

2 Green.

3        Q.    Can you please press play.

4             (Playing video.)

5             Again, who's that?

6        A.    That's Heather Idoni.

7        Q.    Did you hear Gallagher say, don't sit in

8 front of the door, don't block the door if you don't want

9 to get arrested?

10       A.    Yes.

11       Q.    What did you take that to mean?

12       A.    That if you did sit in front of the doors

13 and block the doors that there was a very, very good

14 chance that you would be leaving in handcuffs that day.

15       Q.    Okay.  From your viewpoint and your review

16 of these videos, was Gallagher communicating to the

17 blockaders frequently that day?

18       A.    Yes.

19       Q.    Why?

20       A.    I feel like --

21             MS. BELL:  I'm going to object to

22 speculation.

23             THE COURT:  Sustained.

24 BY MS. KLOPF:

25       Q.    Did you observe Gallagher to communicate

1    with the blockaders frequently?

2            A.    Yes.

3            Q.    Okay.  Let's switch over to some clips from

4    Chester Gallagher's recording.  Can we please turn to 3A.

5                    (Playing video.)  Can you pause.

6                    Who is this individual?

7            A.    That's Dennis Green.

8            Q.    Okay.  All right.  And then can we finish

9    out this clip, please.

10                   (Playing video.)

11                   What was that police officer doing?

12           A.    He was trying to encourage us nicely to

13   stop breaking the law and go outside.

14           Q.    Did anyone comply with his orders?

15           A.    No.

16           Q.    Can we please play 3B.

17                   (Playing video.)

18                   Why is Gallagher narrating what's

19   happening?

20                   MS. BELL:  Objection, speculation.

21                   THE COURT:  Sustained.

22    BY MS. KLOPF:

23           Q.    Did you hear Gallagher's voice in this

24   recording?

25           A.    Yes.

1      Q.    What is he doing?

2      A.    Narrating.

3            MS. BELL:  Objection, speculation.

4            THE COURT:  She said narrating.  Overruled.

5  BY MS. KLOPF:

6      Q.    What was your understanding of why

7  Gallagher was doing that?

8      A.    Because --

9            MS. BELL:  Objection, speculation.

10           MS. KLOPF:  I'm asking about what her

11  understanding is.

12           THE COURT:  You need some foundation for

13  that.  Sustained.

14  BY MS. KLOPF:

15     Q.    Earlier you talked about the meeting the

16  day before, and I believe you described Gallagher's role

17  as that of -- was it an educator?  Am I getting that

18  correct?

19     A.    Like a teacher, a rescue.

20     Q.    And what did you understand that evening

21  that to mean?

22     A.    Well, he had the most experience --

23     Q.    I want to stop you there.  What did you

24  understand he was going to do at this clinic?

25     A.    I understood that he was going to be

teaching and encouraging the blockaders on the best way
that they could execute the rescue.

        Q.    Okay.

            MS. BELL:  Your Honor, may we have a
sidebar?

            THE COURT:  Yes.

            MS. BELL:  Thank you.

            (Whereupon, the following proceedings were
had at the bench outside the hearing of the jury:)

            MS. BELL:  I think I'm being put in the
position where I'm going to almost have to ask for a
mistrial if they talk just about my client's extensive
experience in this area.  It's walking very close to that
404(b) line.

            I almost feel like I need to ask if he
wants me to move for one because I think he would be
entitled to one.  The government is violating the Court's
order that she shouldn't step into the 404(b).

            I'm going to have to object if she's going
to keep doing this.  And having the government
appropriately advise their witness of what she can and
cannot say.

            MS. KLOPF:  As I put on the record this
morning, we did clearly advise her of this.  I asked her
about meeting the day before and was trying to elicit the

information.  But I would note in yesterday's ruling when
we argued that part, on page 176 of the transcript from
her opening statement --

COURT REPORTER:  Excuse me, you'll have to
read slower.

MS. KLOPF:  Sorry.  I'm reading from the
transcript from yesterday at a page 179 -- during -- this
is Bell's opening.  It does say as part of his ministry,
she's speaking of Mr. Gallagher, he rescues.  We just
talked about engages in rescues that involved what's
called interposition or hearing about that.  He also
knows that through these activities he risks arrests.

So he's talking about -- here she uses the
word plural, rescues, so it's already -- that door has
already been thrown wide open.  I do -- that question was
not posited to elicit referenced to 404(b).

THE COURT:  Yeah.  She's right about your
opening statement.  You made it as if he did have
extensive experience with rescues in your opening, but
I'm going to ask -- she's not violated specifically the
ruling I made about the other blockades where people were
arrested.  But it's close to the line.  And I'm going to
ask Ms. Klopf to, perhaps, when you're getting near an
area that is dangerous to go ahead and lead the witness
to avoid any further implication of his participation in

1 extensive other rescues.

2         MR. CRAMPTON: Your Honor, may I also make

3 a note here on behalf of Paul Vaughn, I'd like to

4 interpose a continuing objection to the unproven status

5 of Mr. Gallagher as a co-conspirator, purporting to speak

6 about what Mr. Vaughn is doing and his motives for doing

7 so. There is no foundation, to my knowledge, for such a

8 claim yet. He is narrating, as they say, but he is -- he

9 has no authority to speak for Mr. Vaughn.

10         THE COURT: Well, I'll be ruling on the

11 admissibility of the co-conspirator statements at the end

12 of the government's proof, as I've already indicated.

13         MR. CRAMPTON: I understand. I just want

14 to note for the record. Yes, ma'am.

15         THE COURT: That's my practice. All right.

16         (End of bench conference. Whereupon, the

17 following proceedings were had in the hearing and

18 presence of the jury:)

19         MS. KLOPF: Sorry, let me find where we

20 were.

21 BY MS. KLOPF:

22     Q. Okay. So in that particular clip is it

23 correct to say that Gallagher was describing what Paul

24 Vaughn was doing?

25     A. Yes.

1          Q.    Okay.  Had you met Paul Vaughn before this

2    day?

3          A.    No.

4                THE COURT:  I'm sorry, was the question had

5    she met Paul Vaughn?

6                MS. KLOPF:  Yes.

7     BY MS. KLOPF:

8          Q.    At first who did you think Paul Vaughn was

9    that day?

10          A.    I thought he was a -- like a chaplain or

11    whatever you call, a chaplain.  I thought he was part of

12    the police force, and I thought that maybe he was the

13    pastor guy that was talked about.  Like, I couldn't

14    figure out who he was and I wasn't sure whose side he was

15    on.  And honestly, I was confused and I clearly was

16    not -- I don't know.  I didn't know.  I wasn't sure.

17          Q.    Did that come to change?

18          A.    Yes.

19          Q.    What did you understand his role to be?

20          A.    Well, I eventually recognized his role was

21    to engage the police.

22          Q.    Do you see him in court today, Mr. Vaughn?

23          A.    Yes.

24          Q.    Can you please identify him?

25          A.    Yes, he has a beard.  He's wearing a blue

1  striped tie, it looks like.  He has -- it's hard to tell

2  if it's a gray shirt.  He's got a suit jacket on.

3           THE COURT:  Who's he next to?

4           THE WITNESS:  He's sitting next to Dennis

5  Green, and Coleman Boyd is on his other side.

6           MS. KLOPF:  Can the record please reflect

7  that the witness has identified Paul Vaughn?

8           THE COURT:  It will.

9   BY MS. KLOPF:

10       Q.    Okay.  So you said that you understood that

11  his role was engaging the police?

12       A.    Yes.

13       Q.    Okay.  And, again, why in a blockade do you

14  need to engage the police?

15       A.    Need to engage the police to buy time.

16       Q.    Can we please play Exhibit 3C.

17           (Playing video.)

18           Did you hear in that that Paul had gotten

19  the police to agree to let him engage with the blockaders

20  individually?

21       A.    Yes?

22       Q.    Do you have any recollection of Paul Vaughn

23  asking you to leave?

24       A.    No.

25       Q.    Based on your observations of Vaughn that

1  day, was he trying to get anyone to leave?

2        A.    No.

3        Q.    Okay.  What was he trying to do?

4        A.    He was trying to buy us more time.

5        Q.    All right.  Let's switch to some clips from

6  Dennis Green's recording.  Let's please go to 2C.

7              (Playing video.)

8              Very generally can you see what we're

9  seeing in front of that door?

10       A.    We're seeing a group of people, myself

11 included, sitting down blocking the door and singing

12 songs.

13       Q.    Now let's play 3D, please.

14             (Playing video.)

15             Did you see any children in that video?

16       A.    Yes.

17       Q.    Whose children were they?

18       A.    I know the ones that are Coleman Boyd's

19 children and I recognize the ones that were Dennis

20 Green's children and ones that I wasn't sure whose kids

21 they were.

22       Q.    One of those children is physically

23 blocking access to a clinic door; correct?

24       A.    Yes.

25       Q.    Was the child who was blocking access to

1  the clinic door one of Boyd's children?

2          A.     Yes.

3          Q.     Can we please play 2D.

4                 (Playing video.)

5                 Is it correct to say that's basically a

6  different perspective of the same recording that we just

7  saw?

8          A.     Yes.

9          Q.     All right.  Can we please play 2E.

10                (Playing video.)

11                Did you see a person walk by holding video

12  camera equipment?

13         A.     Yes, I did.

14         Q.     Is that the person you were talking about

15  earlier?

16         A.     Yes.

17         Q.     Okay.  Can we please play 3D.

18                (Playing video.)

19                I apologize.  I think I played that one

20  twice for you.

21                THE COURT:  Yes, we've seen that one

22  before.

23   BY MS. KLOPF:

24         Q.     So did you hear Chester Gallagher talk

25  about people who are still lingering?

1          A.     Yes.

2          Q.     Who was he talking about?

3          A.     I wasn't a hundred percent sure.

4          Q.     Okay.  Did you see Dennis Green in that

5    video?

6          A.     Yes.

7          Q.     When Gallagher said that there were two

8    doors to block, what doors was he talking about?

9          A.     He's talking about the clinic door and --

10   like, for the patients and then the employee entrance to

11   the clinic.

12         Q.     So just so we can get some bearings too, we

13   see a lot of people in this hallway.  Are those people

14   the blowfish?

15         A.     Yes.  Anyone who's not directly in front of

16   a door and once we started arresting who didn't hang

17   around, those are all the blowfish.  So everyone that

18   ended up leaving on the final warning, those were all the

19   blowfish.

20         Q.     All right.  Can we please look at 3P.

21                (Playing video.)

22                So what individuals are we seeing here?

23         A.     In the far left to the back, that is

24   Heather Idoni in the black jacket.  Crouched down under

25   the door handle is Paul Place.  In the wheelchair is Eva

1    Edl.  In the pink shirt with the long braid is Eva
2    Zastrow.  In the front with the pink hair piece --
3            Q.    Please don't use the name.  I think that's
4    a child; correct?
5            A.    Yes.  I don't know her name, so you're in
6    luck.
7            Q.    Okay.
8            A.    Do you want me to say who I think her
9    father is or no?
10           Q.    Yes, that's fine.
11           A.    I don't for sure.  I only think it's Dennis
12   Green's child.
13           Q.    Okay.
14           A.    Then that one in the center in the front is
15   a Zastrow.  It's one of Calvin Zastrow's son.  I think
16   it's Jim or James and then there's me.
17           Q.    Can we please look at 3G.
18                 (Playing video.)
19                 You participated in a protest before;
20   correct?
21           A.    Yes.
22           Q.    Do you agree with him that this was not a
23   protest?
24           A.    Yes.
25           Q.    Can we please play 2F.

1    (Playing video.)

2    So in that clip could you see Gallagher

3 talking to a camera?

4    A.    Yes.

5    Q.    Based on your understanding, is it an

6 accurate assessment to say that he is talking to the

7 camera because he is trying to educate others?

8    A.    Yes.

9    Q.    Can we please play -- and when I say

10 others, who do you understand that to mean?

11    A.    Anyone that would be the audience to that

12 video.  Anyone and everyone that would view it.

13    Q.    And why?

14    A.    Because the mission of these rescues is

15 to -- some of it, even though I think everyone wants to

16 pretend it's not true, is a public spectacle.  It makes a

17 big gigantic spectacle.  It brings the problem into the

18 light.

19    Q.    Let me ask a follow-up question on that.

20 Based on your review of these videos, is advice being

21 given on how to do a future blockade?

22    A.    Yes.

23    Q.    Can we please play 2G.

24    (Playing video.)

25    So who was talking in that video?

1          A.     Cal Zastrow to the police officer.

2          Q.     Did you hear him say that today was not a

3    protest?

4          A.     Yes.

5          Q.     Can we please play 3H.

6                 (Playing video.)

7                 Is that the same video from another angle?

8          A.     Yes.

9          Q.     Okay.  Can we please play 2H.  I'm sorry to

10   keep jumping around.

11                (Playing video.)

12                What is Gallagher talking about here?

13                MS. BELL:  Objection, speculation.

14                THE COURT:  Sustained.

15   BY MS. KLOPF:

16         Q.     Did you view this video?

17         A.     Yes.

18         Q.     What was the context of what

19   Mr. Gallagher's talking about?

20         A.     He's talking about engaging the police.

21         Q.     Okay.  That cameraman in the middle of the

22   screen, did you see him?

23         A.     I did.

24         Q.     Did any people ask him to leave?  Any of

25   the blockaders, excuse me.

         1          A.    I don't recall seeing him asked to leave.

         2          Q.    At any point did you see Gallagher be

         3  uncomfortable with him being there?

         4          A.    Not one time.

         5          Q.    Did Gallagher seem to occasionally speak to

         6  the camera?

         7          A.    Yes.

         8          Q.    Can we please play 3I.

         9                (Playing video.)

        10                Where are you in the context of this video?

        11          A.    Sitting on the floor in the same spot that

        12  I was most of the time.

        13          Q.    Did you hear the police officer tell you to

        14  move?

        15          A.    Yup.

        16          Q.    Did you move?

        17          A.    No.

        18          Q.    Why not?

        19          A.    Because I knew he was going to ask me to

        20  move, and my plan was not to move unless I was physically

        21  removed by a police officer.

        22          Q.    Why?

        23          A.    Because my goal in that day was keep anyone

        24  and everyone from getting inside.  Like, I didn't care.

        25  I was like -- even if they hurt me, I'm staying here.

1        Q.    Did that woman end up going inside the
2   clinic?
3        A.    No, she did not.
4        Q.    Ultimately was that the goal of the
5   blockade?
6        A.    Yes.
7        Q.    At any point on March 5, 2021, did you talk
8   directly to patients while you were sitting in front of
9   that door?
10        A.    I pretty sure I called out to them at some
11   point.  Anyone that got close I'm pretty sure I called
12   out to and just said, have mercy on your baby or whatever
13   it was that I would usually say.
14        Q.    Did you engage with anyone?
15        A.    I -- close up, I don't think I had a
16   closeup one-on-one conversation, but I'm pretty sure I
17   recall at one point calling out to someone, telling them,
18   show mercy to your baby or something like that.
19        Q.    Okay.  So you called at a patient.  Do you
20   remember having any substantive conversation with any
21   patient?
22        A.    I don't recall having any substantive
23   conversation.
24        Q.    What was your role in regards to patients?
25        A.    My role was just to block the door and make

1    sure they couldn't get inside.

2          Q.    Okay.  Can we please play 2I.

3                (Playing video.)

4                Is it correct that this perspective is from

5    Dennis Green?

6          A.    I believe so.

7          Q.    Okay.  What was Cal Zastrow doing in this?

8          A.    Cal Zastrow was trying to protect the

9    people that were blocking the door.  Where I was

10   blocking, he was trying to add even more of a buffer

11   because he saw that the big police officer was coming our

12   way, and I think he was trying to protect the women.

13   That's what I thought he was doing.

14         Q.    How did he move his body?

15         A.    He, like, came over and moved towards the

16   center of the hallway towards the door.

17         Q.    And what did Dennis Green do?

18         A.    It looked like he crouched down.  I don't

19   specifically remember watching Dennis Green.  I remember

20   seeing Cal doing that.  I remember watching and being,

21   like, uh-oh, what's going to happen.

22         Q.    Do you agree both men moved back towards

23   you?

24         A.    Yes.

25         Q.    And are you still at this point sitting in

1    front of that door?

2         A.    Yes.

3         Q.    So it's just another layer in front of you?

4         A.    Yes.

5         Q.    Can we please play 2J.

6               (Playing video.)

7               What's happening in this clip?

8         A.    He's just giving an update on the rescue,

9    on the blockade for everybody that's watching.

10        Q.    The blockade, in fact, continued much

11   longer after this clip; correct?

12        A.    It did, but everyone kept thinking it was

13   going to end sooner than it did.

14        Q.    Why do you think they kept thinking it was

15   going to end sooner?

16        A.    Because the --

17              MR. CRAMPTON:  Objection, speculation.

18              THE COURT:  You can ask her what she

19   thought.

20    BY MS. KLOPF:

21        Q.    Yeah.  What did you think?  Why did you

22   think it was going to end sooner?

23        A.    Because the police kept saying we're going

24   to arrest you soon.  If you don't move from the sidewalk,

25   we're going to have to arrest you.  And then, like, we

1  kept hearing words, like Chet coming over and saying,

2  they're going to arrest soon or if you don't want to be

3  arrested, the next warning -- like, it kept happening

4  over and over again.  And it took hours before we finally

5  got arrested.

6         Q.    Can you please play 2K.

7               (Playing video.)

8               Did you hear what Gallagher was talking

9  about in this clip?

10        A.    Yes.

11        Q.    Had anyone ever communicated that kind of

12 information to you before?

13        A.    Many times.

14        Q.    Okay.  Who?

15        A.    A lot of the different people I stood with

16 just protesting outside the clinic legally.  Because

17 frequently the cops get called, and that concept is one

18 that almost everybody that's more respectful, if that's

19 the term you want to use, will hold onto that.  Like, one

20 person speak to the police at a time.

21               Because sometimes you'll go out to the

22 abortion clinic with a bunch of protestors and everyone's

23 talking over each other when the cops get called, and

24 it's just pure chaos.  So I'd heard this communicated

25 many times before.  I was familiar with the concept, and

1    I knew it was especially encouraged in rescue.

2         Q.    For this particular rescue did you

3    understand that the intention of that was to buy more

4    time?

5         A.    Yes.

6         Q.    Okay.  All right.  Let's please play 2L.

7               (Playing video.)

8               Okay.  And then can we please play 3J.

9               (Playing video.)

10              So were those two clips the same --

11              MR. CRAMPTON:  I'm sorry.  Counsel, could

12   you identify that last clip again?  I missed it.

13              MS. KLOPF:  3J.

14              MR. CRAMPTON:  Thank you.

15    BY MS. KLOPF:

16         Q.    Was that the same event just from different

17   angles?

18         A.    Yes.

19         Q.    Were you aware that carafem provided

20   services other than abortion?

21         A.    Yes.

22         Q.    Do you know what other services they

23   usually provide?

24         A.    Well, I knew one of the things was birth

25   control, and I knew that they also do ultrasounds because

1  they have to, even to do an abortion.  And I knew that

2  they're famous for -- let me say I heard that they were

3  famous for doing therapeutic abortion.

4          Q.    What, if anything, did you ask patients

5  about what services they were seeking?

6          A.    I didn't ask any patients directly.  Like,

7  if I spoke to any patient that day, it would have been me

8  calling out to one.  I never had a direct one-on-one

9  conversation myself.

10         Q.    Would you, if you had the opportunity, have

11 asked them what service they were seeking?

12         A.    I probably would have asked why they were

13 there today.  That's how I would have phrased it.  So

14 yes.

15         Q.    If they said it was not for an abortion,

16 would you have let them in?

17         A.    No.  I would have said why would you do

18 business with a place that kills babies.  At that time

19 that's exactly what I would have said.

20         Q.    Is it correct to say that you and the

21 people you were -- you were with was going to block

22 patient access no matter what service they were seeking?

23         A.    Yes.

24         Q.    Why?

25         A.    Because we -- at the time it was, like,

man, if this place is killing babies, why would you let
them do business at all.  Why would we let anyone inside.
Like, with that mentality.  And at that time that
mentality for me drove way above and beyond obeying laws
and trying to get laws changed.  Like, my logical,
rational wisdom side was in the toilet and my passionate,
emotional side was driving.

       Q.    I just want to be clear.  No matter what --

       A.    No matter what.

       Q.    -- if someone was coming for birth control,
miscarriage care, ultrasound --

       A.    Yes.

       Q.    -- anything like that, you were not going
to let them in?

       A.    Yes.

       Q.    Is that the same to say for the ultimate
plan of you and your co-conspirators?

       A.    Oh, yes.  Yes.

       Q.    Can we please play 2M.

       (Playing video.)

       Who is that talking in that video?

       A.    Dennis Green.

       MR. CRAMPTON:  Excuse me, Your Honor, may
we ask for a sidebar?

       THE COURT:  Okay.  Why don't we take our

1  afternoon break.  Jury's excused.  We'll take a 20-minute
2  break at this point.
3              (Whereupon, at 3:01 p.m. the jury retired
4  from open court.)
5              THE COURT:  Okay.  You may step down.
6              (Witness leaves the courtroom.)
7              THE COURT:  What is the request?
8              MR. CRAMPTON:  Counsel refers to Ms. Davis
9  and her, quote, co-conspirators.  We would object to the
10 use of that terminology at this stage.
11             THE COURT:  Okay.  All right.  Don't use
12 that term.
13             MS. KLOPF:  I will not use that term.
14             THE COURT:  How much longer have we got
15 here?
16             MS. KLOPF:  I think we have about -- I just
17 asked you for 3M?
18             MR. CRAMPTON:  2M.
19             MS. KLOPF:  2M, thank you.
20             I have ten clips left to play.  And then a
21 few follow-up questions, two pages of follow-up
22 questions.  So hopefully one more hour.
23             THE COURT:  We'll definitely start the
24 cross --
25             MS. KLOPF:  Yes.

1          THE COURT:  -- today.  Who's taking the
2  lead on the cross?
3          MS. BELL:  I am.
4          THE COURT:  Okay.  All right.  We're in
5  recess.
6          (Whereupon, a break was taken from
7   3:03 p.m. to 3:24 p.m.)
8          THE COURT:  Okay.  We'll get the jury in.
9          (Whereupon, at 3:24 p.m. the jury returned
10  to open court.)
11          THE COURT:  All right.  Ms. Klopf, you want
12  to continue?
13          MS. KLOPF:  Yes.  Thank you, Your Honor.
14   BY MS. KLOPF:
15      Q.   During the break I was advised of an error
16  I had made.  So would you please take a look at 3M and O.
17  They're DVDs.  We didn't deal with the machinations of
18  getting them admitted.  I think I stopped at M instead of
19  N.
20          THE COURT:  I have marked as admitted 3M, N
21  and O.
22          MS. KLOPF:  Oh, you do.
23          COURTROOM DEPUTY:  I just have M.
24          THE COURT:  You just have M, okay.
25

1    BY MS. KLOPF:

2           Q.    So are those also -- did you review those?

3           A.    Yes.  My signature is on all of them.

4           Q.    Perfect.  And are those true and accurate

5    copies of portions of the clips from the day of March 5,

6    2021?

7           A.    Yes.

8                 MS. KLOPF:  Move to admit, Your Honor.

9                 THE COURT:  Which ones?

10                MS. KLOPF:  3N and 3O.

11                THE COURT:  N?

12                MS. KLOPF:  N as in Nancy.

13                THE COURT:  Any objection?

14                MS. BELL:  No, Your Honor.

15                THE COURT:  Thank you.

16                (Government Exhibits Nos. 3N and 3O were

17   admitted.)

18                THE COURT:  But you already did admit P, Q

19   and R.

20                MS. KLOPF:  Yes, Your Honor.  I just --

21   luckily there are people helping me when I make

22   housekeeping errors like that.

23   BY MS. KLOPF:

24          Q.    Okay.  So I -- I'd like to show 2M.

25                THE COURT:  M as in Mary?

```
 1              MS. KLOPF:  Yes.
 2    BY MS. KLOPF:
 3         Q.    (Playing video.)
 4              I'm so sorry.  I misspoke.  2N.
 5              THE COURT:  2N as in Nancy.
 6              MS. KLOPF:  2N as in Nancy.  I'd drawn my
 7    line in the wrong place, and we've already watched that
 8    one.
 9              THE COURT:  2N as in Nancy.  Okay.
10    BY MS. KLOPF:
11         Q.    (Playing video.)
12              Okay.  Who's talking?
13         A.    That's Chet Gallagher.
14         Q.    Okay.  And what's happening there?
15         A.    He's saying that we're at the point where
16    the police are for sure going to arrest and you need to
17    decide if you're going to hit the road or stay seated.
18         Q.    And what's going through your head?
19         A.    I was, like, well, I decided I'm going to
20    stay here.  And I remember feeling like right at the last
21    second, they gave me one last chance right before they
22    cuffed me with a zip thing and I was, like, oh, I could
23    walk away.  I could do it, this is really stupid, I could
24    do it.  And then I was, like, no, I have to stay strong.
25    Yeah.
```

1          Q.    Okay.  Can we please play 3K.

2                (Playing video.)

3                Based on your observations that day, do you

4    think Vaughn's efforts made the blockade last longer?

5          A.    Yes.

6          Q.    Did you see Zastrow nodding his head while

7    Gallagher was speaking?

8          A.    Yes.

9          Q.    Can we please play 2O.

10               (Playing video.)

11               So what's happening here?

12         A.    The people who were the blowfish were being

13   separated from the people who were the blockaders.

14         Q.    And can we please play 3L.

15               (Playing video.)

16               And who is Gallagher talking to here?

17         A.    I thought he was talking to everybody that

18   was still hanging around.

19         Q.    Now, during this kind of period of time

20   when everyone's being instructed that they should go down

21   the hall if they're not being arrested, did the children

22   leave?

23         A.    Not all of the children.

24         Q.    Okay.  Let's please play 3M.

25               (Playing video.)

1          Can we pause right there.  Okay.  Of course
2   it's blurry.  Are any of these children here Coleman
3   Boyd's children?
4          A.    Yes.
5          Q.    Are any of these children Dennis Green's
6   children?
7          A.    Yes.
8          Q.    Where is Heather Idoni right now?  I know I
9   chose a bad part to pause.
10         A.    Heather Idoni is straight ahead on the left
11  side standing in the black garb.  I'm pretty sure that's
12  her.
13         Q.    Can we please press play.
14               (Playing video.)
15               Whose voice are we hearing at the end?
16         A.    Unfortunately, that's my voice.
17         Q.    I see you shaking your head.  Why were you
18  shaking you're head when you were watching that?
19         A.    Because my math is really bad.
20         Q.    So why can we hear your voice so clearly?
21         A.    Because I'm holding the camera.
22         Q.    At this point where was Cal Zastrow?
23         A.    He's standing really close to the door
24  right in front of me.
25         Q.    And then where was Paul Vaughn in that?

```
 1          A.    I have no idea where Paul Vaughn was.
 2          Q.    Can you play -- replay that about
 3   three-quarters of the way through.  Can you move the
 4   cursor right where I put my finger, I think we'll get
 5   right where I need to go.  Thank you.
 6          A.    There he is.
 7          Q.    So where is he?
 8          A.    He's up against the door in the hallway
 9   next to Kendra Petty.
10          Q.    Just pause there.  Where is Dennis Green?
11          A.    Dennis Green is in the doorway of the
12   stairwell.
13          Q.    And Coleman Boyd is gone at this point;
14   correct?
15          A.    Yes.
16          Q.    Okay.  Can we please play 2P?
17                MS. BELL:  I'm sorry, Ms. Klopf, I couldn't
18   hear.
19                MS. KLOPF:  P as in Peter.
20                MS. BELL:  Thank you.
21    BY MS. KLOPF:
22          Q.    (Playing video.)
23                Who is being counted there?
24          A.    He was counting all the people that were
25   going to go to jail.  All the people blocking.
```

1      Q.    And what did you do?

2      A.    I raised my hand, like, oh, I'm gonna go to

3  jail.

4      Q.    Can we please play 3N.

5            (Playing video.)

6            Who is Gallagher talking to at this point?

7      A.    It sounded like he was talking to the whole

8  group of people.

9      Q.    I'm sorry?

10     A.    Sorry.  He was talking to the people left.

11     Q.    Okay.  Were those people blowfish?

12     A.    The people that were the blowfish are the

13  people, like, lined up in the hallway and the people that

14  are -- were close to the door were not.

15     Q.    Did you hear Gallagher use the term

16  physically blocking access?

17     A.    Yes.

18     Q.    What does that term mean to you?

19     A.    To me that means people -- people keeping

20  patients and employees from entering the clinic.

21     Q.    Okay.  Let's play 3O.

22            (Playing video.)

23            What's happening here?

24     A.    The resource pamphlets that everybody had

25  in case they came in contact with a mom or a patient,

```
1   they were all being handed in.  And it looks like the
2   flyers that were put on the cars outside were stuffed
3   into the pamphlets.
4           Q.    Is that the flyer you testified about
5   earlier this morning?
6           A.    Yes.
7           Q.    Okay.  Can we please look at 2R.
8                 (Playing video.)
9                 And who is that?
10          A.    Paul Vaughn.
11          Q.    Okay.  What's he holding?
12          A.    Looks like he's holding a bunch of those
13  papers that -- the pamphlets that were put on people's
14  cars, looks like a stack of those.  That's what I thought
15  they were.
16          Q.    Was he arrested with you that day?
17          A.    Not that I recall.  I don't recall seeing
18  him arrested.
19          Q.    How did this blockade end?
20          A.    With all of the people who raised their
21  hand and said they were going to stick around, so the
22  four juveniles, and what was it, nine adults, they were
23  all -- we were all arrested.  Like, almost all at the
24  same time and brought down the steps and taken to jail.
25          Q.    Without those arrests, would this blockade
```

1  have ended?

2        A.   No.  I mean, eventually obviously, but not

3  until the end of the day.

4        Q.   Okay.  Earlier today you testified that

5  carafem was in a building with multiple businesses.  To

6  the best of your knowledge did the blockade shut down

7  more businesses than just carafem this morning?

8        A.   I heard --

9             MS. BELL:  Objection.

10            MR. PARRIS:  Objection.

11            THE COURT:  Sustained.

12  BY MS. KLOPF:

13        Q.   I'm not asking about what you heard about.

14  To the best of your knowledge, did you see that other

15  businesses were shut down?

16            MR. CONWAY:  Objection, relevance.

17            MR. PARRIS:  Correct.

18            THE COURT:  Sustained.

19  BY MS. KLOPF:

20        Q.   So today we've watched just some of the

21  clips; correct?

22        A.   Yes.

23        Q.   Okay.  During the parts that we didn't

24  watch, were any of the blockaders violent?

25        A.   No.

1       Q.    Were any of the blockaders physically

2  harming anyone?

3       A.    No.

4       Q.    Okay.  What was happening with the doors of

5  the clinic throughout the entire recording?

6       A.    They were staying shut.

7       Q.    Why?

8       A.    Because we were sitting in front of them.

9       Q.    So of your codefendants, who remained after

10  the final order of dispersal was given?

11       A.    So of the defendants that remained,

12  everybody except Coleman and Vaughn.

13       Q.    Now, there's another exhibit there,

14  Exhibit 17 in that stack.  I know it's a big stack.

15       A.    Got it.

16       Q.    Have you had an opportunity to review that

17  before?

18       A.    Yes.

19       Q.    Okay.  Is it another clip of footage from

20  that day?

21       A.    Yes.

22       Q.    Is it fair to say that it's a series of

23  clips edited together of footage from that day?

24       A.    Yes.

25       Q.    Do you know who created this?

1       A.    No.

2       Q.    But does it still fairly and accurately

3 depict the events that you observed that day?

4       A.    Yes.

5       MS. KLOPF:  We'd move to admit and publish

6 Exhibit 17.

7       THE COURT:  Any objection?

8       MS. BELL:  No objection.

9       THE COURT:  Received.

10      (Government Exhibit No. 17 was admitted.)

11 BY MS. KLOPF:

12      Q.    (Playing video.)

13      Pause there.  Generally who are we seeing

14 here?

15     A.    We're seeing all the people that were in

16 the staircase preparing to block or be a blowfish enter

17 into the hallway.

18     Q.    Is this part early in the morning?

19     A.    Yes.

20     Q.    Before you're even there?

21     A.    Yes.

22     Q.    All right.  And just to be clear, did you

23 see Paul Vaughn there?

24     A.    Just now?  I wasn't looking for him.

25     Q.    Okay.  Can you scroll back a tiny bit?

1          (Playing video.)?

2     A.     Yes.

3     Q.     And who else do you see?

4     A.     Calvin Zastrow, Amanda Place, ▇▇▇▇▇

5 Boyd, and I don't recognize anyone else.

6     Q.     All right.  Can you press play.

7          (Playing video.)

8          So is it correct to say that these are

9 three different clips put together?

10    A.     Yes.

11    Q.     So just walk us through clip 1, clip 2,

12 clip 3.  What are we seeing here?

13    A.     Clip 1 was the entrance into the hallway at

14 the very beginning of the event.  And then the second

15 clip I don't remember what it was.  The third clip was

16 Calvin Zastrow engaging with the police officer who was

17 trying to rationalize, hey, this is not wise, what are

18 you doing.  And Cal's, like, well, babies are being

19 murdered here.

20    Q.     Do you know who made this?

21    A.     No, I still don't know.

22    Q.     After the blockade concluded, did you have

23 the opportunity to watch a video of Paul Vaughn being

24 interviewed outside of carafem?

25    A.     Yes.

Q.   Have you reviewed it in preparation for
trial?

A.   Yes.

Q.   And have you reviewed clips of that video?

A.   Yes.

Q.   Were clips from that video marked 5A and
5B?

A.   I think so.

Q.   What's that?

A.   Yes, I think so.

Q.   If you'd like to check, please do.

A.   Okay.  I believe you -- I don't remember
all the names of the videos, but I saw them all and I
signed them.  They're out of order.

Oh, yes.  They're at the end, yes.

Q.   And you've reviewed those in preparation
for trial?

A.   Yes.

Q.   Are those true and accurate clips of the
portions of the videos?

A.   Yes.

MS. KLOPF:  Move to admit, Your Honor.

THE COURT:  5A and B?

MS. KLOPF:  5A and 5B.

THE COURT:  Any objection?

1              MR. CRAMPTON:  No objection, Your Honor.

2              THE COURT:  Received.

3              (Government Exhibits Nos. 5A and 5B were

4    admitted.)

5    BY MS. KLOPF:

6         Q.    Can we please play Exhibit 5A.

7              (Playing video.)

8              Who are we seeing in this clip?

9         A.    That's Paul Vaughn.

10         Q.    And did you see the children behind him?

11         A.    Yes.

12         Q.    Generally who were those kids?

13         A.    Those were kids of the defendant

14    participants of the event.

15         Q.    And what is Vaughn describing in this clip?

16         A.    He's describing the blockade.

17         Q.    Did you hear him use the word we?

18         A.    Yes.

19         Q.    Is that consistent with your experience on

20    March 5, 2021?

21         A.    Yes.

22         Q.    Sitting here today, what do you view

23    Vaughn's role as in this blockade?

24         A.    He was the police communicator.

25         Q.    And what was the result of his conduct?

1          A.    He bought us a bunch of time in front of
2    the door.
3          Q.    Can we please play 5B.
4                (Playing video.)
5                Did you hear Vaughn say that the
6    participants were from all over?
7          A.    Yes.
8          Q.    Is that correct?
9          A.    Yes.
10         Q.    Were you local?
11         A.    No.
12         Q.    How far did some people travel?
13         A.    Some people traveled as far from Michigan
14   all the way down to Tennessee.  I included.
15         Q.    Were the Boyds local?
16         A.    No.
17         Q.    Where were they from?
18         A.    Mississippi.
19         Q.    Was Idoni local?
20         A.    No.
21         Q.    Where was she from?
22         A.    Michigan.
23         Q.    Were the Zastrows local?
24         A.    No.
25         Q.    Where were they from?

1          A.     Michigan.

2          Q.     Was Dennis Green local?

3          A.     I don't know where he's from.

4          Q.     And then, again, where were you from?

5          A.     Michigan.

6          Q.     Okay.  And after you left Tennessee after

7    this, where did you go next?

8          A.     Well, I went back home to Michigan, but

9    eventually -- shortly thereafter I also went to

10   Mississippi.

11         MS. KLOPF:  With the Court's indulgence,

12   just one moment.

13         No further questions.  Thank you,

14   Your Honor.

15         THE COURT:  Okay.  Ready for cross?

16                   **CROSS-EXAMINATION**

17   BY MS. BELL:

18         Q.     Good afternoon, Ms. Davis.

19         A.     Good afternoon.

20         Q.     My name is Jodie Bell, I represent

21   Mr. Gallagher.  And I need to ask you some questions.

22   Okay?

23         A.     Okay.

24         Q.     First of all, you're here as a government

25   witness today; correct?

1          A.    Yes.

2          Q.    That is also part of a cooperation

3    agreement that you have entered into with the government;

4    correct?

5          A.    Yes.

6          Q.    Okay.  And we'll talk about that in a

7    minute.  That agreement was entered into as part of your

8    plea in Michigan in August of 2022 -- no, '23; correct?

9          A.    I believe so.

10         Q.    The time of your plea in Michigan; correct?

11         A.    Yeah.

12         Q.    I want to talk about first how many times

13   you have met with the government globally and then

14   initially about this case.  So you said that you had

15   testified previously three times; correct?

16         A.    If I remember correctly, yes, three times

17   in Washington, DC.

18         Q.    So you had said you thought earlier you

19   testified I've met with the government about ten times?

20         A.    Yeah, that was a rough guess.  I have no

21   idea.  It's been a good amount of times before each time

22   I testified.  And then the proffer session and prep for

23   this trial as well.

24         Q.    Okay.  So I have at least seven proffer

25   reports?

1    A.    Okay.

2    Q.    Okay.  So those would be separate and apart

3 from your trial prep sessions; correct?

4    A.    I don't even know.  It's been a lot of

5 times.

6    Q.    A lot of times?

7    A.    It's been a lot of times.

8    Q.    We know that the first time you met was on

9 July -- about the 18th of 2023?

10    A.    Okay.

11    Q.    Prior to your plea; does that sound right?

12    A.    I'm sure it is.  I don't have any of the

13 documentation, but I met with them a lot of times.

14    Q.    It sounds like you studied an awful lot of

15 things before you came and testified today.  So what did

16 you study in advance of your testimony today?

17    A.    I don't know what kind of question that is,

18 honestly --

19    Q.    Okay.

20    A.    -- I'm not sure how to answer that.

21    Q.    Ms. Klopf had talked about you've gone

22 through all these videos.

23    A.    Yes, I did.

24    Q.    Okay.  So we can start with that.  Did you

25 have your own copies or did you do it at the

1  US Attorney's Office?

2         A.    So I originally had gone through all of the

3  Facebook videos myself before -- or, like, right after I

4  initially got indicted.

5         Q.    Okay.  I'm asking in preparation for trial

6  because after you got indicted you weren't preparing for

7  trial; right?  I'm sorry, to testify.  You weren't

8  preparing to testify.

9         A.    I was preparing for anything and everything

10 when I first got indicted.

11        Q.    Fair enough.  Let's talk about your trial

12 preparation to come into this courtroom today.

13        A.    Sure.

14        Q.    Did you get those video clips?  Because

15 those were not provided, those little clips in discovery,

16 were they?

17        A.    These are what I watched and what I signed,

18 and they were shown today to the Court.

19        Q.    You had in your discovery full video clips,

20 the full Chet Gallagher video, the full Dennis Green

21 video.  You didn't have little spliced pieces in the

22 discovery.

23        A.    I'm sorry, are you asking about when I was

24 initially indicted or are you asking when I prepped for

25 this trial to testify?

1        Q.    I said when you were preparing for this

2    trial to testify, did you have your own little video

3    clips?

4        A.    I didn't take individual video clips home.

5    I watched them and I signed the disks.

6        Q.    Did you watch them just today as the first

7    time you've seen the clips?

8        A.    No, I've seen these clips plenty of times.

9        Q.    The little individual clips did you see

10   prior to today, the shortened clips that the government

11   has introduced?

12       A.    Oh, my God.  I saw plenty of clips over the

13   stretch of time of prepping for this trial.  These clips

14   specifically I saw yesterday and the day before

15   yesterday, the ones that were shown today clipped how

16   they were.  But then I've seen other parts of all of the

17   videos together throughout prep sessions for this

18   testimony for this trial.

19       Q.    Let's talk about the clips, the little

20   clips that you watched yesterday and the day before.

21       A.    Okay.

22       Q.    Where did you do that?

23       A.    I did that here, at this building.

24       Q.    With whom?

25       A.    With Ms. Klopf.

```
 1        Q.    You watched all those clips.  How long were
 2   you meeting --
 3        A.    Well, with Ms. Klopf and with a -- I've
 4   watched clips with Ms. Klopf, I've watched them with
 5   individuals at that table and with a paralegal or a legal
 6   assistant.
 7        Q.    Okay.  Well, yesterday how much time did
 8   you spend with the US attorneys getting ready for trial?
 9        A.    I didn't time it.
10        Q.    Five minutes?
11        A.    I mean, I think it's safe to assume those
12   videos were not five minutes long.
13        Q.    Were you here for two hours, morning,
14   evening?
15        A.    Yesterday I spent a lot of the day sitting
16   in a room just in case I would be testifying.
17        Q.    Okay.  Were you watching video clips?
18        A.    Not the whole time, but one point I did
19   watch video clips and I didn't time it.
20        Q.    What about the day before?
21        A.    The day before I came here, I watched some
22   video clips and I went back to my hotel.
23        Q.    Did you meet with the government the day
24   before?
25        A.    Yes, I did because I watched the video
```

1   clips.

2           Q.     Who from the government did you meet with?

3           A.     I met with -- it was a legal assistant that

4   sat through with me, but I also met with the prosecution.

5           Q.     For how long did you meet with the

6   prosecution --

7           A.     I don't remember.  I did not time it.

8           Q.     Well, can you estimate, was it an hour?

9           A.     Maybe.  An hour or two.

10          Q.     And that was just two days ago, so you

11  can't really tell?

12          A.     I'm not sure.  I'm trying to give you an

13  accurate representation.  I got here from the airport, I

14  watched some videos, I went back to my apartment after an

15  all-nighter and I went to bed.

16          Q.     Fair enough.  We just touched on the last

17  two days of trial prep.  Prior to that when did you meet

18  with them?

19          A.     I have no idea off the top of my head.  Not

20  a clue.  It's been a couple times over Zoom and then I

21  came here in person once.

22          Q.     We've got FBI 302s, so I guess I'll take a

23  look --

24          A.     Yeah, you'd have to reference them.  I

25  don't have it memorized.

1          Q.     Well, so you say the last two days you saw

2    them, but you can't tell me, then, when you saw them

3    before that?

4          A.     I can't tell you the exact dates, but I

5    definitely saw video clips before that.

6          Q.     Well, if the FBI 302 says you saw them on

7    the 19th, would that be accurate?

8                 THE COURT:   19th of what?

9     BY MS. BELL:

10         Q.     I'm sorry, January.  Like a week ago.

11         A.     Yeah, because we had a trial prep session

12   where I came out here.

13         Q.     How long did that last?

14         A.     I came out here and I met them at 10:30 and

15   I started driving home I think around 4:00, maybe.

16         Q.     So for about five and a half hours last

17   Friday you met with them on the 19th of January?

18         A.     I believe so.  I don't have my calendar in

19   front of me, but I'll trust that that date is correct

20   from you.

21         Q.     Did you meet with them on the 8th of

22   January over Zoom or in person?

23         A.     I think that one was Zoom or maybe that was

24   the in-person one, I can't remember.  And I might have

25   gotten those dates flipped up.  Again, I don't have my

calendar in front of me.

Q.     Then on the 19th, just so I'm clear, you
gave them a bunch of new information about Coleman Boyd;
is that right?

A.     I have no idea.  Take your word for it.  I
don't remember what I told them in total.  I told them
the truth, though.  I just told them what I know.

Q.     It was only a week ago.

A.     I know.  I have a busy life, so.  But I
told them the truth.

Q.     And then did you meet with them on -- could
it be possible you also met with them one other time in
early January of this year --

A.     It's very possible.

Q.     -- via Zoom?  But you can't remember?

A.     No, I don't honestly remember.

Q.     So you can't remember certain things that
happened this month, but you've got a really good memory
of things that happened in 2021, just so I'm clear?

A.     So just to be clear, you're asking me on
the stand under oath about my date and schedule, and I'd
like to be sure about those things.  Those are not things
I've reviewed; whereas, this case I've reviewed many,
many times.  My own personal documentation from the days,
my text messages, my emails, my pictures.  Like, dude,

1  I've looked at all that stuff many, many times, but I

2  didn't sear into my brain the times I met with Ms. Klopf.

3          Q.    Fair enough, fair enough.

4                Now, you mentioned, I think, that you're

5  experienced in rescue; right?

6          A.    Well, if you call two times experienced,

7  plus my observation of the DC and my helping with that

8  one and the red rose rescue, then yes.

9          Q.    Let's talk about DC since you said your

10 observation of DC.  I think you testified in front of

11 this jury just a few hours ago that you participated in

12 DC?

13         A.    If you heard my whole sentence, I mentioned

14 that, yes, I participated but not in the blockade.  But I

15 also observed the blockade.

16         Q.    Do you have criminal liability in DC, in

17 your opinion?

18         A.    Do I have criminal liability.  Can you

19 explain that?  Like, am I -- did I commit a crime?

20         Q.    Yes.

21         A.    Yes, I've trespassed.  And I've said that

22 on the stand already.

23         Q.    In DC all you did was trespass?

24                MS. KLOPF:  Objection, Your Honor, calls

25 for a legal conclusion.

1          THE COURT:  Sustained.

2     BY MS. BELL:

3          Q.    And it's fair to say that you have

4     previously made statements that you feel like it's okay

5     to trespass; correct?

6          A.    No, I don't believe, but I used to believe

7     that.  Do you remember how I had a change of heart and I

8     don't believe that anymore, that's why I'm on the stand

9     today?

10         Q.    Okay.  Let's talk about rescue.

11         A.    Okay.

12         Q.    Rescue has multiple meanings; is that fair

13    to say?

14         A.    Yes.

15         Q.    Means different things, not only -- can

16    mean different things to different people; is that fair

17    to say?

18         A.    Oh, yes.

19         Q.    Fundamentally rescuing the unborn; is that

20    fair -- a fair interpretation of what it means?

21         A.    That could be one way, sure.

22         Q.    Is it ever not rescuing the unborn --

23         A.    I mean --

24         Q.    -- in the context --

25         A.    -- rescue the weak and the needy.  Is that

1  the unborn, is that -- you know what I'm saying?  It can

2  be.  A lot of times it is.

3          Q.    In the context of going out to a

4  reproductive health center for a rescue, is the objective

5  to rescue the unborn?  Can we agree on that?  If it's a

6  red rose rescue or whatever other intent you have in

7  going out there, bottom line is if you're a pro-life

8  person and you're at the reproductive health center,

9  legal or illegal activity, the goal is to save the

10 unborn.

11         A.    100 percent, yes.

12         Q.    Okay, we agree on that.  And that is how it

13 is different from a protest; correct?

14         A.    That depends on your definition of protest,

15 I guess.

16         Q.    Protest doesn't necessarily embrace the

17 idea of saving the unborn.  It may simply be I'm against

18 abortion without the saving component.  Can we agree on

19 that?

20         A.    I think it's a semantics argument,

21 honestly.

22         Q.    Okay.  You're entitled to that.

23               So rescue also can involve interposition;

24 right?

25         A.    Yes.

1          Q.    Can we agree that interposition is placing

2     a person in between a pregnant person or suspected

3     pregnant person and a clinic?

4          A.    Yes, that's a form of interposition, but I

5     don't think anyone cares about that as much as did you

6     break the law or did you not break the law --

7          Q.    I'm not asking --

8          A.    -- it comes down that.

9          Q.    I'm just seeing if we can agree on some

10    general concepts, okay?

11         A.    Yeah.

12         Q.    Would you agree with me to effectively

13    interpose, okay, there is a need to connect with the

14    mother or the pregnant woman?

15         A.    No.

16         Q.    If you're trying to persuade someone not to

17    go through with the procedure, is an effective way of

18    interposing talking to that person?

19         A.    I think so, but it's debatable.  Apparently

20    some people think not talking at all and just saying

21    you're not going past here is an effective method, so.

22         Q.    Is an effective method to try to counsel

23    someone?

24         A.    I think it can be.

25         Q.    Okay.  Is an effective method to try to

1  offer help?

2          A.     I think it can be.

3          Q.     To offer financial assistance?

4          A.     I think it can be.

5          Q.     Housing, if that's part of the dilemma for

6  the person?

7          A.     Yes, I think it can be.

8          Q.     Maybe even offer to give them a baby

9  shower?

10         A.     Again, I think it can be.

11         Q.     And I think you talked about one of the

12 final videos you watched, you said something there was --

13 I believe Mr. Vaughn had some papers in his hand and you

14 said that was maybe a resource pamphlet; is that right?

15         A.     There was resource pamphlets that everybody

16 had.  And it looked like those flyers for the cars

17 outside that preemptively said we were going to get

18 arrested, those were stuffed in the pamphlets.

19         Q.     I'm asking you a question about the

20 resource pamphlets.

21         A.     Oh, okay.

22         Q.     All right.  Do the resource pamphlets -- is

23 that a document that you-all have or people have at

24 rescues that have resources for an expecting or pregnant

25 woman so that you can give that to her so she can maybe

1  go get some more help?  Is that what a resource pamphlet

2  is?

3          A.    Yes.

4          Q.    So those were there that day --

5          A.    Yes.

6          Q.    -- correct?  Okay.

7                THE COURT:  Ms. Bell, could you get that

8  mic a little closer?

9                MS. BELL:  Oh, I'm sorry, Your Honor.  And

10 I feel my voice is going.  Sorry about that.

11  BY MS. BELL:

12         Q.    So another issue that I wanted to address

13 with you regarding the idea of rescue is you were talking

14 about risking arrest.  Do you remember that?

15         A.    Yes.

16         Q.    And so risk doesn't necessarily mean arrest

17 will happen.  Can you agree with me on that?

18         A.    I agree.

19         Q.    Risking arrest doesn't necessarily mean

20 arrest for FACE; would you agree with me on that?

21         A.    Oh, yes, I would agree with you on that.

22         Q.    And you would know that if you go somewhere

23 and you're asked to leave, you would risk arrest; right?

24         A.    Yup.

25         Q.    For what offense?

```
 1              MS. KLOPF:  Objection, Your Honor.  I think
 2   this goes much farther afield than the Court's ruling on
 3   what they were arrested for.
 4              THE COURT:  Overruled.
 5   BY MS. BELL:
 6        Q.    You can answer.
 7        A.    Trespassing.
 8        Q.    Okay.  And, in fact, that's what happened
 9   that day, correct --
10        A.    Yes.
11        Q.    -- on March 5?
12              Now, in moving sort of forward, you
13   testified that you first met Mr. Gallagher at a camping
14   trip in Michigan; is that correct?
15        A.    According to my memory, I believe that's
16   the first time I met him.
17        Q.    Do you remember approximately when that
18   was?
19        A.    It would have been around August of 2020.
20        Q.    And during that particular event, people
21   were sharing their pro-life beliefs; correct?
22        A.    Yeah, they were preparing for a rescue.
23        Q.    They were ministering; correct?
24        A.    That did happen on that camping tour, yes.
25        Q.    People were preaching, talking, eating?
```

1    A.    Yup.

2    Q.    Getting to know one another; is that fair?

3    A.    Yes.

4    Q.    What sort of personal interaction during

5  that trip, if any, did you have -- or during that event,

6  if any, did you have with Mr. Gallagher?

7    A.    I do not remember, honestly.

8    Q.    Because it was a long time ago; right?

9    A.    Well, because I haven't sat around and

10  thought deeply about if I had a personal interaction with

11  Chet Gallagher on that camping tour.

12    Q.    He was present, you said?

13    A.    He was there.  I remember seeing him, but I

14  don't specifically remember if we had a one-on-one

15  conversation.

16    Q.    Was that the first time you met him,

17  though?

18    A.    I believe so.

19    Q.    Were you introduced to him?

20    A.    I believe so.

21    Q.    But you're not sure?

22    A.    I'm pretty sure, but that's the best answer

23  I can give you and also be telling the truth, you know.

24    Q.    Then the next time you would have seen him

25  was when you traveled to Tennessee; is that right?

1          A.     I think so.  I'm pretty sure.

2          Q.     Well, do you remember some other instance

3     where you may have interacted with him or talked to him

4     or had a one-on-one with him?

5          A.     I don't recall any other time.  And that's

6     why I'm saying I'm pretty sure the next time I saw him

7     was Tennessee.

8          Q.     And with respect to your relationship with

9     Mr. Zastrow, Mr. Boyd, you know them better; is that fair

10    to say?

11         A.     Absolutely fair to say.

12         Q.     And they would invite you to pro-life

13    ministries and gatherings; correct?

14         A.     Yes.

15         Q.     When you came to Tennessee, that was for

16    that purpose as well; correct?

17         A.     Yes.

18         Q.     So there was ministry where you would all

19    get together and pray and sing; right?

20         A.     Yes.

21         Q.     You'd eat; correct?

22         A.     Yes.

23         Q.     Okay.  You also, I think, said that you

24    went to maybe another -- was it Planned Parenthood?  Did

25    you go to another clinic?

1         A.    Yes.  We went to a Planned Parenthood in
2    Tennessee before the rescue.
3         Q.    Did you go to the legislature?  Did you do
4    any other pro-life activities?
5         A.    We went out onto the streets, held signs
6    and yelled at people for a while.
7         Q.    And where was that?
8         A.    Downtown somewhere in the
9    Nashville/Mt. Juliet area.  I'm not very familiar with
10   Tennessee, to be honest.
11        Q.    That's totally fair.  You said also that
12   you traveled down here from Michigan with it sounded like
13   some female friends; is that right?
14        A.    That is correct.
15        Q.    And you stayed at a hotel that Ms. Idoni
16   had arranged for?
17        A.    Yes.
18        Q.    And she used that hotel points; is that
19   right?  Is that how she got it?
20        A.    She called it a room share.  I don't know
21   what that is.
22        Q.    But so that other people can come; correct?
23        A.    Yes.
24        Q.    And she's, you said, like a mother figure
25   to you; right?

1          A.     She was, yeah.

2          Q.     Now, you said there were several meetings

3    and you talked about this second meeting out by the

4    pavilion; correct?

5          A.     Yes.

6          Q.     Do you remember that?

7          A.     I do.

8          Q.     How many people were at that meeting?

9          A.     That was the smallest gathering of them

10   all, but there was a solid number.  I don't remember an

11   exact number.  There was a lot of kids, and there was

12   most of the defendants.

13         Q.     Well, which defendants were not there?

14         A.     Well, I don't recall Paul Vaughn.  I don't

15   recall Paul Vaughn until the day of the rescue.  It's

16   possible he was there and I just didn't recognize him or

17   pay attention to him.  And then I also don't a hundred

18   percent recall -- who was the other person?  I said it

19   earlier.  We went through it.

20              I believe Dennis Green, I can't remember

21   hundred percent sure if it was Dennis Green, if he was

22   there or not, but I recall Boyd being there, Cal being

23   there, Chet being there, people that are not on the

24   defendants list being there, like Eva Zastrow -- for

25   today, I mean.  Eva Zastrow, Eva Edl.  I remember the

1  Hebbs being there and their kids.  I remember Andrew

2  Belanger and his wife Marie and their kids.

3          Q.    It was out at a pavilion area; correct?

4          A.    Yes.

5          Q.    Were there picnic tables out there?

6          A.    There was.

7          Q.    Do you remember how many?

8          A.    A lot.  I don't know.

9          Q.    Were they full?

10          A.    Yeah, and a lot of people were standing.

11          Q.    Okay.  So it was crowded, then; is that

12  fair to say?

13          A.    Yeah.  I mean, it didn't feel like squeezed

14  in.  All I'm saying is it was the smallest gathering, but

15  most of the defendants were there that I recall and

16  people that were at the rescue that weren't -- that

17  didn't get arrested, they were also there.

18          Q.    I'm trying to get an estimate or to figure

19  out, were there 50 people there, were there five people

20  there?

21          A.    There was way more than five.  And I would

22  say probably less than 50, but I'm not sure.

23          Q.    And it sounds like there were children

24  running around?

25          A.    Yes, there was.

1          Q.    Because you were outside; right?

2          A.    Yup.

3          Q.    And you talked about how there were

4     discussions amongst you-all about various roles; is that

5     right?

6          A.    Yes.

7          Q.    Okay.  Of the discussions, so we're clear,

8     this was going to be peaceful; correct?

9          A.    Yup.

10         Q.    This was going to be nonviolent; correct?

11         A.    Yes.  That's correct.

12         Q.    One of the things that was important -- and

13    you can correct me if I'm wrong -- was that it be orderly

14    as much as it can be as well?

15         A.    Yes.  That was definitely -- it was an

16    orderly plan.

17         Q.    There is an appreciation for this being an

18    emotional situation for people; correct?

19         A.    I guess that depends on your definition of

20    an appreciation for.  I don't know.

21         Q.    There is a concern that these particular

22    people, when they went over there, did not want to upset

23    or cause a fight or an outbreak of any kind; is that fair

24    to say?

25         A.    I don't think their intentions were to

1  cause any violence or to -- their intentions were not to
2  upset people.  I think their intentions were to try and
3  keep abortions from happening, if that makes you happy.
4       Q.   And that -- well, I'm just asking you what
5  happened.
6       A.   I truly believe that's true.  Like, I don't
7  think they were out there trying to hurt feelings.  I
8  think they were trying to keep abortions from happening.
9  I don't necessarily agree with their method, but --
10      Q.   We get that.  But it's important that it be
11 somewhat orderly.  Like, when you talked about earlier
12 interacting with the police, you said that in most
13 rescues/protests that you go to, that only a single
14 person would talk -- want to be designated to speak with
15 police; right?
16      A.   Yes.  There was always order and there was
17 always a plan.
18      Q.   Protest, rescue, regardless of the ultimate
19 intent; correct?
20      A.   For rescue specifically, there was always a
21 plan and it was always orderly, in my opinion.
22      Q.   Okay.
23      A.   For what it was.
24      Q.   To avoid anyone feeling threatened; right?
25      A.   That was always preached, yeah, to make

1  sure that you responded peacefully, even if you got hurt

2  or someone tried to hurt you, yeah.

3       Q.    And to take the sort of emotion down if

4  somebody was getting emotional that showed up, say, at

5  the clinic; correct?

6       A.    Yes, that was taught, yes.

7       Q.    Okay.  And so that was -- we can agree on

8  that, that's --

9       A.    Yup.

10      Q.    Okay.  And so we're clear, you were talking

11  about how Mr. Zastrow would talk about the FACE Act, kind

12  of all the time?

13      A.    Yeah.

14      Q.    Correct?

15      A.    Yes.  A lot.

16      Q.    This is something he's passionate about;

17  correct?

18      A.    Yes, I would say so.

19      Q.    And he -- would it be fair to say he tries

20  to educate himself about what people are doing, what's

21  going on in the pro-life movement and that sort of thing?

22  Would that be fair to say?

23      A.    Yeah.

24      Q.    And so be having an awareness of what the

25  FACE Act is would be consistent with that; is that right?

1          A.    Yeah.

2          Q.    Okay.  And he would talk about it and what

3   it was; correct?

4          A.    Yes.  Yes.

5          Q.    Okay.  Now, before getting to March 5,

6   there was another meeting, you said, after meeting at the

7   pavilion; correct?

8          A.    Yes.

9          Q.    And that was a church service; right?

10         A.    Yes.

11         Q.    And that was actually in a church; correct?

12         A.    Yes.

13         Q.    And there were a lot of people there;

14  right?

15         A.    Yeah, it seemed like a lot of people to me.

16         Q.    More than at that pavilion?

17         A.    There was multiple tables filled up with

18  people and there was food.

19         Q.    Praying?

20         A.    Yup.

21         Q.    Worshiping together?

22         A.    Yup.

23         Q.    Singing hymns --

24         A.    Yes.

25         Q.    -- right?

1          A.     Yes.

2          Q.     And that was the night before, you said;

3     correct?

4          A.     Yes.

5          Q.     And who -- that was the night that Mr. Boyd

6     was preaching; correct?

7          A.     Yes.

8          Q.     Was my client preaching?  Do you remember?

9     Mr. Gallagher?

10         A.     I specifically only remember Coleman Boyd

11    giving a sermon that night.  He may have said something

12    that I don't remember.  And the reason I specifically

13    remember it is because I texted Coleman Boyd and I have

14    that text and it says something like thank you for your

15    sermon, it was, like, heart touching or something like

16    that.

17         Q.     Okay.  And just to back up again, I mean,

18    these events are basically big gatherings of like-minded

19    people who share similar spiritual beliefs, as well as

20    pro-life beliefs; correct?

21         A.     I would say so, yes.

22         Q.     And do you remember when you got the

23    invitation, was it to a just-show-up ministry or do you

24    remember what it was called?

25         A.     Wait, what?  When I got the invitation for

1 the rescue?

2      Q.    Yes.  The invitation to come to Nashville.

3      A.    Oh, the initial invitation was in person

4 and it was from Cal Zastrow.  And he was indicating that

5 it was going to be a blockade, a rescue.  Like, it wasn't

6 like a hey, let's go hold signs in the street and, you

7 know, do legal things.  It was, hey, we're going to go do

8 a rescue, a big hoorah.

9      Q.    A big hoorah.  Doesn't he have a ministry

10 he runs called Holiness Revival Ministry or something

11 like that?

12      A.    I mean, he would say that all the time.

13 Like, he called us the Michigan Holiness Revival Team and

14 we had the Michigan Holiness Revival Group on Facebook

15 Messenger, so.

16      Q.    So he did?

17      A.    I mean, yeah, I guess so.  I guess you

18 could say that.

19      Q.    And you said that when you came here, to

20 some extent it seemed like Chet had done some of the

21 organizing; correct?  Mr. Gallagher?

22      A.    Based off my understanding from the

23 conversations I overheard and the conversations I had

24 directly with Cal Zastrow is that he was organizing it

25 with Chet Gallagher and they were working with local

1  Christians in this area to plan a blockade.

2       Q.    It would make sense if Mr. Gallagher lives

3  here for him to help arrange for the church, for

4  instance, to have the service?

5       A.    A hundred percent.

6       Q.    Where you guys stay with Ms. Idoni;

7  correct?

8       A.    Yes, that would make a lot of sense.

9       Q.    If a bunch of people, like-minded with him,

10 are coming to town; right?

11      A.    Yes, that would make sense.

12      Q.    Okay.  I want to talk about just a couple

13 more things.  So you talk about risking arrest.  Do you

14 remember what you have testified to about that and in

15 light of what offenses you were risking arrest for?

16      A.    Like, what?

17      Q.    You testified in Washington; correct?

18      A.    Yes.

19      Q.    Do you remember saying you would risk

20 arrest for criminal trespass or something along those

21 lines?

22      A.    Like, in Tennessee?

23      Q.    In general.

24      A.    So not every day, but when I participated

25 in the rescue in Tennessee and when I participated in a

rescue in Michigan, I did so, in my mind thinking I'm
risking arrest.  I might and most likely will go to jail.

        Q.    For criminal trespass; correct?

        A.    Yes.  And I thought to myself, there's a
great possibility that I could be charged with FACE
because that's what I had been told a lot and I did my
research and I was pretty sure that was a real
possibility.

        Q.    Since you're saying that, around that
timeframe you didn't know anybody who had faced a
federal --

              MS. KLOPF:  Objection, Your Honor.  This
goes to the charging decision.

              THE COURT:  Sustained.

 BY MS. BELL:

        Q.    Let me ask you this.

              I'll move on.  Just so we're clear -- and
we've seen a lot of videos and some of the other lawyers
will probably ask you.  During the entire time that you
were at the carafem clinic that morning -- you got there
right before it opened; correct?

        A.    Yup.

        Q.    And do you know what time it was over?

        A.    I don't remember.  It was like three hours
or something like that.  It was a long time.

1    Q.    You think three?

2    A.    It was long.

3    Q.    Again, nobody threatened anybody; right?

4    A.    Not to my knowledge.

5    Q.    Nobody lunged at anybody?

6    A.    Not to my knowledge.

7    Q.    Okay.

8    A.    Not -- not out of the rescuer side, anyway.

9  I mean, the most violence I saw was that cop that, like,

10 shoved Calvin Zastrow and Amanda Place against the wall.

11 That is the most violent thing I saw that day.

12   Q.    Okay.  So let's talk about that.  So you

13 were arrested that day --

14   A.    Yup.

15   Q.    -- right?  And prior to that arrest you

16 said that the blowfish had left; right?

17   A.    Yes.

18   Q.    They were given a warning, everybody was

19 given a warning; right?

20   A.    Yes.

21   Q.    After the blowfish leave, then you are

22 arrested along with the remaining other people; correct?

23   A.    Yes.

24   Q.    Now, you have testified that part of the

25 goal that day, I guess, was to keep the clinic closed as

1  long as possible; right?

2         A.    Yes.

3         Q.    And to buy as much time as possible;

4  correct?

5         A.    Yes.

6         Q.    Okay.  That arrest process, you'd agree

7  with me, was very, very civilized; right?

8         A.    I mean, yeah.  Best-case scenario, like,

9  we're breaking the law and the cops gave us that much

10 time.  Like, that's best-case scenario.  I've never met

11 nicer cops.

12        Q.    They just walked you down the stairs?

13        A.    Yup.

14              MS. KLOPF:  Objection.  The way they were

15 arrested is not relevant.

16              THE COURT:  Sustained.

17  BY MS. BELL:

18        Q.    At the time of the arrest, no one utilized

19 any of the tactics you have previously discussed like

20 going limp to delay the arrest; correct?

21        A.    I didn't see anybody do that, no.

22        Q.    But that is something that people regularly

23 do if they're trying to buy more time?

24        A.    Yes.

25        Q.    Nobody tried to lock themselves to the

1  stairwell, did they?

2          A.    No.

3          Q.    And that is a tactic often used by people

4  who are trying to delay to buy more time; correct?

5          A.    Lock and block is used in rescue, yes.

6          Q.    But not used here?

7          A.    That is correct.

8          Q.    Completely orderly; right?

9          A.    It was very orderly.

10         Q.    And so you went to jail that day.  You were

11 charged with criminal trespass; right?

12         A.    Yes.

13         Q.    And got out, I guess, shortly thereafter;

14 is that fair to say?

15         A.    It was 28 hours later, and my case was

16 dismissed for the trespass charges.

17         Q.    All right.  So that was on March 5 that you

18 were arrested; correct?

19         A.    Right.

20         Q.    And then if we go along the timeline, then

21 following that, when were you indicted?

22               MS. KLOPF:  Objection, Your Honor.

23               MS. BELL:  Sorry, when were you -- excuse

24 me, Your Honor.

25               THE COURT:  What's the relevance of the

1  date of her indictment?

2           MS. BELL:  Her change of heart.  Excuse me.

3  And when she changed her -- I'm sorry.  Do you have a

4  water?  Thank you.

5           THE WITNESS:  You'd like to know when I

6  changed my mind?

7   BY MS. BELL:

8      Q.    I want to talk you through it a little bit.

9      A.    I was going to say, we can save time and

10 I'll tell you right now.

11     Q.    Was there a particular date that you

12 changed your mind?

13     A.    No, it was over time.  And it was over a

14 period of lots of conversations with specific people.  It

15 started with Zach Lottenschlager with End Abortion Now.

16 He had a debate with me and I was super pro-rescue,

17 whatever.  I went to Reform Con, it's a conference, and

18 had a long debate with him and he was really kind to me.

19 Took the time to explain why he really believed rescue

20 was unwise at the end of the day.  And that he

21 believed -- it's not necessarily wrong, but it is wrong

22 to break the law to try and change the law.

23           Like, it just won't work and you can use

24 better methods and accomplish greater things and do good

25 things with your life that actually bless society and

1  help life progress, rather than rotting away in a jail
2  cell by making yourself a martyr and forcing your
3  opinions on other people who are going to go do what they
4  want to do anyway.  He didn't say it quite like that, but
5  this is how I processed it.
6          Q.    Let me talk about a couple of things that
7  happened between March 5 and that date.  Okay?
8          A.    Okay.
9          Q.    You were charged in this district court;
10  correct?
11          A.    Yup.
12          Q.    And that was before that conversation with
13  your friend; right?
14          A.    Yes.
15          Q.    Okay.  And you were charged also
16  probably -- I believe that was in October of 2022 --
17          A.    Yes.
18          Q.    -- that you were charged in this district
19  court.  The following spring you were charged in Michigan
20  as well with a federal indictment; correct?
21          A.    Right.  Yeah.  I was charged in Michigan
22  and Tennessee, yup.
23          Q.    Let's talk about that for a second.  So
24  when you're charged in October, you're charged with the
25  FACE Act violation; correct?

1       A.      Yup.

2       Q.      And the conspiracy charge; correct?

3       A.      Yes, I was.

4       Q.      It's the first time you're ever charged in

5  federal court; right?

6       A.      Yes.

7       Q.      It's very different than in state court;

8  correct?

9       A.      Very different.  Look where we are.

10      Q.      You're only how old at the time?

11      A.      I don't remember.  In 2022, October --

12      Q.      23?

13      A.      What's that?

14      Q.      Would that have been about 23?

15      A.      In October of 2022 I would have been 24,

16 right?

17      Q.      I'm not sure your date of birth.

18      A.      I have no idea.  I just turned 25 in

19 August.

20      Q.      Okay.  You're young --

21      A.      I am young.

22      Q.      -- fair to say?  Had never been confronted

23 with this kind of thing before; correct?

24      A.      No.

25      Q.      Stressed you out; correct?

```
 1          A.     Oh, yes.  Terrified me.
 2          Q.     Caused you anxiety; right?
 3          A.     Yes.
 4          Q.     You have anxiety; correct?
 5          A.     No.
 6          Q.     You don't have anxiety?
 7          A.     I feel great.
 8          Q.     At that time you were struggling with
 9   anxiety; is that fair to say?
10          A.     Oh, yes.  And I had just gotten back from
11   Ukraine and horrible things happened there that I
12   witnessed.  I struggled with anxiety.
13          Q.     It was even a condition of your release
14   that you get mental health treatment or continue with
15   mental health treatment; correct?
16          A.     It was a condition, yeah.
17          Q.     Okay.
18          A.     I was already in therapy though because of
19   what happened in Ukraine.
20          Q.     Fair enough.  But this didn't help; right?
21          A.     No.  Who would it help?
22          Q.     You did not anticipate this; is that fair
23   to say?
24          A.     I sort of did because of the DC case.
25          Q.     The which case?
```

1          A.     The DC case.  That one happened first, and

2     I was like, oh, watch all of us get charged.  Oh, I see

3     this coming.

4          Q.     Okay.  Well, and after the DC case do you

5     remember you went up on YouTube and posted --

6          A.     Oh, yeah.  Very pro-rescue video.

7          Q.     And talked about how the FBI was trying to

8     scare people --

9          A.     Yes.

10          Q.     -- and that sort of thing.

11               COURT REPORTER:  Wait until she finishes

12     her question.

13     BY MS. KLOPF:

14          Q.     What was it called?  Do you remember the

15     video's name?

16          A.     Something in the Bloody City.

17          Q.     Again, saying the FBI is trying to scare

18     people, mentions rescuing -- or, excuse me, arresting

19     people for criminal trespass; right?

20          A.     Yes.

21          Q.     Okay.  So in October you get the first

22     indictment; right?

23          A.     Yup.

24          Q.     And all the sort of overwhelming things

25     that come with that, not to mention what else is

1  happening in your life; right?

2        A.    Yes.

3        Q.    Okay.  Then in the spring you get a second

4  federal indictment; correct?

5        A.    Yes.

6        Q.    Charging you with the same thing; right?

7        A.    Yes.

8        Q.    In a different jurisdiction; correct?

9        A.    Yes.

10        Q.    That weighs heavy on you, having a second

11  one; right?

12        A.    Yeah, of course.

13        Q.    Along with these two indictments is a whole

14  lot of unknown about your future; would that be fair to

15  say?

16        A.    No, I felt very sure that my future was

17  prison.

18        Q.    Okay.  Well, that's something you were

19  worried about; right?

20        A.    I mean, I kinda settled with it and I

21  thought it was the right thing until I had people

22  speaking life to me and care about me and tell me that I

23  don't need to martyr myself.

24        Q.    And that's totally okay.  I mean, I'm not

25  trying to give you a hard time.  I'm just trying to

```
1   figure out your kind of mindset after you get two
2   indictments.  You're 23, 24 years old, right, with your
3   life in front of you; correct?
4          A.    Yup.
5          Q.    You work at a law firm; right?
6          A.    I started working right after the
7   indictment.
8          Q.    Okay.  You know how serious this can be,
9   right, from your boss?  You work at a criminal defense
10  firm.
11         A.    Oh, yeah.  I didn't start working there
12  until, what was it, eight months ago or something like
13  that, but yeah.  Or five, I don't know.  May.  I started
14  that job in May.
15         Q.    And that was before you pled guilty or
16  entered into any --
17         A.    Actually --
18         Q.    -- cooperation agreement?
19         A.    Sorry.  My boss actually had a lot to do
20  with changing my mind.  My boyfriend, my boss, Zach
21  Lottenschlager, my family, my extended family, my older
22  brother, my grandma, my aunts and uncles.  I had so many
23  people, like, arguing with me in a really loving way
24  trying to show me how unwise what I did was.
25         Q.    Fair enough.  Fair enough.
```

1              But you're working at a law firm, so you
2    know at 24 you're facing some felony charges; right?
3        A.    Yes.
4        Q.    Which carry really serious consequences?
5              MS. KLOPF:  Objection, Your Honor.
6              THE COURT:  Sustained.
7    BY MS. BELL:
8        Q.    You're concerned about that; right?
9        A.    I think we established that it was a
10   concerning thing to be charged with all that, yeah.
11       Q.    I mean, the long-term consequences were
12   unknown after you got the second indictment; right?
13       A.    Yeah.  With a max of 22 years.
14             MS. KLOPF:  Objection, Your Honor.  We're
15   talking about penalties again.
16             MS. BELL:  I wasn't.
17             THE COURT:  Ask your question again.
18   BY MS. BELL:
19       Q.    The long-term consequences, what was going
20   to happen, how it was going to turn out, where your life
21   was going to go were unknown?
22             MS. KLOPF:  Again, I object.
23             THE COURT:  Sounds like penalty to me.
24   Sustained.
25

1   BY MS. BELL:

2         Q.    Let me ask it this way.  You've got your

3   life ahead of you and you're stressed out and anxious

4   about how this is going to turn out; is that a fair

5   assessment?

6         A.    I mean, yeah.  That's a fair assessment.

7         Q.    Right.  Two indictments.  And at that

8   point, shortly after May of 2020, your mind changes?

9               THE COURT:  2020?

10  BY MS. BELL:

11        Q.    I'm sorry, 2023.  After that Michigan

12  indictment.

13        A.    It's not right away.  It was like -- I

14  don't even know.  I think -- whenever Reform Con

15  happened, that's the beginning.  That was the spark for

16  me.  And after that I had more and more and more

17  conversations until I discovered proffers because I

18  worked at a criminal law firm and I was, like, oh, that

19  would be the right thing to do, go tell the truth and

20  just see what happens.  And then I was offered a deal

21  because everyone was offered a plea deal, a plea

22  agreement, and --

23        Q.    Okay.

24        A.    -- I was, like, this is awesome.  Like, God

25  had opened the door for me to not be stuck.  And God says

1  in Matthew Chapter 13 to settle with your prosecutor

2  before going to trial.  And, I don't know, I have had

3  lots of arguments about this, yes.  I had a change of

4  heart, and I realized that this is a no-brainer and...

5          Q.    Let's talk about a couple things about

6  that, though.

7          A.    Okay.

8          Q.    So you get a plea offer in two different

9  jurisdictions ultimately; correct?

10         A.    Yes.

11         Q.    Okay.  You enter into a proffer agreement

12  with the Michigan prosecutors in July of 2023 and sign a

13  proffer letter; correct?

14         A.    I don't remember the date, but I've sure

15  you got it.  I don't remember.

16         Q.    Do you want to take a minute to refresh

17  your memory?

18         A.    You can if you want.  Honestly, I'm just,

19  like, where is this getting to.

20              THE COURT:  I'm sure you're getting tired,

21  Ms. Davis, but you just need to answer the questions and

22  don't comment.  Okay?

23              THE WITNESS:  Okay.

24              MS. BELL:  Your Honor, if I could hand this

25  up so she can refresh her recollection.

1        THE COURT:  Yeah, we'll hand it to her to

2  refresh her memory on the date.

3        THE WITNESS:  July 14, 2013.

4  BY MS. BELL:

5        Q.    And that's your proffer letter; correct?

6        A.    Yes.

7        Q.    And that's with the authorities in

8  Michigan; correct?

9        A.    Yes.

10       Q.    And so you met with them shortly after

11  that; right?

12       A.    Yes.

13       Q.    On the 18th I believe it was?

14       A.    Okay.

15       Q.    And Ms. Klopf was there as well, right,

16  your first proffer?

17       A.    I believe so, yes.

18       Q.    Okay.  Then you -- after that you entered

19  into a plea agreement in Michigan; correct?

20       A.    Yes, I did enter a plea agreement in

21  Michigan.

22       Q.    And that plea agreement, as well as the one

23  here, has a cooperation component to it; isn't that true?

24       A.    Yeah.

25       Q.    And the cooperation agreement in Michigan

1    is pretty broad.  Would you say that's accurate?

2         A.    I -- I don't necessarily feel that way, but

3    if you do, that's okay.

4         Q.    Okay.  Well, you signed a contract, this

5    cooperation agreement, that obligates you to provide

6    truthful and complete information concerning all facts

7    known to you about the Michigan case and all others;

8    correct?

9         A.    Yeah.

10        Q.    And that was an agreement between you, the

11   Eastern District of Michigan and the Department of

12   Justice; correct?

13        A.    Yup.

14        Q.    And it covers this case and testifying

15   here; correct?

16             MS. KLOPF:  Objection, Your Honor.  Can we

17   have a sidebar?

18             (Whereupon, the following proceedings were

19   had at the bench outside the hearing of the jury:)

20             COURT REPORTER:  Judge, my transceiver

21   isn't working.  The battery is dead.

22             THE COURT:  I'm going to ask just Ms. Bell

23   and Ms. Klopf to come forward for a bench conference up

24   here.

25

1          MS. KLOPF:  I'm concerned we're getting

2    very close to the implication that somehow the Middle

3    District of Tennessee cooperation -- I'm sorry, the

4    Middle District of Tennessee -- the Middle District of

5    Tennessee plea offer was contingent on the cooperation.

6    That sounds like what the implication is, that she is --

7    you know, we've built up now what a big deal the Middle

8    District of Tennessee felony --

9          THE COURT:  You opened the door.

10          MS. BELL:  I mean, this is a cooperation

11    agreement like I've never seen before.  It basically says

12    you're going to cooperate everywhere.  And in exchange

13    for this cooperation --

14          THE COURT:  That's what all cooperation

15    agreements say.  They say you have to give us information

16    about any crimes you know about, period, paragraph.  And

17    there's no limit to the venue.

18          MS. BELL:  But it doesn't go on to say

19    this:  In exchange for your agreement to cooperation, you

20    will be permitted to plead guilty to two misdemeanors

21    instead of a felony.  They don't usually go that

22    specific.

23          MS. KLOPF:  That part I think is fair game.

24          MS. BELL:  I wasn't going into Nashville at

25    all.

```
 1                THE COURT:  It sounded like it.
 2                MS. KLOPF:  It very much sounded like it.
 3                MS. BELL:  If it did, I'm trying to --
 4                MS. KLOPF:  That's why I wanted to flag it.
 5  I think we're literally --
 6                THE COURT:  You're very close.
 7                MS. KLOPF:  From where I'm sitting, it
 8  sounds like --
 9                MS. BELL:  She actually already said it,
10  which, again, I should have moved for a mistrial.  She
11  said everybody got plea agreements.  I think we all heard
12  that.
13                THE COURT:  That's easily interpreted as I
14  learned about proffers because I'm a paralegal and
15  everybody gets plea agreements.
16                MS. BELL:  I think y'all just need to know
17  I'm trying to walk the line.
18                MS. KLOPF:  That's why I wanted to flag it.
19                THE COURT:  When was the plea offer?
20                MS. KLOPF:  July 3.
21                THE COURT:  In Tennessee?
22                MS. KLOPF:  In Tennessee.  We offered the
23  no time deal.
24                THE COURT:  Yeah.
25                MS. KLOPF:  But, yes, I understand plea
```

1  agreements are very broad, but I just -- I think we're
2  getting really close to the implication --
3                THE COURT:  Just be careful.
4                MS. BELL:  Yeah, I'm going to be careful.
5                THE COURT:  Yeah, that's fine.
6                MS. KLOPF:  We're good.
7                THE COURT:  Yeah.
8                (End of bench conference.  Whereupon, the
9  following proceedings were had in the hearing and
10 presence of the jury:)
11  BY MS. BELL:
12       Q.    Couple more questions about your
13 cooperation agreement.  Can you hear me okay?
14       A.    Yes.
15       Q.    So with this contract too you have to be
16 available for polygraph examinations at the government's
17 request; correct?
18       A.    Yup.
19       Q.    Anytime they ask; right?
20       A.    Yes.
21       Q.    Have they ever polygraphed you?
22       A.    No.
23       Q.    Okay.  And one other aspect of this plea
24 agreement with respect to Michigan is that it
25 specifically says in exchange for this broad cooperation

1  and to be available to testify whenever they want,

2  wherever they want, that they're going to drop your

3  felony charge and allow you to plead to two misdemeanors;

4  correct?

5          A.    Yes.

6          Q.    And part of your plea agreement in Michigan

7  also involves a recommendation, is it for probation or

8  supervised release?

9          A.    Probation.

10         Q.    To avoid jail time; correct?

11         A.    Yes.

12         Q.    And you understand, working at a law firm,

13 the difference between concurrent and consecutive

14 sentences or probation; right?

15         A.    I sure do.

16         Q.    And what do you understand that to mean?

17         A.    That if it's running consecutive, then it's

18 like it stacks over each other.  Right?

19         Q.    Yes.  It adds on one sentence or one

20 probationary period to the other; is that right?

21         A.    Yeah.

22         Q.    Do you have any agreement about your

23 Nashville sentence, potential sentence, and the Michigan

24 sentence regarding consecutive or concurrent sentences?

25         A.    I don't remember, to be fully honest with

1    you.  I'm sure there was discussion about it.  I don't

2    remember what the conclusion was.  I remember asking

3    about it, I don't remember the answer.  But I know in

4    Nashville and Tennessee it's almost identical.

5                    MS. KLOPF:  Your Honor, I'm sorry, I think

6    we need to approach again.

7                    THE COURT:  Okay.

8                    (Whereupon, the following proceedings were

9    had at the bench outside the hearing of the jury:)

10                   MS. KLOPF:  There is no sentence in

11   Tennessee.  It's -- it's a no time agreement.  She's just

12   agreeing -- it's a C deal to probation.

13                   MS. BELL:  That's what I was asking.

14                   THE COURT:  Well, she doesn't -- she hasn't

15   gotten there yet.  She doesn't know whether it's

16   concurrent or consecutive.

17                   MS. KLOPF:  No, but --

18                   MS. BELL:  She gets the probation, that's

19   what I was saying.

20                   MS. KLOPF:  I think, again, the implication

21   is that this is a much bigger, like, risk that she is

22   taking and that somehow she's been given this huge

23   benefit.  There is no concurrent agreement.

24                   THE COURT:  I don't believe -- has she even

25   testified that she has an agreement to a probationary

1  sentence in Nashville?

2                MS. KLOPF:  No, I don't think so.

3                THE COURT:  I don't think she has.

4                MS. BELL:  I've stayed completely away from

5  the sentence on purpose.

6                MS. KLOPF:  And I -- I do appreciate that,

7  but I mean, I know this is like the floor is lava, but I

8  am very concerned about the implication that there's

9  some --

10               MS. BELL:  All the time I'm trying to make

11 is this girl was stressed out.  She wanted certainty.

12 She approached, she entered into a cooperation agreement

13 so she could shut it down.

14               THE COURT:  She doesn't remember whether

15 it's concurrent.  So can you just move on to something

16 else?

17               MS. BELL:  Yes, I'm about done.

18               THE COURT:  Okay.

19               (End of bench conference.  Whereupon, the

20 following proceedings were had in the hearing and

21 presence of the jury:)

22  BY MS. BELL:

23       Q.   Just to kind of wrap this point up, you

24 approached the government about cooperating, correct?

25       A.   Correct yes, I did.

```
 1          Q.    During a stressful time?
 2                MR. CRAMPTON:  Microphone, please.
 3   BY MS. BELL:
 4          Q.    During a stressful time; correct?
 5          A.    Yeah.
 6          Q.    And you worked out a deal in your case;
 7   right?
 8          A.    Yes, I did.
 9          Q.    And it obligates you to cooperate for them?
10          A.    Yes, it does.
11          Q.    Okay.  And I think the last thing, just to
12   be clear, there's nothing at any time involved in this
13   March 5 incident that -- where anybody was threatening
14   violence, hurting anybody or damaging any property; is
15   that fair to say?
16          A.    Oy.  I mean, I don't feel like I can even
17   give a short answer to that question, to be honest.
18                THE COURT:  I think it's been asked and
19   answered.
20                MS. BELL:  I'll end right there.
21                Thank you, Your Honor.
22                MS. KLOPF:  Your Honor, I'm sorry.  Can we
23   approach one more time?  I'm so sorry.
24
25
```

1               (Whereupon, the following proceedings were

2   had at the bench outside the hearing of the jury:)

3               MS. KLOPF:  I think the thing we were

4   scared of happening just happened.  She said that she

5   approached the government first and then was offered a

6   plea agreement and --

7               MS. BELL:  She approached the government in

8   Michigan because that is what happened.

9               MS. KLOPF:  You just said plea agreement.

10  Like, and she -- she was not -- her offer here is not --

11  was not contingent on her plea.  Every single defendant

12  was offered that.

13              MS. BELL:  I'll clean that up.

14              THE COURT:  All right.  You clear it up and

15  you can clear it up again.

16              MS. KLOPF:  I will.  I just -- you know,

17  the problem is part of clearing it up, what we're all, I

18  think, worried about is bringing in that all of the

19  defendants got this offer and that hers was not --

20              THE COURT:  We don't have to bring that in.

21              MS. KLOPF:  I know, but right now the

22  timeline implies that -- I think you need to make clear

23  she got her offer in --

24              MS. BELL:  Yeah.

25              MS. KLOPF:  -- here first.  I think that

1  would remedy this.

2              MS. BELL:  Yeah, that's fine.

3              THE COURT:  And you may reinforce it.

4              MS. BELL:  It's totally fine.  I'll totally

5  fix that.

6              (End of bench conference.  Whereupon, the

7  following proceedings were had in the hearing and

8  presence of the jury:)

9   BY MS. BELL:

10        Q.    And I think you hit on this, but just so

11  that we're clear.  Just so that we're clear, prior to you

12  signing that proffer agreement, you did have an offer

13  from Tennessee?

14        A.    Yes.

15        Q.    You did not have an offer in Michigan;

16  correct?

17        A.    I don't specifically -- I really don't

18  remember, but I had an offer on the table in one of the

19  places.

20        Q.    In one of the places --

21        A.    Yes.

22        Q.    -- but not the other when you approached

23  the Michigan prosecution?

24        A.    I believe that's true, yes.

25              MS. BELL:  That's all we needed to clear

1  up.  Thank you, Ms. Davis.  Appreciate it.
2                 THE WITNESS:  You're welcome.
3                 THE COURT:  Who's next?
4                      **CROSS-EXAMINATION**
5   BY MR. PARRIS:
6          Q.    Ms. Davis, there's a lot of discussion
7   about your relationship with Mr. Zastrow.  And
8   specifically in this case there was a lot of discussion
9   about the planning of it.  And it was -- would it be fair
10  to say that it was meticulously planned?
11         A.    I guess so.  It was -- I thought it was
12  well planned for what it was.  I mean, if you're going to
13  plan to do something like that, I guess it was done well.
14         Q.    And I think you testified not only was it
15  well planned, but it was orderly and it was
16  nonthreatening; correct?  That was the plan?
17         A.    Well, I think I testified that it would
18  be -- I don't remember what the word was, if it was
19  threatening or not if a patient were to walk down the
20  hallway and see a bunch of people standing.
21         Q.    I'm not talking about what it was.
22         A.    I guess I used the word intimidating,
23  excuse me --
24         Q.    I'm not --
25         A.    -- so threatening, I guess not.

```
1           Q.    You through?
2           A.    Yes.
3           Q.    Okay.  I'm not asking about the act itself.
4   I'm asking about the plan.  The planning.
5           A.    Okay.
6           Q.    The plan was always to be, keep it well
7   ordered, to be exact with what you're doing, to not
8   threaten people, to not try and intimidate people, to
9   not -- to not do any of those things; wouldn't you agree?
10          A.    I believe the plan was to be peaceful and
11  it was well ordered.
12          Q.    Is that a yes --
13          A.    There was one part --
14          Q.    -- because I asked you --
15          A.    -- that you said I just didn't fully agree
16  with, but other than that.
17          Q.    What part?
18          A.    Well, I think inherently -- didn't you say
19  to not be intimidating?
20          Q.    I didn't say inherently to anything.
21                THE COURT:  Yes, you did say intimidating.
22                MR. PARRIS:  I said intimidating, but I
23  didn't say inherently, I don't think.
24                THE COURT:  No.  You said it was planned to
25  not be this, this, and one of those words was
```

1  intimidating.

2  BY MR. PARRIS:

3          Q.    Correct.  I mean, that's the plan.

4          A.    I just don't agree with that, but okay.

5          Q.    What makes you -- I mean, did they sit down

6  and say, okay, we're going to go in a big group so that

7  we can intimidate these people?

8          A.    I don't believe that in -- that the goal

9  was, let's go be intimidating, like that.  I believe that

10  the goal of what they wanted to do is inherently

11  intimidating.  I believe that.  You asked me if I

12  believe.  I gave you my answer.

13          Q.    That's not -- that was not the intent of

14  the question.  If I asked it that way, then that was my

15  fault.

16          A.    Okay.

17          Q.    I'm asking you what you heard and what you

18  saw of the plan.

19          A.    Okay.

20          Q.    And the plan was always to be well ordered,

21  to not do injury, not do harm to people.  They were there

22  to save lives; correct?

23          A.    Yes.

24          Q.    And to not be threatening, to not be

25  intimidating.  If a situation arose, not to escalate the

1  situation --

2          MS. KLOPF:  Objection, Your Honor.

3          MR. PARRIS:  -- that's the plan.

4          MS. KLOPF:  Compound question.

5          THE COURT:  Sustained.

6  BY MR. PARRIS:

7      Q.    Would you agree that it was -- that the

8  plan, now, not what actually happened, what the intent of

9  the plan was was to save lives first; correct?

10     A.    Yes.

11     Q.    Okay.  And to do that, the plan that was

12 made was to be well ordered, No. 1; right?

13     A.    Yes.

14     Q.    To be nonthreatening?

15     A.    I mean, I think that the goal was certainly

16 not to be threaten, not to be -- nonthreatening, but to

17 save lives.  I can agree with you that that was their

18 intentions.

19     Q.    I'm not asking about what happened.  I'm

20 asking about what the goal was and what the plan was.

21     A.    Yeah.

22     Q.    So the plan was not to be threatening;

23 correct?

24     A.    Yeah, I don't think their plan was be

25 threatening --

1          Q.     Or --

2          A.     -- I think it was to save lives.

3          Q.     I'm sorry, I didn't mean --

4                 THE COURT:  Wait until she's finished.

5                 MR. PARRIS:  I know.  That was my fault,

6     I'm sorry.

7     BY MR. PARRIS:

8          Q.     Nor to be intimidating.  None of these men

9     ever said anything about, we need to go in and be

10    intimidating, did they?

11         A.     None of them said we need to go in there

12    and be intimidating, that is correct.

13                MR. PARRIS:  That's all I have.

14                THE COURT:  Who's next?  Mr. Haymaker?

15                MR. THORNTON:  Thank you, Your Honor.

16                THE COURT:  Mr. Thornton.

17                      **CROSS-EXAMINATION**

18    BY MR. THORNTON:

19         Q.     Good afternoon, Ms. Davis.  My name is

20    Steve Thornton.  Just bear with me a minute while I move

21    this out of the way.

22                I would like to get a sense of chronology.

23    I know you said your views changed over time.  Did you go

24    to Reform Con in Phoenix, Arizona?

25         A.     Yes, I did.

```
1        Q.    And isn't that held in September?

2        A.    Yeah, I thought it was like fallish time.

3        Q.    That help your recollection?

4        A.    Yes, that does help.  Thank you.

5        Q.    You said there's a name of some person, is

6  it Augenbaugh?

7        A.    Zach Lottenschlager.  Is that what you were

8  looking for?

9        Q.    I'll have to come back to that, look at my

10  notes.

11              Now, I'll ask you a few questions again to

12  kind of give us a chronological perspective.  You may

13  have answered this before, but I want to make sure you

14  follow my question as I ask you.  You grew up in Atlanta;

15  correct?

16        A.    Till I was 11, yes.

17        Q.    And you said that you -- your mother took

18  you to abortion clinics often; is that correct?

19        A.    Starting at around age 7, yes.

20        Q.    Was that in Atlanta or other cities as

21  well?

22        A.    Atlanta.

23        Q.    Okay.  And I believe you said it was almost

24  every Saturday?

25        A.    Yes.
```

1        Q.     So that makes me think that you had quite a

2   bit of exposure to whatever you did at that age with your

3   mom at the abortion clinics?

4        A.     Yes.

5        Q.     Tell me what you did.  Did you stand on the

6   sidewalks?

7        A.     I stood on sidewalks, held signs.  My mom

8   encouraged me and my siblings to call out to the women

9   going into the clinics.

10       Q.     Did you try to talk to what you believed to

11  be expectant mothers?

12       A.     Yeah.

13       Q.     That's one of the goals, wasn't it?

14       A.     Yes.

15       Q.     To try to persuade them to not have an

16  abortion but to have an alternative?

17       A.     Yes.

18       Q.     Now, I'm going to ask you a question about

19  your understanding.  I want to explain, though, I'm not

20  going to ask you any legal conclusions, but because of

21  your testimony, I want to know what your thinking and

22  your understanding is.  Okay?

23       A.     Okay.

24       Q.     Do you believe that what you were doing

25  with your mom on the sidewalk was illegal?

1          A.     No.

2          Q.     Okay.  Now, you said that you held signs.

3   Did you believe that was illegal?

4          A.     No.

5          Q.     I want to try to make a precise distinction

6   here.  Did you stand always on the sidewalk or on the

7   grass beside the sidewalk in your growing-up years?

8          A.     It was always in the public right-of-way

9   wherever we were allowed to stand.  Sometimes it was a

10  grassy area, sometimes it was a sidewalk, sometimes it

11  was a parking lot.  It just depended where we were, but

12  it was always legal where we stood.

13         Q.     Yes, I want to understand what you mean by

14  that.  Is it legal to stand in the parking lot?

15         A.     It can be because they didn't own the

16  parking lot at that one abortion clinic that we would go

17  to in downtown Atlanta.  It just depends on the property

18  lines.  And my mom was aware of where those were.  We

19  never got in trouble.  We were friends with the police.

20         Q.     If you step off of that property line,

21  whatever the public property line is, and you step onto,

22  let's say, the business owner's property, do you think

23  that's trespassing?

24         A.     It can be if they ask you to move and you

25  stay there.

1        Q.    Thank you.  Thank you.  That's very

2    helpful.

3              Now, at some point you moved -- I believe

4    you said May 2017 you moved to Michigan?

5        A.    Yes.

6        Q.    Okay.  And you met your now ex-husband,

7    Mr. Davis?

8        A.    I met him before that in Florida at

9    college.

10       Q.    Okay.  That's helpful.

11             And you got married to Mr. Davis in

12   November of 2017?

13       A.    Yes, I did.

14       Q.    Now, let me not confuse these.  Now, when

15   you're there in Michigan, you said that you worked for a

16   while for an insurance company?

17       A.    I did.

18       Q.    And then -- but you -- nevertheless you did

19   some research, you found some local abortion clinics and

20   you began going out and standing on the sidewalks at the

21   abortion clinics?

22       A.    Yes.

23       Q.    And do you believe that was legal?

24       A.    It was legal, yes.

25       Q.    And were there people that joined you in

1  that exercise?

2       A.   Eventually, but I -- like, occasionally

3  there was this one guy that would come out and his name

4  was Bill and he just showed up randomly sometimes.  And

5  then eventually I met a guy from One Life Church that he

6  showed up and then he was there every single day after

7  that.  And he connected me to the Flushing Road abortion

8  clinic to meet the Zastrows and the Phillips.

9       Q.   Now, do you find that consistent with your

10  prior experience that people with a vision like yours

11  would show up at the same place you are to join you in

12  trying to rescue babies by talking to mothers from the

13  sidewalk?

14       A.   I think so.

15       Q.   Okay.  And your impression, your

16  understanding is that they were like-minded.  They

17  thought like you thought?

18       A.   Yes, I think so.

19       Q.   Now, you said that you had -- were put in

20  contact or recommended -- someone recommended that you go

21  to an abortion clinic, I believe -- I don't remember -- I

22  didn't write it down where you said.  Was it Flint,

23  Michigan you went?

24       A.   Flint, Michigan, Flushing Road.  It was an

25  abortion clinic on Flushing Road in Flint, Michigan.

1    Q.    And that's where you met the Zastrows?

2    A.    Yup.

3    Q.    And you joined them there in the exercise

4    to try to rescue babies --

5         MS. KLOPF:  Objection to the term rescue

6    babies.

7         THE COURT:  Excuse me?

8         MS. KLOPF:  Objecting to the term rescue

9    babies.

10         THE COURT:  Sustained.

11    BY MR. THORNTON:

12    Q.    Let me ask you, then.  You joined them in

13    the exercise of trying to persuade moms not to have

14    abortions?

15    A.    Yes.

16    Q.    And did you perceive the Zastrows to have a

17    like mind to yours that you wanted to be in the public

18    way or near the abortion clinic to try to persuade moms?

19    A.    I thought that theirs went far beyond mine,

20    and I wanted to be like that.

21    Q.    Okay.  Now, regarding what is a rescue,

22    there are a few different ways that word is understood;

23    correct?

24    A.    Yes.

25    Q.    Okay.  There are different types of

1  rescues, aren't there?

2      A.    Yes.

3      Q.    Rescue doesn't necessarily mean blocking

4  doors, does it?

5      A.    Not necessarily.

6      Q.    You've used the word rescue to describe

7  people just standing on the sidewalk, haven't you?

8      A.    I have.

9      Q.    And you've used the word rescue to describe

10 people standing on a public easement and calling out to

11 young women who are entering the clinic?

12     A.    I have.

13     Q.    And you've participated in rescues that did

14 not have any blocking involved?

15     A.    Yes, one.  One in particular.

16     Q.    Now, you have said some would say that

17 rescue could be just standing on the sidewalk and opening

18 your mouth to the weak and the destitute to quote

19 scripture.  You said that?

20     A.    Yes.

21     Q.    At some rescues you've attended, there

22 would be some individuals standing outside the building

23 trying to talk to people entering the building; correct?

24     A.    Yes.

25     Q.    Okay.  Now, you mentioned, but we didn't

get a very good description.  I want to ask you about --
the idea of handing out roses.  Some forms of rescue,
according to you, have people handing out roses; right?

      A.    I was just talking about red rose rescue.
It's a -- it's like a group of individuals who do rescues
where they try to not force people, but they want to try
and get closer to them and still have the opportunity to
talk to them even -- so that they can't walk away.

      Q.    You don't think that's illegal, do you?

      A.    It is illegal.  But it's like breaking the
trespassing law, not breaking FACE.  At least I don't
think it is, but...

      Q.    We don't have a good picture of where
they're handing out the roses.  Are they handing out the
roses at the front door of the building?

      A.    Generally they go inside the building with
moms and sit down in the waiting room with them.

      Q.    Now, if it's a building that's open to the
public because they're inviting you to come to the
business, whatever that business is, it's not trespassing
to go into that building, is it?

            MS. KLOPF:  Objection, Your Honor.

            THE COURT:  Sustained.  Asks for a legal
conclusion.

            MR. THORNTON:  Well, Your Honor -- thank

1   you.

2    BY MR. THORNTON:

3          Q.    I'm trying to get your understanding of

4   what is and what isn't okay for a rescue, trying to get

5   your understanding, whether you think that going in this

6   building to hand out roses is something that you can't do

7   because it's unlawful.

8                MS. KLOPF:  Objection, Your Honor, calls

9   for a legal conclusion.

10               THE COURT:  You're asking about -- okay,

11  and you're really asking for a legal conclusion.  And I

12  don't think I heard her yet talk about handing out roses

13  in connection with red rose rescue.  I heard you talk

14  about it.  I haven't heard her talk about it.

15   BY MR. THORNTON:

16         Q.    Okay.  Let me ask this way.  Did you

17  testify earlier about a red rose rescue?

18         A.    Yes, I did.

19         Q.    Okay.  Did you describe what that was

20  earlier?

21         A.    I described -- not anything about handing

22  out roses, but I did talk about how we broke the law just

23  in a different way.  So we trespassed.  So if you're

24  looking for my distinction, it's don't break the law.

25         Q.    Yes.  What I'm trying to find out, what you

1   mean when you say break the law by handing out roses.

2          A.    I never mentioned that.

3                MS. KLOPF:  Objection.  Yeah, misstates the

4   testimony.

5                MR. THORNTON:  I just asked her, I'm trying

6   to understand what she's testifying, Your Honor.

7                THE COURT:  What is the question?

8    BY MR. THORNTON:

9          Q.    I'd like to understand and ask you to

10  explain what you mean that is unlawful about the red rose

11  rescue.

12         A.    Okay.  I believe it's unlawful to trespass

13  on someone's property and then they say, get off my

14  property, and you say no and you stay there.  I think

15  that's illegal and it's wrong.  And I believe you can

16  save babies without doing that.

17         Q.    Yes --

18         A.    That's what I think is wrong.

19         Q.    That's not quite what I'm asking.  I'd like

20  to understand what transpires in the scenario that you

21  have in your head, but we'd like to understand, what

22  transpires?  Do they walk into an abortion clinic?

23         A.    Yes, in a red rose rescue most of the time

24  they will do that.  But in the one I participated in, we

25  trespassed by going on the concrete of their property.

1  And then when they said please leave, we didn't.  We just

2  kept coming onto the property until we got arrested.

3          Q.    Okay.  But in those scenarios where a

4  person goes into an abortion clinic building and they

5  aren't asked to leave, it's your impression or

6  understanding, they wouldn't be trespassing, would they?

7                  MS. KLOPF:  Objection, Your Honor, calls

8  for a legal conclusion.

9                  THE COURT:  Well, she's talking about --

10  I'm going to -- I'm going to deny the objection.  Go

11  ahead and answer the question.

12                  THE WITNESS:  If you're not asked to leave

13  and no one has a problem with you being there, I wouldn't

14  see that being illegal or an issue at all.  But in red

15  rose rescue, I have not seen that happen yet.  But,

16  again, like, if you're not asked to leave, of course,

17  then you're not breaking the law.

18  BY MR. THORNTON:

19          Q.    You testified about a rescue in October of

20  2021 that took place in Washington, DC.  You remember

21  that testimony?

22          A.    I do.

23          Q.    You were not one of the organizers of that

24  rescue, were you?

25          A.    I was not.

1          Q.    And I believe there was a meeting of

2    interested people held the day before the DC rescue?

3          A.    There was.

4          Q.    You attended that meeting along with your

5    friend Eva Zastrow?

6          A.    Yes, I did.

7          Q.    The two of you, you and Eva, had ridden

8    from Michigan the day before the rescue; correct?

9          A.    Yes, we did.

10          Q.    Before that rescue, you didn't know much

11    about it; correct?

12          A.    I did not know much about it.

13          Q.    Now, on the drive down you rode with -- or

14    rode in Ms. Heather Idoni's car; correct?

15          A.    Yes.

16          Q.    And you'd ask --

17               MR. CONWAY:  May we approach?

18               THE COURT:  Yes.

19               MR. PARRIS:  May I approach also,

20    Your Honor?

21               THE COURT:  Yeah, I think we'll call it a

22    day.  It's 5 o'clock.  Members of the jury, please do not

23    talk about this case amongst yourselves or with anyone

24    else.  Please do not do any research about anything or

25    anyone connected to the case.  Please ignore any news

1   coverage on any media.  Have a restful evening and we'll

2   see you back in the morning at 9 o'clock.  You're

3   excused.

4                   (Whereupon, at 4:59 p.m. the jury retired

5   from open court.)

6                   THE COURT:  I think you may step down.

7                   THE WITNESS:  Thank you.

8                   (Witness excused for the day.)

9                   THE COURT:  And you-all may sit down.  And

10  I can't remember who requested, was it Mr. Haymaker that

11  requested?

12                  MR. CONWAY:  It was me, Your Honor.

13                  THE COURT:  It was Mr. Conway, okay.  So

14  let's have our bench conference with the jury out.

15                  We do have a little questioning implicating

16  your client in another rescue.

17                  MR. CONWAY:  Yes, we do.  And he does not

18  represent my client.

19                  THE COURT:  Right.

20                  MR. CONWAY:  And we've been through this

21  extensively with the --

22                  THE COURT:  I ruled that it wasn't

23  admissible.  So why are you getting into it,

24  Mr. Thornton?

25                  MR. THORNTON:  I don't want to get into her

conversations with Ms. Idoni.  I want to get into her

understanding of what will be happening the next day.

            THE COURT:  Why do you have to include

Ms. Zastrow in this?

            MR. THORNTON:  You mean Ms. Idoni.

            THE COURT:  I mean Ms. Idoni in this.

            MR. THORNTON:  You know, in a refined

sense, I don't.

            THE COURT:  Okay.  Then you better stay

away from it.

            MR. THORNTON:  Okay.

            MR. CONWAY:  I talked to my client.  We're

not asking for a mistrial at this point in time.  I don't

think the bell was rung that loudly.  But, I mean, if we

cross the line, then I may have to just on her individual

behalf.

            THE COURT:  Yeah.

            MR. CONWAY:  I'm trying to be --

            THE COURT:  Understood.  Understood.

Understood.  I don't know why we got into that at all.

            MR. PARRIS:  Also on behalf of Calvin

Zastrow, there's -- I'd spoken with the government about

this, did not feel the need to file a motion in limine.

There was a -- in one of Ms. Davis's 302s I believe is

where it is, she states there's a reason she did not --

1 and I'm not going to state out loud -- that she did not

2 participate in the DC rescue. And we've discussed this.

3 And I trust that it's not going to be elicited.

4         THE COURT: Well, she's testified she

5 didn't organize it. And so far she's testified that Eva

6 Zastrow and she attended a meeting the day before. And I

7 don't know what minefield we're talking about.

8         MR. PARRIS: He was -- she gave a statement

9 that -- and I can't remember now whether she said it was

10 Eva that told her, whether it was Cal told her not to

11 go -- or not to participate because there was a

12 transsexual and a Catholic that were involved. Now,

13 there's a much longer story to that that's not involved

14 in the -- in the 302. I've spoken to my client about it.

15 It's not as bad as it sounds. There is some reasoning

16 behind it. But the reasoning was he didn't want his

17 daughter or them to be connected with it. Not because

18 they were Catholic, not because they were transsexual,

19 but for other reasons. But it's in the 302 like that,

20 and she's -- I think she may have even testified to that.

21 She did.

22         THE COURT: She hasn't testified to that.

23         MR. PARRIS: Not here.

24         THE COURT: No.

25         MR. PARRIS: In Washington.

THE COURT:  Well, then you need to talk to your co-counsel here and tell him what the minefields are and request that he not stumble into them and cause a mistrial.

MR. PARRIS:  Well, I did, but she's not his witness and she's not my witness.  So I think now I need the government to instruct her that if it gets anywhere near that to hold up because --

THE COURT:  What would she say about her participation in DC?  She's testified she went to a planning meeting the night before.  Then what would she say?

MS. KLOPF:  And she testified she rode the elevator and did five-minute (sic) sermons.  That was it. My understanding from talking about this -- because we weren't going to get into this, so it's a little rusty, but is that she either overheard a phone call or Eva Zastrow -- is that correct?  I think she overheard a phone call in which Mr. Zastrow told Eva Zastrow not to participate and said some things about the people who were participating.

I mean, frankly, I don't see how actually much of this at all is relevant.  I mean, I think there's actually a cutoff to where the relevance here actually gets to this trial.  I actually -- when I have the

opportunity, I also would like to raise something with
the Court about that last line of questioning if that's
all right.

THE COURT:  Well, this -- that's what we're
talking about is this whole Washington.  Why do you need
to get into what happened in Washington?

MR. THORNTON:  Your Honor, you've heard the
extensive testimony as she's implicating the intent of
these people to conspire to commit a crime.  In
Washington she participated in a rescue where she had no
intent of blocking the door.  And she communicated that
to Eva.  So I'm trying to navigate this minefield where I
get out of her an admission which it's in the --

THE COURT:  So what?  So what she didn't
intend to block a door in DC?  What's the relevance of
that?

MR. THORNTON:  The relevance is if she
knows that she can attend a rescue and not intend to
block the door, then she knows that there are other
people who attended the Tennessee rescue and didn't
intend to block a door either.  They intended to engage
in protected activity.

These people come together from various
sources.  Some of them, their only intent -- they never
agree to commit a crime or even commit the elements that

would constitute a crime.  What they intend to do from
the very get-go is to participate in an effort to save --
to persuade --

             THE COURT:  She's already talked about
blowfish who don't intend to block doors.  She's
testified at length about the fact that not everybody who
comes to these things intends to get arrested.

             MR. THORNTON:  But the blowfish terminology
tells the jury that they are participating in the
conspiracy -- in the conspiracy, the planning meetings,
and then the actual event.  They use the word blowfish
like -- the only reason they're there to be a blowfish,
to make it look like there's a lot of people there so
that these people can commit a crime.  These people
aren't there to help them commit a crime.  These people
are there for the First Amendment protected activity, and
that's their intent --

             THE COURT:  These people are also charged
with aiding and abetting.

             MR. THORNTON:  Yes, Your Honor.  And that
is an issue that we'll get to, but I believe the fair
process would allow us to elicit from her, she knows that
there are people there to engage in -- she won't know
First Amendment protected activity, I suppose, but we'll
use other language.  She knows they're not there to try

1  to break the law.  There are other reasons for being

2  there.

3  And if they have other reasons for being

4  there -- I mean, I can talk about United States versus

5  Falcone.  They have other reasons for -- even though they

6  know that these people may break the law, you've heard

7  her say that -- I believe it was my client, Coleman Boyd,

8  said you have to let the spirit guide you as to whether

9  or not you sit at that door, but there are other people

10  that say, I'm never gonna sit at that door.

11  In Washington, DC Caroline Davis was one of

12  those people.  She said, I knew I wasn't going to.  I

13  talked to my friend Eva and we said -- we told one

14  another we're not going to.  I don't need to ask about

15  what her dad told her, but Caroline Davis never intended,

16  in that rescue that she participated in, to engage in

17  illegal activity.  She intended to engage in legal

18  activity.

19  THE COURT:  We're not going to --

20  MS. KLOPF:  She admitted on the stand that

21  she was an aider and abettor and said that she was

22  criminally liable for what she had done, she just didn't

23  get charged.  During the course of her direct

24  examination, I very carefully questioned her on that and

25  she admitted that she aided and abetted, understood,

1    supported their actions in DC.  She just didn't
2    physically participate in the blockade.  But she admitted
3    legal culpability.
4              This is massively problematic because, A,
5    he's asking for the witness to draw a legal conclusion.
6    This is that whole First Amendment argument that we've
7    been grappling with over and over again, and it's just
8    being revisited in this second way.  He asked Ms. Davis
9    for a legal conclusion, asked her:  If you're not asked
10   to leave, you're not breaking the law; is that accurate?
11             And she said yes, because she is not a
12   lawyer and she doesn't understand.  In fact, doing that,
13   participating in this red rose rescue may, in fact, be a
14   FACE Act violation.  It could be an aiding and abetting
15   violation.  There's so many different ways that it could
16   be violated by asking her that question and leaving the
17   jury with that misunderstanding of the law.
18             We have a problem here that I object to and
19   I think needs to be cleaned up on the record tomorrow
20   morning because she -- she frankly -- oh, sorry.  The
21   suggestion -- I think what we're getting to is the
22   suggestion that Coleman Boyd's departure when the police
23   officers told him to leave somehow absolves him of any
24   sort of guilt of this when he's charged with aiding and
25   abetting and he's charged with conspiracy.  I think

1  that's the direction we're going, and that's an

2  inappropriate line of argument.

3          MR. THORNTON:  Your Honor, if I may, if

4  Coleman Boyd came there to livestream and to publicize,

5  he was doing the same thing that the television cameraman

6  was doing there.  He's exercising his right to free

7  speech and free press.

8          THE COURT:  We don't know who that

9  cameraman was.  Does anyone know who that cameraman was?

10         MS. KLOPF:  No.  She testified she actually

11 did not know who she (sic) was.  There are plenty of

12 people who are co-conspirators on those videos who just

13 aren't charged, frankly, in part because they're not

14 identified.  But there are -- there's a massive number of

15 co-conspirators in that hallway who are all engaging in

16 the same activity and order with the same end result,

17 trying to keep people from getting into the clinic.

18         MR. THORNTON:  Your Honor, the government

19 has to draw that conclusion to make that argument.  We

20 can't draw that conclusion until we have the evidence.

21 And the evidence -- by the way, one of the exhibits the

22 government gave us has an interview of Paul Vaughn by the

23 television cameraman.  I'm not saying that the guy in

24 their clips was a television cameraman.

25         THE COURT:  You're talking about the guy

1  outside.

2  MR. THORNTON:  Yes.  Wherever he was.  I

3  don't know who the guy in the hall was, whether he was a

4  TV cameraman or not.

5  MS. KLOPF:  I can say with -- my

6  understanding of everything, that man inside was not from

7  the news.  The video that we pulled is from Fox news, and

8  is from --

9  THE COURT:  It is not the same source.

10  MS. KLOPF:  Yes, exactly.

11  MR. THORNTON:  We don't have to know that

12  answer.  But if the guy, the cameraman was there not to

13  aid the blockade, just to publicize the event, trying to

14  do his own -- make his own blog post or whatever he's

15  doing, he was trying to publicize something that he

16  thought was of public interest, he's not conspiring and

17  he's not participating in the blockade.

18  Coleman Boyd, he says, I'm going to

19  participate in what y'all do, but I'm going to do it

20  legally.  I'm going to exercise my right to First

21  Amendment protected activity beside you while you do

22  whatever you're going to do.  I may know what you're

23  going to do, but under *United States Falcone*, that's not

24  sufficient.

25  THE COURT:  We're not making closing

1  arguments at this point.  Okay?

2              MR. THORNTON:  Okay.

3              THE COURT:  I'd like to focus on the

4  questioning of this witness.  I'll look forward to the

5  government making some kind of a proposal about how you

6  feel that this problem that her saying that, if you're

7  not asked to leave you're not doing anything illegal, how

8  you want to try to resolve that.  I think you can resolve

9  it on redirect of her pretty easily.

10             But your questioning her about her -- her

11 intent, that's what you want to ask her about.  So tell

12 me exactly what you want to ask her.

13             MR. THORNTON:  I want to -- she has made --

14             THE COURT:  You're talking about in DC.

15             MR. THORNTON:  Well, she's made statements

16 in her proffers and in her testimony in DC about what she

17 intended that day and what she thought other people were

18 intending.  She extrapolates into others an evil intent,

19 which gives herself an out.  I want to ask her about her

20 statements in the proffer that express her intent in DC

21 and her summary of what other people were doing.  There

22 were other people who were not participating in the

23 block.  She was not participating in the block.  She

24 never intended to participate in the blocking.  She

25 intended to ride an elevator or stand outside.  That was

1  her intent the day before in the meetings.

2             So while other people are talking about

3  whatever they're talking about, she's intending not to

4  participate in the illegal activity.  She wants to do

5  legal activity.

6             THE COURT:  Well, you can ask her what she

7  intended to do, but you cannot ask her if she intended to

8  do something illegal.

9             MR. THORNTON:  I almost have to ask her did

10  she intend to do something legal.  That's part of the

11  intent.

12             MS. KLOPF:  On direct she already conceded

13  that she did something illegal.

14             MR. THORNTON:  That's not consistent with

15  her proffers.

16             THE COURT:  Well, then you can impeach her

17  on her proffers.

18             MR. THORNTON:  I'm trying to get there,

19  Your Honor.

20             THE COURT:  You can impeach her on her

21  proffer.

22             MR. CRAMPTON:  Your Honor, if I may just

23  interject in that context, the government has elicited

24  from the witness a pure legal conclusion, but now we're

25  being prohibited from inquiring about those same kind of

1  legal conclusions.  Seems to me this is a two-edged

2  sword.

3              THE COURT:  What did the government elicit

4  from her in terms of a legal conclusion specifically?

5              MR. CRAMPTON:  As counsel just alluded to,

6  among others, the fact that she claims now that she was

7  clearly guilty in DC of aiding and abetting and so forth

8  and conspiracy.  That sounds like legal conclusion.

9              MS. KLOPF:  It was not that black and

10  white.  Hang on.

11             THE COURT:  I don't think it was that black

12  and white.  She indicated she was not indicted.

13             MR. THORNTON:  Well, Your Honor, she just

14  testified while I was asking her questions that she was

15  guilty.  She was guilty of breaking a law.  Either that's

16  a legal conclusion, which I submit to you if she gives us

17  her impression, her belief or understanding, she's

18  getting to her intent.  And that's what we're entitled to

19  ask about, her specific intent.

20             Because the government is going to say that

21  her intent reflects on the intent of the people who met

22  the day before.  They're going to offer argument that

23  circumstantial evidence, while it's just what Caroline

24  Davis intended, so that's what everybody else attending

25  that meeting intended, and that is not consistent with

her own past conduct, her own proffer or what actually
happened, particularly as it concerns my client.

          THE COURT:  Well, your -- I'm going to ask
the court reporter to find for us and send a rough copy
of -- I think it's pretty early in her testimony, when
she's talking about Washington.

          MS. KLOPF:  It's very early.

          THE COURT:  And you certainly can impeach
her if she has made an inconsistent statement about
Washington.  Okay?

          MR. THORNTON:  Yes.  Let me add to it.  I
want to use those statements to show that she expressed
what her intent was in Washington.

          THE COURT:  Yeah.  Well, we will -- we
will -- we will look at her testimony and see if she
expressed her intent of what she was going to do in
Washington and you can impeach her on that.

          I don't believe that she has testified --
are you alleging that she has testified to what -- she
testified about the planning and what people said.  Are
you saying that she has testified to what other people's
intent was?

          MR. THORNTON:  Does your question mean what
she testified to today or what she testified --

          THE COURT:  Yeah, today.

1          MR. THORNTON:  Today?

2          THE COURT:  Today.  I don't believe she's

3    been allowed to testify to the intent of these

4    defendants.  I think I would have gotten an objection

5    that I would have sustained.

6          MR. CRAMPTON:  I think Mr. Parris asked her

7    some intent questions about the other defendants and she

8    responded.

9          THE COURT:  Mr. Parris did?

10         MR. CRAMPTON:  Yes, ma'am.

11         THE COURT:  Well, once again, you need to

12   keep your co-counsel in check.

13         MR. THORNTON:  Your Honor, if I may,

14   whenever -- I'm sorry.  Whenever they asked --

15         THE COURT:  He asked about -- he asked

16   about the goal.  He asked about the goal.

17         MR. CRAMPTON:  Yeah, he asked specifically

18   about intent.

19         THE COURT:  That's pretty close to intent.

20   I don't remember anybody else objecting.

21         MR. CRAMPTON:  True.  I believe the

22   government also asked her the group intent.  There were

23   questions about group intent.

24         THE COURT:  I don't think it was worded in

25   terms of intent.  It might have been worded in terms of

1   goal.

2           MR. THORNTON:  One of those is worded in

3   terms of blowfish, what's a blowfish, what do they do,

4   why are they there.  She's extrapolating what are they

5   thinking, why are they there, what's their plan.

6           THE COURT:  No, she's saying what they're

7   going to do.

8           MR. THORNTON:  She's telling you that

9   the -- if she said that from her perspective they were

10  blowfish, that's one thing.  But she said it was their

11  intent to be blowfish, that's another thing.  She doesn't

12  say it was their intent.  She said, oh, they were

13  blowfish.  Oh, the blowfish are leaving now.  And I think

14  she even said on the video, oh, the blowfish are leaving

15  now.  She's calling them blowfish, but she's

16  extrapolating -- and this is what they're going to ask

17  the jury to do, oh, those people the day before, they

18  were planning on being blowfish.

19          Well, they might not have been planning on

20  being blowfish.  They might have been planning on, like

21  my client, exercising his First Amendment rights, okay.

22  He wasn't a blowfish.  He wasn't there to be a blowfish.

23  He was on the other end of the hall.  Does that make him

24  a blowfish?  The testimony was in every case broad.  It

25  applies to everybody.  She didn't say John was a

blowfish.  She said, there goes the blowfish.  They're
there for that purpose.

That purpose says either somebody has a
plan.  Who has that plan?  And did this person say, oh, I
agree to that plan.  And this is the crux.  Did that
person agree to be a blowfish or did that person agree to
participate in trying to reach young mothers because the
intent, the specific intent of the agreement that you're
agreeing to or the terms of the agreement has to be
unlawful conduct.

As we said, they don't have to know all the
details of the law, but they have to have a specific
intent to do something, commit acts, the choate offense,
they have to have that specific intent to do that.  And
the government has to prove that they have the specific
intent.  And they're using Caroline Davis to say, oh,
they had this intent and they planned it the day before.

THE COURT:  That they aided and abetted the
intent.

MR. THORNTON:  That's a different crime
than conspiracy, Your Honor.

THE COURT:  I know, but they're charged
with aiding and abetting.

MR. THORNTON:  Granted, but I'm asking
questions to get to the heart of conspiracy.

1          MS. KLOPF:  And the conspiracy is to

2 violate a right, like to -- interfere with the right.  It

3 doesn't matter if you do it by aiding and abetting.  It's

4 about the agreement.  The ultimate agreement by all the

5 parties, but injecting this concept of trespassing if

6 someone tells you to leave that somehow you've insulated

7 yourself from being part of the conspiracy that has

8 nothing to do with trespass is invading the province of

9 the jury and the fact finder in terms of what they're now

10 left with the impression that somehow by her, you know,

11 not doing X, Y and Z she has agreed with this idea that

12 she has not committed a crime, which is frankly -- maybe

13 she's not committed a state crime, but she still could

14 have committed a federal crime, which is what we're

15 dealing with here today.

16          And so taking this a little bit away from

17 the kind of DC issue of the 404(b), but, like, whether or

18 not she walks into that crime thinking that she is

19 committing a crime, if she is intending to commit the

20 elements of what constitutes a crime, then she has

21 committed a crime.  That's what's happening here.  And

22 trying to inject this through Caroline Davis and insulate

23 Mr. Boyd through that argument is completely

24 inappropriate.

25          MR. THORNTON:  But she made statements that

1 she never intended to block.  And she made statements as

2 that was the crime.  Not that --

3                THE COURT:  She doesn't get to say what the

4 crime is, Mr. Thornton.

5                MR. THORNTON:  Yes, Your Honor.

6                THE COURT:  Even if she said it in a

7 proffer, she doesn't get to say what the crime is.

8                MR. THORNTON:  But she gets to say what her

9 intent is.

10                THE COURT:  Yeah, she can say -- she can

11 say what her intent was.

12                MR. THORNTON:  And on the stand she's

13 saying what the blowfish's intent was.

14                THE COURT:  She talked about that in

15 general.  And we haven't called anybody a blowfish here,

16 I don't think.

17                MR. THORNTON:  Well, the people were

18 leaving and she said, there goes the blowfish.

19                THE COURT:  So what?  So what?

20                MR. THORNTON:  That would include my

21 client.

22                THE COURT:  That's not relevant.  She's

23 talking in general about what these -- these rescues are.

24 She's talked about the roles of various people.  But she

25 hasn't said that any of these people were blowfish or not

1 | blowfish.

2 |         MR. THORNTON:  When she talked about the

3 | roles of the people, are these roles that were assigned

4 | by someone or agreed to by someone?

5 |         THE COURT:  Mr. Thornton, I can't answer

6 | all your questions.

7 |         MR. THORNTON:  I'm not asking you to

8 | answer --

9 |         THE COURT:  You can ask her about her

10 | intent.  You can impeach her.  You can impeach her if she

11 | has made an inconsistent statement.

12 |         MR. THORNTON:  Yes.

13 |         THE COURT:  We will all see what she said

14 | about Washington.  And we will decide whether that's

15 | appropriate impeachment.  You will clear up on redirect

16 | that she doesn't know what's legal and what's illegal.

17 |         MS. KLOPF:  I would just ask for a little

18 | leeway on those questions.

19 |         THE COURT:  I will give you some leeway on

20 | those questions.

21 |         Now, who else has complaints over here?  I

22 | see a lot of grumbling.  Speak up or forever hold your

23 | peace.

24 |         MR. HAYMAKER:  No complaints, Judge.  No

25 | complaints, other than I'm hungry.

1          THE COURT:  I want to resolve as much of

2    this tonight as we can.  We can't until we get that

3    transcript fully.

4          MR. CONWAY:  I would just ask that

5    everybody not mention Ms. Idoni in Washington.  Everyone.

6          THE COURT:  All right.  We're in recess.

7          (Whereupon, at 5:23 p.m. these were all of

8    the proceedings had in the above-captioned cause on the

9    above-captioned date.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE PAGE

 2

 3          I, Roxann Harkins, Official Court Reporter for

 4   the United States District Court for the Middle District

 5   of Tennessee, in Nashville, do hereby certify:

 6          That I reported on the stenotype shorthand

 7   machine the proceedings held in open court on

 8    January 25, 2024, in the matter of UNITED STATES OF

 9   AMERICA v. CHESTER GALLAGHER, ET AL., Case No.

10   3:22-cr-327; that said proceedings were reduced to

11   typewritten form by me; and that the foregoing transcript

12   is a true and accurate transcript of said proceedings.

13

14          This is the 12th day of March, 2024.

15

16                       s/ Roxann Harkins____
                         ROXANN HARKINS, RPR, CRR
17                       Official Court Reporter

18

19

20

21

22

23

24

25
```